**UNITED STATES v. SUGAR INSTITUTE, Inc., et al.**

District Court, S. D. New York.
March 7 and Oct. 9, 1934.

John Lord O'Brian, Asst. to Atty. Gen., Harold M. Stephens, Asst. Atty. Gen., James Lawrence Fly and Walter L. Rice, Sp. Assts. to Atty. Gen., and George Z. Medalie, U. S. Atty., of New York City, for the United States.

Cadwalader, Wickersham & Taft, of New York City (Cornelius W. Wickersham and Arthur L. Fisk, Jr., both of New York City, of counsel), for defendants Spreckels Sugar Corporation, Rudolph Spreckels, Edgar H. Stone, and W. W. Harper.

Sullivan & Cromwell, of New York City (John C. Higgins, of New York City, John Dickinson, of Washington, D. C., and Hyman Zettler, S. Pearce Browning, Jr., and Parker McCollester, all of New York City, of counsel), for the other defendants.

MACK, Circuit Judge.

By petition filed March 30, 1931, the United States seeks a decree under the provisions of the Sherman Act and acts amendatory thereof and supplemental thereto (15 U.S.C.A. § 1 et seq.), dissolv-ing the Sugar Institute, a trade association incorporated under the laws of New York, and enjoining certain corporations, firms, and individuals, defendants herein, from engaging further in an alleged conspiracy in restraint of interstate commerce in sugar. In addition to the Institute, the defendants are fifteen sugar refinery companies which either have been or are members thereof and various individuals who either have been or are active in its management and in the direction of the activities alleged to constitute the conspiracy.

The testimony is transcribed in over 10,000 typewritten pages; more than 900 exhibits covering many thousands of pages were introduced in evidence.

The petition charges a comprehensive conspiracy affecting almost all phases of the sale and distribution in the domestic markets of domestic refined cane sugar, and incidentally beet and offshore sugar. The complicated and frequently disputed issues of fact and of law involved must be approached with the more important factors of the sugar industry in mind.

I. Background.

The Institute was organized in December, 1927, and began operation the following month. The scope of its activities may be gathered to some extent from its "Code of Ethics," reproduced in the Appendix hereto. The implications of the code were worked out in great detail by "interpretations" adopted pursuant thereto. The code, together with these rulings the nature of which is hereinafter more fully described, reveals much of the purpose and plan of the Institute.

The Institute members refined practically all of the imported raw sugar processed in this country. They describe their product as "domestic refined." In recent years, the wholesale value thereof has been as much as $500,000,000. Prior to the Institute, they provided in excess of 80 per cent of the sugar consumed in the United States. They have since supplied from 70 per cent. to 80 per cent. thereof; in some states, particularly in the New England and Middle Atlantic areas, they have supplied in excess of 90 per cent.; in only a few states throughout the country is their share less than 55 per cent. Ex. E-15.[1] Manufacturers of beet and of domestic

---

[1] Unless otherwise stated all figures herein are taken from defendants' data. All figures are exclusive of corn sugars.

The record does not reveal the extent to which they enter into competition.

cane sugar and cane refineries located in the insular possessions and foreign countries provide the remainder of the nation's supply.

Domestic refined, beet sugar, and foreign and insular refined known in the trade as "offshore" refined, constitute about 99 per cent. of the nation's supply. The balance, which consists of domestic cane grown and refined principally in Louisiana, is not, so far as the record shows, an important factor in the national markets. Quantities of various sugars used in the United States in recent years are shown in Ex. D-15.[2]

Defendants' refineries are located in the vicinity of Boston, New York, Philadelphia, Baltimore, Savannah, New Orleans, Galveston, and San Francisco. Only two defendants operate more than one plant: The National Co., with three refineries near New York: the American Co., with refineries in or near Boston, New York, Philadelphia, Baltimore, and New Orleans. In 1927, American accounted for 25.06 per cent. of all sugar produced by defendants, National, for 22.07 per cent.; the others in that year ranged from Henderson's 1.13 per cent. to California and Hawaiians' 10.84 per cent. Ex. Y-14. Capital employed ranged from Henderson's $2,037,975 to American's $119,854,340. Ex. E-17.[3]

Raw cane sugar used by defendants is imported principally from Cuba and to some extent from the insular possessions. It is obtained by clarifying juice extracted from the cane at mills near the plantations. The raws, which usually contain about 96 per cent. pure sucrose, are further clarified and purified at defendants' domestic plants to produce sugar 100 per cent. sucrose and ready for consumption. Ample supplies of raw sugar in a steadily declining [3a] market have been available since the formation of the Institute.

The government does not contest defendants' claim that the refined sugar produced by them is, as to physical and chemical properties, a thoroughly standardized commodity. It is undisputed that at least since the Institute, the product of the various defendants has generally sold at a uniform price in any given trade area. The government insists, however, as a basis for contentions hereinafter discussed, that because of certain preferences created by advertising and other means, the sugars of the several defendants are economically different products.

Beet sugar for many years has been an important factor in the domestic market, and offshore sugar, since the Institute, has increasingly become such. See note 2, supra. Either or both offer some competition to defendants' product in nearly all trade areas (Ex. E-15), and each has always sold at a differential below domestic refined.

The sugar beet is grown and the sugar therefrom produced and sold chiefly in the Middle and Far West, providing in some states well over 75 per cent. of the supply. It competes, too, with other sugars, in a number of Southern and Middle Atlantic States. Ex. E-15. Although for most purposes practically identical with domestic refined, it has ordinarily, for several reasons, sold at a differential of 20 cents per hundred pounds. In the early years of the beet sugar industry, the grade was inferior;

---

2 EXHIBIT D-15

(Unit = 100 lb. Bag)

| | 1927 | | 1928 | 1929 | | 1930 | | 1931 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amount | % of Total | Amount | % of Total | Amount | % of Total | Amount | % of Total | Amount | % of Total |
| 1. Domestic Cane Sugar Refiners | 99,061,118 | 82.5 | 95,259,545 | 76.0 | 99,910,673 | 78.5 | 97,645,582 | 76.2 | 88,068,308 | 71.0 |
| 2. Domestic Beet Sugar | 17,308,502 | 14.4 | 23,741,591 | 19.0 | 19,073,035 | 15.0 | 21,209,629 | 16.6 | 25,385,504 | 20.5 |
| 3. Foreign & Insular Refined Cane Sugars | 3,407,514 | 2.8 | 5,533,969 | 4.4 | 6,999,579 | 5.5 | 7,954,681 | 6.2 | 9,647,241 | 7.8 |
| 4. Louisiana Direct Consumption Cane Sugar | 400,000 | .3 | 800,000 | .6 | 1,250,000 | 1.0 | 1,250,000 | 1.0 | 950,000 | .7 |
| Total | 120,177,134 | 100.0 | 125,335,105 | 100.0 | 127,233,287 | 100.0 | 128,059,892 | 100.0 | 124,051,053 | 100.0 |

3 In 1931, American's share of defendants' production was 27.12 per cent.; National's, 19.27 per cent., others from Henderson's 1.49 per cent. to C. & H.'s 13.09 per cent. Ex. Y-14. Capital employed ranged from Henderson's $2,138,902 to American's $116,090,904. Ex. E-17.

3a From time to time, as recently, there have been rises.

thus, a prejudice grew up against it, which to some extent has carried over to the present time. Beet sugar, unlike domestic refined, is not sold in full assortments of grades and packages and is therefore less attractive to the trade. While 20 cents has been the customary differential, at various times and localities, it has ranged from 10 cents to 35 cents both before and since the Institute.

The relation of the Domestic Sugar Bureau to the beet manufacturers is similar to that of the Institute to the domestic refiners. They were informally organized at about the same time. A few months later, in the spring of 1928, the Bureau was incorporated, with headquarters in Chicago. Its "Code of Ethics" is substantially identical with that of the Institute and is admittedly patterned after it. While defendants insist that the two trade associations are entirely independent, they freely admit that the Institute has sought and obtained a high degree of co-operation from the Bureau in practically all of its activities. Joint meetings have been held, questions of policy have been discussed, and action jointly taken. The two associations have continuously communicated by letter, telegram, or personal contact of their officials. The evidence, however, does not support the contention that defendants have effected an agreement with the producers of beet sugar, through the Bureau, to maintain a fixed 20 cents differential, even though that differential may have prevailed more consistently since the creation of the Institute than theretofore.

Offshore sugar, which is practically a new factor in the domestic market, is refined principally in Cuba and to some extent the insular possessions. Its sale in this country is in the hands chiefly of four selling agencies. Its important trade areas have been Middle Atlantic and Southern States, although substantial quantities of it have also been sold in other parts of the country. In some states, it has provided from 25 per cent. to 40 per cent. of the total supply. With the exception of Hershey sugar, represented by H. H. Pike & Co., all of it is sold at a differential from 5 cents to 10 cents below defendants' sugar. This is due to the fact that it has not been in the market long and also because it is offered in a limited assortment of grades and packages.

An agreement with the offshore interests (except Hershey) to sell at a fixed 5-cent differential is charged against defendants. The government relies, in this connection, on a letter written by the executive vice secretary of the Institute, in which the statement is made that, "the Armstrong people [representative of an offshore refinery] * * * had sold their sugars strictly in accordance with our Code Rulings on a price differential of 5¢." Ex. 324. While this might be susceptible of the inference, as contended, that the 5-cent differential was the result of an agreement, the explanation offered therefor by defendants, that it was merely expressive of the fact that Armstrong had sold at such a differential, is equally plausible. In view of the lack of other evidence to support the government's charge and the failure to refute defendants' evidence of a varying differential, I cannot find that any such agreement was made by them with the offshore interests even though, as defendants freely admit, co-operation has been sought and obtained in many activities. Certain alleged activities, however, are denied by defendants; of course, as to these they likewise denied having sought such co-operation.

There is one other important factor in the sugar industry, which the government charges has also been drawn into the conspiracy by defendants. The sugar merchandising firm of W. H. Edgar & Son of Detroit, although not directly engaged in the refining of sugar, offered substantial competition to some of the defendants by reason of its manifold activities. In 1928,* it merchandised, according to testimony of the head of the firm, about 2 per cent. of all the sugar consumed in the United States.[4] It distributed both cane and beet sugar and was sales agent for some beet companies in which the Edgar family was heavily interested. In addition, the Edgar family controlled the Edgar Sugar House,

---

*The court's special findings of fact, pursuant to Equity Rule 70½, 28 U.S. C.A. following section 723, filed together with the decree subsequent to its opinion, modified this as follows: "11. The firm of W. H. Edgar & Son of Detroit * * merchandised about 2% of all the sugar consumed in the United States * * *. (Opinion * * * modified * * *.)"

[4] This is considerably more than the individual output of three of the smaller refineries which were members of the Institute.

which engaged widely in the storage of sugar and also acted as sugar brokers. The Edgar interests, moreover, operated a chain of cash and carry sugar stores in Michigan, Indiana, Ohio, New York, West Virginia, and Pennsylvania. The Institute sought and obtained from the Edgar interests a high degree of co-operation.

## II. Pre-Institute Secret Concessions.

Defendants assert that for a number of years prior to the formation of the Institute, the sale and distribution of sugar had become increasingly characterized by grossly unfair and uneconomic practices. This situation, defendants urge, provides a complete legal and economic justification for the steps taken through the Institute to correct it.

Defendants assert that the sugar industry has always purported to be one in which the product was sold on open published prices and that this in fact was done up to the year 1924. During the period 1917 to 1919, when the industry was under governmental control, prices were fixed and all forms of concessions and rebates were forbidden by the government. But beginning perhaps as early as 1921 and increasingly thereafter, the practice developed on the part of some but not all refiners of giving secret concessions from their basis prices.[4a] Arbuckle, California & Hawaiian, Henderson, Revere, & Western were the exceptions.[5] They have never indulged in the practice of secret concessions. The so-called "unethical" refiners, however, gave secret concessions and rebates in 60 per cent. to 70 per cent. of the sugar sold by them in 1927, as estimated by one of defendants' principal witnesses. R. 4594.[**] The need of secrecy was urgent, for if and as soon as it became known that a specific concession was grant-

ed, it would be generally demanded. That concessions and rebates were widely granted was of course generally known in the trade. Each refiner, too, was able to find out in a general way the approximate prices and terms of his competitors. Moreover, many of the contracts carrying concessions revealed that fact on their face. But in the conditions prevailing prior to the Institute, it was impossible for refiners and purchasers to know with any degree of accuracy what prices and terms were granted in the innumerable transactions. The mere fact that many of the larger customers of the "unethical" refiners not infrequently received no concessions indicates that the efforts at secrecy were at least fairly successful.

Various causes undoubtedly contributed to the development of these selling methods. Probably chief among them is the substantial overcapacity since the war, stated in defendants' answer to be about 50 per cent. Among other causes assigned by defendants were: (1) The lack of statistical information as to the amount of production, deliveries, and stocks on hand, causing overproduction; (2) the uncertainties which prevailed in the raw market during this period and which made the refined sugar industry highly speculative; (3) the fact that since 1922, most sugar has been sold through brokers and is thus somewhat outside of the refiners' control; and (4) the standardization of the several defendants' sugar, which has made their sale depend almost entirely upon prices and terms offered.

The concessions granted were largely, although not entirely, arbitrary in character. While they were given principally to the large buyers of sugar, no system was followed in this respect; they were fre-

---

[4a] Defendants' sugar is quoted at so much per pound per 100-pound bag of "fine granulated" or "granulated." This is called the "basis price"; contracts are closed with reference to it, but the purchaser has the option at stipulated differentials to specify for delivery under the contract an assortment of grades and packages.

[5] In 1927, these five refiners accounted for 25.45 per cent. of all sugar produced by defendants; in 1931, for 28.54 per cent. Ex. Y–14.

[**] The court's special findings of fact modified this as follows: "20. Beginning perhaps as early as 1921, and increasingly thereafter, the practice developed on

the part of some but not all refiners of giving secret concessions, actually or in effect from their basis price, in the highly competitive areas. Arbuckel, California & Hawaiian, Henderson, Revere and Western never indulged in this practice. The other and so-called 'unethical' refiners gave secret concessions and by 1927, such concessions were given on a very substantial amount of all the sugar sold by them in the territories in which such concessions were granted. By fair estimate, at least 30% of all sugar sold by the Institute members in the United States in 1927 carried secret concessions of some kind. (Opinion * * * modified * * *.)"

quently granted to the smaller purchasers as well. Defendants assert that the refiner was thus largely at the mercy of the purchaser, who, in order to secure a particular concession, would falsely represent that he could get it from a competitor. While there is little direct evidence that such misrepresentations were extensively resorted to, nevertheless the refiners' fears in this respect appear to have been genuine.

Defendants further claim that the discriminatory nature of the concessions which were granted, was leading to the creation of monopolies among the distributors; that the leaders, most successful in obtaining concessions, were thereby potentially enabled to, and in fact to some extent did, secure monopolies in their respective trade areas. Some smaller distributors, defendants contend, had thus been put into so disadvantageous a position that they were disinclined to push the sale of sugar and as a result, in 1927, per capita consumption fell off about 10 per cent.

It may well be that such discriminatory concessions tend to create territorial monopolies in sugar distribution. The evidence shows that certain smaller distributors did suffer because of the advantages enjoyed by the larger ones, such as W. H. Edgar & Son. But I believe that the advantages enjoyed by them and by several other large distributors were in largest measure attributable to their greater efficiency. Moreover, there is no substantial evidence that these distributors in fact obtained such monopolies.

With respect to the falling off of consumption in 1927, it must not be overlooked that, as one of defendants' principal witnesses indicated, the "slimness campaign" of 1927 had a substantial effect in discouraging the use of sugar. R. 4598. There is, however, some evidence that distributors of sugar did refrain from pushing it because they could not sell it profitably.

Defendants' contention that "the refiners who did not indulge in concessions were well on their way to becoming martyrs," and that "their problem was how long they could survive" (Fact Brief, pp. 9, 10), is without substantial support in the evidence. While the "ethical" refiners may have been inconvenienced through the sales methods of some of their competitors and probably believed its effect on them to be harmful, they had no part in the first steps taken to form the Institute and were in no danger of being eliminated from the industry. Three of the five refiners who suffered losses in the year 1927, when the profits for the industry as a whole showed a substantial decline, were "ethical" companies. But the deficit shown in the statement of one of them, California & Hawaiian, is without much significance because of the special arrangement subsisting between C. & H. and its parent corporation, the owner of sugar plantations in Hawaii. Moreover, despite the "fair competition" inaugurated by the Institute, two of the "ethical" companies showed substantially less profits for the post-Institute period, 1928 to 1931, than for the pre-Institute years of 1925 to 1927, while the profits of several of the "unethical" companies increased substantially in the post-Institute period.

The conditions which defendants allege confronted them just prior to the Institute are thus summarized in their brief: "The refiners had had ample experience with the regime of secret concessions. They had witnessed a falling off in their sales due to the reluctance of wholesalers and retailers to sell sugar, because they could not compete. Their customers in large numbers were complaining that the system was wrecking their business. Sugar distribution was being concentrated in a few hands, and some of the refiners themselves were facing ruin." Fact Brief, p. 15.

As the foregoing discussion reveals, this picture is greatly exaggerated. The declining profits for the year 1927 must be attributed, at least in large part, to causes other than the secret concessions system. Defendants themselves have complained of the enormous overproduction and the ruinous dumping that took place during that year. The "slimness campaign," too, had its effect. Nevertheless, although the picture is by no means as black as painted and the serious consequences foreseen, the loss of business, and the ruin of refiners and distributors are to a large extent speculative, the industry was characterized by highly unfair and otherwise uneconomic competitive conditions; arbitrary, secret rebates and concessions were the rule, and the widespread knowledge of market conditions which the courts and economists have recognized as necessary for intelligent fair competition were lacking. I believe the refiners' testimony that they were disturbed economically and morally over the then prevailing conditions. There is

evidence, too, that at least American was concerned at the possibility of liability under the Clayton Act because of the discriminations resulting from the various concessions. I believe, too, that among the purposes for which the Institute was formed were, as defendants insist: (1) The elimination of secret concessions and selling of sugar on open, publicly announced terms; (2) the gathering and the dissemination of statistics not previously available, as to refined stocks, consumption, location of stocks throughout the country, production, and current deliveries; (3) the elimination of practices which they deemed wasteful; and (4) the institution of an advertising campaign to increase consumption. But it will be apparent, from a discussion of the actual activities of the Institute and of its members, that these were by no means the dominant purposes.

### III. The Sugar Institute.

The agitation which finally resulted in the formation of the Institute began in the summer of 1927. Representatives of American, National, McCahan, Federal (reorganized in 1929, as Spreckels), and Lowry, the then operator of Pennsylvania, met with W. L. Cummings, later general counsel of the Institute, to discuss the situation. A series of meetings were held, the condition of the industry, with particular reference to undesirable practices and secret concessions, was discussed, and in September, Cummings submitted to representatives of the Attorney General's office a proposed certificate of incorporation and by-laws for a trade association, together with a number of suggestions respecting trade practices.

In September, the other refiners were invited to attend a joint meeting. Representatives of each refiner met frequently in December; a Code of Ethics was worked out. It was submitted to and discussed with officials in the Attorney General's office and, as a result, some changes were made. According to Cummings' testimony, the code, finally adopted on January 7, 1928, was substantially identical with that worked out when the discussions with the Department of Justice officials were held. With the exception of the two changes noted in the appended copy, it has retained its original form.

Members of the Institute meet annually as well as in occasional special meetings. The board of directors meets generally monthly, and the executive committee, composed of certain members of the board, weekly. Various other committees have met from time to time. In February, 1928, Judge Sydney Ballou, until then general counsel of California & Hawaiian, joined the Institute staff as executive secretary at a salary of $75,000 annually. Upon his death in October, 1929, his duties were assumed by the vice secretary,* whose annual salary was $25,000. Other executive salaries amounted yearly to about $15,000. According to the testimony of the office manager of the Institute, other annual expenses were: Salaries of a staff of stenographers, statisticians, etc., about $45,000, and overhead about $85,000; advertising averaged $450,000 annually. The Institute statement for 1930 shows, too, that in that year some $29,000 were spent for investigations. It is interesting to note that the total expenses for that year were set at some $838,000, of which, some $641,000 were for "advertising and publicity." Expenses were defrayed by levy on the members proportionate to their production.

Although the defendants have emphasized the reporting and statistical services of the Institute, the minutes and other records of the meetings of members, directors, executive committee, and other committees, abundantly demonstrate that the Institute and its members were to a very high degree occupied in their meetings with the various problems and practices relating to sales and distribution.

Defendants have insisted throughout that their activities have been characterized by the utmost good faith. In this connection, they cite their open dealings with the Attorney General's office both immediately prior to and after the formation of the Institute. As far as the evidence shows, the Department of Justice, in its three investigations of the Institute in 1928, 1929, and 1930, was given complete access to the Institute files. The record likewise shows that from time to time, as new issues of the Code and Code Interpretations were printed, copies thereof were forwarded to the Attorney General's office. But the Department of Justice was not notified of various important steps taken by the Institute which are now charged to be illegal and of course not as to those activities in which the Institute denies having engaged. Defendants' good faith must

---

* Fred G. Taylor.

be largely a matter of inference to be drawn from their admitted or proven actions with respect to such and other matters.

For convenience and clarity, the various activities of the defendants upon which plaintiff bases its charges of illegality will be classified and separately considered, although most of them are more or less vitally related to one another.

Defendants assert that the fundamental principle underlying practically all of these activities is expressed in Code 1: "All discriminations between customers should be abolished. To that end, sugar should be sold only upon open prices and terms publicly announced."

To attain these results, defendants insist, was their primary purpose in creating and maintaining the Institute. Necessarily and admittedly implied in the agreement to sell only on open publicly announced prices and terms is the further obligation to adhere thereto until public announcement shall have been made of any change.

## IV. Price Reporting.

With respect to the reporting system adopted by the Institute, the government alleges: "Defendants have concertedly adopted and maintained a comprehensive system for the exchange of detailed and complete information relating to the prices, terms and conditions of current and future sales; they have agreed that the prices, terms and conditions of sale shall be reported to the Institute by the Members as a condition precedent to any sale of sugar; and they have agreed that no Member shall deviate from, or change, such prices, terms, or conditions until such Member shall have given at least 18 hours notice of such deviation or change. The Institute has immediately relayed all such reports by wire to all members. Defendants have sold and are now selling all sugar under a binding mutual agreement to adhere strictly and without deviation, to the prices, terms and conditions reported to the Institute, and to maintain such prices, terms and conditions until they shall have given at least 18 hours notice of proposed changes and deviations as aforesaid."

The reporting activities of the defendants concern not only changes in the basis price, but all changes in the sales conditions and terms. The present discussion, which is concerned only with price report-

ing, sufficiently indicates the nature of defendants' system.

1. The price reporting system was worked out in its final form only about a year after the formation of the Institute. Certain points with respect to the earlier practices must be clarified before considering it in its final form.

(a) In February, 1928, the following provision was adopted by the directors; it appeared first in the code issue of February 17, 1928, as an interpretation:

"Three O'Clock Notice.

"Except to meet a competitive price already announced, the Institute recommends to its Members that they announce changes in price not later than three o'clock of the day before the changed price becomes effective. *The first announcement of a change in price should be sent by telegram to the Executive Secretary, he to notify the other Members.*" (Italics mine.)

The government contends that the italicized provision required that all changes in price be first announced to the Institute. The language is not clear. The Institute's office manager testified (R. 5120) that it meant merely that only the announcement of the refiner first to announce a change in price was to be relayed to the other members by the Institute; this appears to have been the early practice.

In support of its contention, however, the government refers to the following memorandum found in American's files:

"Announcement of change in price, either an advance or decline, must be made before 3 P. M., to become effective at the opening of the market the following morning.

"When change in price has been decided upon, and before making announcement to our brokers and the trade, copy of the change must be furnished Judge Ballou." Ex. 385–K.

However, unlike other memoranda in this series admittedly prepared by American's sales manager, the one quoted did not carry his signature. With respect thereto he testified: "I do not know who prepared it and with respect to the second paragraph which states * * * [that when a] change in price * * * has been decided upon and before making announcement to our brokers and the trade, copy * * * must be furnished Judge Ballou; that has never been done." R. 5259, 5260.

He, as well as several other refiners, testified emphatically that the actual practice has always been first to notify the trade through the various channels used prior to the Institute and then, the Institute. The evidence, in my judgment, establishes that there was never any obligation to give the Institute the first notice of a change in price. The important requirement imposed upon the refiners was to make an open announcement to the trade. In fact, California & Hawaiian, with the possible exception of a brief period in the early days of the Institute, never exchanged any price information with the Institute.

I am inclined to accept defendants' explanation in this matter. In any event, in the next printing of the code, November 26, 1928, it was expressly provided that the trade should be notified, by the individual refiners before the Institute, of a change in price and that the Institute should relay to all members not only the first announcement of a change, but all subsequent announcements. The latter practice had been adopted by the executive secretary on March 14, 1928. As defendants explain, this was done because the price change of that date was a complicated one, and it was then found advisable to continue the practice in the interests of accuracy.

(b) It is charged, too, that defendants were under an obligation to notify the Institute not only when they changed their prices, but also when, after a change had been announced by another member, they chose not to follow it. In support, the following minute from the executive committee meeting of March 6, 1928, is quoted: "Executive Secretary expects all members of the Institute to give him immediate notice of what they do or decide not to do." Ex. 21–26, pp. 29–30.

Nothing in the record, however, indicates that this procedure was followed. The Institute office manager testified that in its entire history, notification to the Institute of what a refiner decided not to do had occurred only one or two times. R. 5122, 5123.

(c) Complaint is made of the activities during its first six months in prohibiting what is known in the trade as "repricing"; that is, giving the benefit of a price decline retroactively to contracts taken at a higher price. Usually this occurred when a decline was announced late in the day and was applied to all of that day's business. Defendants admit that during the first few months of the Institute, an attempt was made to prevent repricing as a violation of the code requirement of openly announced prices and they assert that their "Three O'Clock Rule" was drafted to prevent the practice. However, the practice was customary in the trade. The Institute rule encouraged buyers to hold off until after 3 o'clock awaiting a possible decline and thus caused a bunching of orders after 3 o'clock. In addition, the announcement of a decline to be effective the following day of course ended all business on the day of the announcement. Consequently, in August, 1928, the attempt to eliminate all repricing was abandoned; partial approval thereof as an "exception to open prices publicly announced" was given in the next printing of Code Interpretations, November, 1928, in the following terms: "The custom of the trade permits giving the customer the benefit of the refiner's lowest price during the day, that is, a contract entered into or sugar delivered in the morning may be repriced at any lower price announced during the day."

Repricing has been practiced at least since August, 1928. Although expressly sanctioned only as to business of the day of the decline, refiners occasionally have repriced beyond that period. But the above-quoted "Interpretation" was evidently intended to prevent this and must have had some effect in discouraging it.

2. Present practice.

Price reporting through the Institute was developed in its present form at least by the beginning of the second year. It is, of course, an integral part of defendants' plan that "sugar should be sold only upon open prices and terms publicly announced."

(a) The present form of the Three O'clock Notice Rule is as follows: "Except to meet a competitive price already announced, the Institute recommends to its members that they announce changes in prices not later than 3:00 o'clock. Such timely announcement will enable a price change to receive wide publication through the evening and morning papers. It is, furthermore, in the interests of uniformity which will be appreciated by the trade."

As to declines in price, its effect was to compel announcement thereof before 3 o'clock in the afternoon. Defendants insist that its sole purpose was to enable the price change to receive wide publication through evening as well as morning papers and the ticker service which stopped at 3

P. M. With respect to announcing price advances, the practice under the Institute pursuant to the "rule" differed from that which had theretofore prevailed. The great bulk of sugar always was and is purchased on what is known in the trade as "moves," although very substantial quantities are, of course, sold from time to time apart from moves. A move occurs when a price advance is announced. Some times, prior to the Institute, an advance was announced to go into effect immediately, usually, however, to become effective at some future time. But regardless of the form of the announcement, some period of grace was always allowed during which sugar could be bought at the price prevailing before the advance. In order to obtain their sugar at the lower price, the trade, unless of course they felt that the move occurred at too high a price, would then enter into contracts covering their needs for at least the next 30 days.

But prior to the Institute, this period of grace allowed for purchasing at the old price was uncertain in duration. Sometimes it was very short, a matter of hours; some times sugar buyers who did not learn of the move in time, sent their orders in too late to buy at the old price. Until the Three O'clock Rule was cast in its final form, it compelled a period of grace from 3 p. m. to the opening of business on the next day because its express language provided that changes in price should be made "not later than 3:00 o'clock of the day before the changed price becomes effective." Until the opening of business the day after the announcement, buyers had been enabled to get the lower price. Early in 1929, the quoted language was deleted from the provision. Why this was done is not apparent. Thereafter the price advance could have been made effective at once. But at this time the definite period of grace had doubtless become well established; in any event, refiners have not availed themselves of the Code privilege to effectuate an immediate advance. Price advances continued to be announced to become effective the following day or even later. There is no evidence that the refiners consulted with one another after an advance had been announced by one of them or that the grace period was in fact used by them, to persuade a reluctant member to follow the example set; and this, too, despite the business necessity of withdrawing an advance unless it were followed by all. The effect, so far as the record reveals, of the Three O'Clock "Rule," in and of itself, seems to have been advantageous to the trade in case of a price advance in that the uncertain period of grace has been replaced by a definite one.

(b) Other material code interpretations covering price reporting at the time of suit, follow:

"Posting. Refiners' basis price of sugar should be kept posted, in accordance with the long established custom of the trade, upon their bulletin boards available to access by the trade. In addition, they should notify the trade of price changes in the manner customary previous to the formation of the Institute."

"Notification to the Institute. (a) Price Changes. The Institute requests members before notifying the Institute of price changes to post or otherwise announce them in their customary manner and then to notify the Institute of action which has been taken."

"Notification by Institute. Upon receipt of a price change notification the Executive Secretary will give the same to the news agencies in New York which operate commercial tickers. He will also advise by telegram members of the Institute, the Domestic Sugar Bureau, and other distributors of refined sugar."

Defendants contend that these Code interpretations, except in so far as they make the Institute the clearing house for price changes, provide substantially for continuing the pre-Institute practice. The testimony of American's sales manager and of Revere's, Arbuckle's, and California & Hawaiian's representatives is that price changes before the Institute were listed on the refiners' bulletin boards, brokers, customers, and news agencies were notified, and frequently, as a courtesy, competitors would be telephoned, and that except for notifying the Institute, price changes, during the post-Institute period have been similarly announced. They testified, too, that both before and since the Institute they have received information of the price changes of their competitors from their customers and brokers and from various news services. It appears to be unquestioned that before the Institute, general price changes were disseminated and became known to the entire trade very quickly.

Defendants insist that the use of the Institute as a clearing house for price change information had for its purpose, and result-

ed only in, a wider and more accurate dissemination of the information. The Institute notified not only the members, but also numerous news agencies and the ticker services. It is unquestioned that the price change data was circulated by the Institute without any comment.

But it is clear that the Institute price reporting system did effect important changes in the methods of announcing and quoting prices. The witnesses as to pre-Institute practice, except American's sales manager, represented the ethical refiners and testified to their practice. But in the case of the other refiners, a somewhat different situation appears to have prevailed. Gardiner, editor of the Willett and Gray sugar trade journal, a government witness, testified that the list prices which many of the refiners announced and which, as such, were published in the trade journal, were merely nominal quotations and bore no relation to the actual "selling bases" at which their sugar was sold. This is confirmed by the testimony of American's vice chairman and McCahan's vice president. No witness has explained the reason for it. The published list prices and the "selling bases" of some of the unethical refiners differed widely. The selling basis was the price at which they purported to sell; the secret concessions were from this basis. In the case of American, the selling basis was given widespread publicity through brokers and customers. In this connection, McCahan's vice president testified: "If we have a soft market, and we sold yesterday to five customers at $5.00, and sold today to one at 4.90 and the market remained soft, and tomorrow we sell to two or three customers at 4.90, I would call that a change in the selling basis." R. 10413. And the evidence indicates that changes in "selling bases" were made from time to time without formal public announcement in advance of sale. Changes therein did, however, become known very quickly to the trade and to competitors; but frequently that knowledge would be obtained not through news agencies or published announcement; customers of a certain refiner would refuse to buy at his then price and would tell him that another refiner was quoting a lower price. All this, of course, is entirely apart from sales carrying secret concessions. It is thus clear that the practice of public announcement since the Institute differs con-

siderably from the prior practice, at least with the unethical and as will hereinafter* appear, in some important respects with the ethical refiners. Of course, the actual adherence to the open price announcements, which has very generally prevailed since the Institute, is vastly different from the prior departure therefrom through a very substantial number of arbitrary secret concession transactions, and other special arrangements.

## V. Statistics.

Government's charge denied by defendants, with respect to the statistical services of the Institute, is that, while defendants exchanged the most intimate details of their business operations, they failed to supply essential information to the trade.

A distinguished economist, testifying for defendants, subscribed to the view that: "Perfect competition requires a perfect knowledge of the state of the market," and, "A perfect market is a district, small or large, in which there are many buyers and many sellers all so keenly on the alert *and so well acquainted with one another's affairs* that the price of a commodity is always practically the same for the whole of the district." (Italics mine.) R. 10209, 10210.

On cross-examination, he was asked and he answered as follows:

"Q. Does your truly competitive situation contemplate that the purchasing trade as well as the sellers shall have full information as to capacities and production, deliveries and stocks of the finished product on hand, and the like? A. The more such information they would have the closer you would approach to the conditions of a free competitive market.

"Q. In other words, you do not really have a freely and truly competitive market unless the purchasing trade as well as the selling trade have all of that information.

"A. You have not perfect competition. You may have a good deal of approximation to it, but not perfect competition." R. 10332.

Defendants' assertion that they supplied the purchasing trade with all those items of information "necessary to place it on an equal footing with the refiners" is not supported by the evidence.

I shall consider separately statistical matters relating to data (1) collected by

the Institute, (2) that as to which the Institute did not concern itself.

1. Most important among the Institute's statistical services exclusive of price and terms reports are the following (all reports were compiled chiefly from data supplied by defendant refiners):

(a) Each week the Institute sent out an individual report to each refiner showing the total weekly melt (i. e., production), deliveries and stock on hand of all members, and the percentage thereof of the refiner so notified.

(b) The Institute reported weekly the melt and deliveries for the week of each member as well as his cumulative total melts and deliveries from the beginning of the year to the end of such week. Key letters were used to designate the several refiners; each refiner had a code of all designations.

(c) At the end of the contract period on each price move, a report or reports were sent out showing for each refiner the total undelivered and unspecified sugar on the contracts. Reports were also sent out showing by states the total amount of undelivered sugar for each refiner; here, too, the key letters were used instead of names.

(d) Reports of capacities of the several refiners were circulated several times during the Institute period.

(e) An annual compilation of statistics collected by the Institute with analyses thereof was sent out.

The foregoing reports were furnished to each of the Institute members, but to them alone.

(f) A quarterly statistical report was sent to Institute members and a few others, chiefly representatives of off shore refiners.

(g) A weekly report showing total deliveries in each state for such week by all refiners, but not by each of them, was sent to the Institute members, Hershey, and its sales representative.

(h) Each month a report showing total deliveries by states of all refiners for the month, together with a comparison with the same in each of the four years immediately preceding and the same data for the year to the end of such month, was sent to the same parties.

(i) A weekly report, showing by states with some subdivisions thereof total sugars on consignment at consignment points for all refiners but not for each of them, was sent to the same parties.

(j) A similar report showing in-transit stocks was sent weekly to the same parties.

(k) Reports showing the amount of sugars moved into each state during the week by all the important differential routes [6] for refiners own account and separately, at customers' request, together with some analyses thereof, were sent to the same parties; some such reports were also sent to L. W. & P. Armstrong, representatives of an offshore refiner.

(1) A monthly report showing the total cane and beet sugar deliveries separately by states was sent, to Institute members, the Domestic Sugar Bureau and several representatives of off shore refiners.

The only data disseminated to the trade generally were:

(a) Weekly statistics as to the total melt and total deliveries. These statistics were widely distributed through news agencies, banks, brokers, etc.

(b) Monthly statistics of the total deliveries of all sugar, divided so as to show the amount of domestic cane, imported cane, and beet sugar, delivered during the period. These statistics were widely distributed through news agencies, banks, brokers, etc. See Ex. I–2.

Data as to capacity of the several refiners were available to the public in substantially similar form to that obtained by the Institute, in an annual trade publication "Sugar Reference Book and Directory" and in less complete form in the annual Report of the American Sugar Refining Company.

Defendants point out, too, that the total refined stocks on hand could be computed by the simple method of subtracting from the total melt of each week the total deliveries during each week and as evidence of their good faith they call attention to their practice in recent years, of continuing to supply statistics on melt and deliveries at a time when the trade could readily calculate therefrom how greatly refined stocks were increasing.

None of the other statistics, as defendants themselves state, were available to the trade from any source except the Institute.

[6] That is, by water and combination water and rail routes, carrying lower freight rate than all rail service.

In May, 1931, after the bill in this suit was filed, the executive vice secretary reported to an executive committee meeting that a representative of "Facts About Sugar," a trade publication, had suggested "that it would be of benefit to the trade in general if the Institute would release to the trade more statistics than at present." A directors' meeting thereafter voted to release combined statistics on the total consumption of cane, beet, foreign, and insular refined sugar by states, together with figures showing the per capita consumption of each state, for the years 1928, 1929, and 1930. Ex. 21–26, pp. 649, 659.

Defendants explain their failure to give additional statistics to the trade only by the suggestion in their brief, but without support in the evidence, that the information relating to the consignment and the in-transit stocks was "of little or no interest to the trade generally." No explanation whatsoever is given for not making the other data available to the trade.

The refiners by thus circulating only among themselves certain collected information were thereby placed in an advantageous position with respect to purchasers. The purchaser's relative handicap is graphically revealed by reference to certain of defendants' exhibits. They show that data relating to total production and deliveries given to the trade and the calculable stocks could have had only a limited significance for the individual purchaser and were even likely to mislead him. For such data reflect only the general situation for the country as a whole and for all the refiners. But the competitive set-ups in the several trade areas throughout the country differ widely. In no state do all of the refiners, and in many of them only a few, offer substantial competition;[7] the business done by those competing in any trade area is not proportionate to their total sugar production (Ex. F–15). In the light of such facts, the vital character of the statistics which defendants did not reveal to the trade becomes apparent. The names of refiners competing in various areas would of course be generally known. Data relating to production and deliveries of *individual* refiners, to deliveries by states, to consigned and in-transit stocks for the several states, obviously would illuminate the situation in the several trade areas; but this was withheld from purchasers. While the refiner was thus informed with respect to the several areas in which he was interested, the customer knew the situation only with respect to the country as a whole.

Defendants also obtained an advantage over the trade by keeping to themselves the data concerning the customers' unspecified and undelivered balances at the end of the 30-day contract period. Under the Institute régime, the refiners professed to compel customers to adhere to the contract terms of giving specifications for delivery and withdrawing sugar not later than 30 days after the contract was made. In fact, however, if it appeared after a "move" that it would be impracticable to enforce these terms, and the determination of that question depended in part at least upon what the statistics revealed, the Institute committee in charge of such matters sometimes recommended a later dead line. The more detailed facts concerning the enforcement of contracts and the question of the legality of concerted action in respect thereto are hereinafter * discussed. It is unnecessary to consider whether the Institute's collection of such data, and its circulation only to members, would have involved unfair dealing with the trade, if each member had been expected to and had in fact used the information independently and not concertedly with the other members.

2. Complaint is made, too, of defendants' failure to collect and publish certain statistics. The contention is that if there is to be open competition, data from which demand for refined sugar might be calculated and that relating to defendants' stocks of raws on hand and to the prices paid therefor ought to be collected and disseminated.

During the early days of the Institute, efforts made to obtain from the members information as to new business entered each week was unsuccessful because three of the refiners, National, American, and Arbuckle, who together did well over 50 per cent. of the business of all defendants, refused to report thereon. Such figures,

7 In 1927, there were three states in which only three defendant refiners delivered over 10,000 bags; five states, five; eight states, six; four states, seven; three states, eight; two states, nine; one state, ten; two states, eleven; and one state, thirteen Ex. H–15. Figures for the eleven western states are not given.
*15 F.Supp. p. 867.

as the Institute's statistical expert testified, were necessary to estimate "the demand." He further stated: "I always considered that the most valuable statistical information we could get." R. 8651, 8652.

The reason given for not collecting data as to the stocks of raws was that, had such information become known generally, raw sugar sellers would have been placed in a position to "squeeze". on "spot sales" any refiner whose stock of raws happened to be low; further, that this information would be of little value in any event and that the only important information with respect to supplies of raws would be that of the world market situation which was readily available from many sources. Justification for the failure to collect and disseminate information as to the raw sugar 'transactions of the several refiners is sought on the ground that this had always been kept entirely secret; the refiners did not reveal it even to one another. The evidence shows that about 50 per cent. of all raw sugar purchased was bought 'in secret transactions rather than in open market. The refiners did not want their competitors to know the "trades" and concessions that they were getting. Moreover, as Place of McCahan testified, if a refiner is buying sugar, "he does not want to bull the market on himself * * * so he tried to hold the transaction confidential until he has bought all the sugar that he wants." R. 8174.

The witness Gardiner, editor of Willett & Gray, testified, too, that if it were known among the buyers of refined that the refiners were buying raw below its then open market quotation, it might to some extent cause them to stop buying because of their belief that a weak raw market indicated an early decline in refined. R. 401.

It thus appears that various factors entered into the Institute's failure to collect data relating to these matters, but chiefly the unexplained hostility of individual refiners and the possibility of jeopardizing the refiners' position with respect to sellers of raw sugar. But the evidence indicates that none of the information except that relating to demand was really important; in any event, defendants' failure to concern themselves is no indication of bad faith or unfair dealing with the trade. In failing to collect such data, defendants have neither sought nor obtained any advantage, if it may be deemed an advantage, over purchasers, which they did not in fact possess individually prior to the Institute.

## VI. Boycott of Brokers and Warehousemen.

Most of defendants' sales are negotiated through brokers; they receive their commission from the refiners. Some are exclusively sugar, others general food brokers. During the period January, 1928 to December, 1931, members of the Institute used 1,360 brokers.

Much of defendants' sugar is delivered in interior points from consignment; that is, from sugar stored by the refiner in an interior warehouse owned by parties other than a defendant, and thence shipped against contracts with customers in the area tributary to such warehouse. Until. withdrawn from consignment, the sugar belongs to the refiner. For the storage service, the warehouseman receives compensation from the refiner. Some warehouses store only sugar, others a great variety of foodstuffs and at times other goods. During the period January, 1928 to December, 1931, Institute members used 1,483 warehouses.

Prior to the Institute, a broker and a warehouseman were frequently one, and/or also a merchant or other sugar user.

Soon after the creation of the Institute, defendants adopted against such combination of occupations by a broker, a warehouseman, or a merchandiser or other purchaser of sugar, a definite policy expressed generally in Code 3 (d), 3 (e), and 5. Defendants virtually admit concerted action in requiring an election of only one of these business activities with a complete cessation of each of the others, and in refusing to deal with those who disobeyed. The reasons for adopting this policy in the light of the general factual background of the situation, the means taken to effectuate it, and the effects of and necessity, if any, therefor, will now be considered.

1. A combination of distribution functions in a single concern facilitated the grant by a refiner of secret concessions, difficult of detection. Thus a customer whom a refiner wished to favor might be paid what was called brokerage commissions, although in fact no brokerage service was performed; or a refiner might place sugar with and pay so-called warehouse fees to a wholesale sugar merchant, although in fact the customer performed

no real storage service but held the sugar on his own premises solely for his own use. A dummy warehouse corporation might even be set up in order the better to conceal the concession.

. This so-called storage as well as bona fide storage with a customer also enabled him to sell the sugar to his own .trade or otherwise to use it, without reporting to the refiner the time of withdrawal from consignment for the customer's own account; the customer might then await a drop in the market and report the withdrawal as of such later time, thus obtaining the benefit of the lower price. By delaying reports, he might also obtain an extension of credit terms. Brokers who stored sugar might by a similar manipulation of reports, use fluctuations in the market to favor their own customers; they might also divert sugar directly to customers' premises and charge refiners for unearned storage.

The evidence indicates that such action by broker-warehouse and jobber-warehouse concerns was at times authorized or acquiesced in by the "unethical" refiners as a means of conferring valuable secret concessions. That defendants appreciated their own partial blame for such abuses is plain. Thus, the sales manager of Arbuckle writing to Edgar in explanation of defendants' policy against combination of brokerage, warehousing, and jobbing, said: "Were the Resolution [which embodied the policy] to require any justification, a cursory examination into recent trade practices (*for which even some refiners are blamable*), would quickly discover the reason for the rule." Ex. 185. (Italics mine.)

It is in my judgment clear (defendants do not say it in so many words but intimate as much in briefs and argument) that one very real motive for adopting the code rules was to assure the refiners, distrustful of one another, that. no one of them could successfully use any of these or similar devices. A like motive actuated defendants in other matters. Thus in arguing against long term contracts, they virtually admit that they disapproved of them because of a fear that some refiners would use them as a means of granting arbitrary concessions. Fact Brief, p. 343.

Other "evils" which the code rules sought to eliminate were the fraudulent practices of delaying withdrawal reports and charging unearned storage without refiners' consent. Such practices were made possible largely by such a combination of activities, and, in fact, were often indulged in by those who combined two or more of the several businesses. In all of these matters it is difficult to determine which of the secret concessions were obtained with refiners' consent and which by the dishonest acts. While, because of this and other obvious difficulties of proof, it is impossible precisely to measure the extent of such fraudulent practices, the evidence indicates that it was substantial.

In another respect, too, defendants insist that combination of functions necessarily led to unfair practices. Thus they assert that while the broker's duty is to sell his principal's sugar to as many customers as possible, his adverse interest, if he was also a dealer, would lead him to violate this obligation. Where distribution functions are combined, there clearly is opportunity for such double dealing; which some brokers and warehousemen may at times seize. Brokers and warehousemen do have special duties toward the refiners; the latter depend upon them to obtain customers, to check consigned stocks, etc. The value to the refiner of one engaged in two or more of the activities may frequently be impaired. But, on the other hand, a principal may permit his agent to have an adverse interest and such a business arrangement may well be advantageous to both. Ordinarily the only requirements for its legality are the principal's consent to and the agent's disclosure of his adverse interest. In the sale and distribution of sugar prior to the Institute; such arrangements were common. Despite the known adverse interest, such brokers and warehousemen were employed.

The evidence affirmatively shows, moreover, that such arrangements, from the refiners' viewpoint, were not infrequently entirely successful; that concerns in substantial numbers, which combined distribution functions, maintained entire honesty and good faith in their dealings with the refiners. Such concerns were not averse to seeking and accepting special favors from the refiners, but this, of itself, of course cannot be deemed unfair or dishonest toward those refiners who granted them.

I deem it unnecessary to review in detail the evidence in this respect. Defendants' brief virtually admits and the correspondence with one another and with brokers, warehousemen, and jobbers shows

that honest dealing by such distribution agencies was not uncommon; indeed, that it was perhaps about.as usual as dishonesty.

Another alleged evil in the combination of functions was that one who dealt with refiners in more than one capacity might obtain an advantage over a competitor who did not or could not do this. For example, to quote from defendants' brief: "The result of a broker merchandising sugar is that through the brokerage which he receives he is placed in a preferred position over the ordinary sugar merchant" (Fact Brief, p. 106), and "The payment of storage charges to certain customers necessarily gives them an advantage over customers who are not paid storage and makes the net price of sugar to such customers lower than to the other customers." Fact Brief, p. 109. The increased income received from two or more activities might enable the recipient to outsell a competitor. To what extent this in fact occurred does not appear. The situation is confused by the fact that at the same time that advantage might naturally accrue because of greater activity, actual advantages were conferred by secret concessions. Whether, if secret concessions alone had been eliminated, the combination of functions would generally have resulted in advantage or in economies in the distribution of sugar, is on this record largely speculative. But it is clear that the possibility of advantage and economies is present in the situation. And in my judgment it is probable here, as in other aspects of the case it is certain, that defendants' real fear was that such function combination endangered the price uniformity [8] that they aimed to maintain. By compelling brokers, warehousemen, and customers to follow only a single occupation, the refiners aimed also to free themselves from the pressure theretofore exerted upon them to obtain reduced prices or other favors in compensation for the inability or unwillingness to combine occupations.

Defendants' position in this connection is somewhat inconsistent. While urging that to permit some to acquire a preferred position is to discriminate against the others, they contend that "only if it is contrary to the Anti-Trust laws for the refiners to deal on the same basis with their customers *similarly situated* * * * can it be said that they were not justified and acting reasonably in adopting the recommendation against storing with customers." Fact Brief, p. 125. (Italics mine.) But a customer who combines two or more functions as some did, is not situated similarly to one pursuing only a single occupation.

It may be true, as defendants urge, that it is impossible to store with all or with any considerable number of their customers and that therefore some must necessarily be favored if such storage be allowed. The guiding motive, however, in the selection was often solely to grant a secret concession. Defendants might concertedly have agreed to prevent customers from re-establishing the pre-Institute wrongful devices. They might thereby have eliminated such practices while at the same time refraining from concerted agreement with respect to their policy toward the many bona fide warehouses of customers. No secret concession is conferred if refiners openly store with such warehouses; no discrimination is practiced because only some customers have warehouses. If such customer-warehouse concerns thereby obtain an advantage, it is an honest one, due to the larger scope of their activities. And as will also presently appear, there is good reason to believe that the dishonesty which did occur could have been checked without concertedly applying coercive tactics to all.

Defendants also claim that the pre-Institute situation was leading to monopolies among the distribution agencies. It may well be that the pre-Institute secret concession practice might have led to monopoly, but defendants have not proved that it did or would so result. Whether apart from secret concessions, the possible advantage to those combining functions might cause elimination of the others is on

---

[8] As will hereinafter appear, there is no substantial evidence of direct action by the refiners to preserve uniformity among themselves in the basis price which each of them quoted to the trade. Apart from secret concessions, such uniformity prevailed generally before and after the Institute, because defendants' sugar was, but for exceptional instances, and is a standardized product. However, most of defendants' activities since the Institute have been designed to preserve what the government charges as "uniformity in price structure"; this objective was accomplished by preventing combination of functions and by prohibiting or limiting all special terms so that sugar should be sold at the basis price only, with the usual differentials for grades and packages.

this record entirely speculative. Such elimination, however, if it occurred as a result of the economies in distribution effected through combination of functions, would be the natural result of fair competition as between economically unequal competitors.

Distribution agencies that combined functions, performed in various ways a valuable service in the industry. At some places, particularly in the southeast, the warehouse accommodations were insufficient without brokers' warehouses; their use was thus essential if consigned stocks were to be kept at such points. (At the first Institute meeting in January, 1928, Savannah, a southern refiner, evidently insisted upon special treatment with respect to the application of the code rule against storing with customers. Ex. 21–26, p. 7.) This situation was not entirely confined to this particular section; thus, in the city of Sherman, Tex., the only warehouse suitable for sugar storage belonged to a sugar purchaser, a candy company. And it is scarcely open to question that Edgar's chain of warehouses located in Michigan, Indiana, Ohio, and New York performed a valuable service to the trade. Defendants cite the Edgar activities as a striking illustration of the vices made possible through combination of functions. It is entirely clear that the vast size and ramified activities of the Edgar organization led to some irregularities in dealings with refiners. But the evidence also shows that when refiners called attention thereto, an honest effort was usually made to correct them, even though it does indicate, too, that some of the Edgar representatives were not overly scrupulous in dealing with refiners. But here again it is scarcely possible to determine where concessionary advantages obtained by Edgar with refiners' consent leave off and those taken without consent begin. It is clear, too, that by its very structure, the Edgar organization offered advantages to the consuming trade. In addition to its warehouses, it maintained a corporation operating a chain of sugar stores at various points in Michigan, Indiana, Ohio, New York, West Virginia, and Pennsylvania. Economies effected through its organization enabled it to give its retail store customers and others, advantages in their sugar purchases. These Edgar sugar stores were "a constant source of irritation to the Institute" (R. 1754), undoubtedly because their operation led to a re-

duction in the price of sugar to consumers, and thereby prevented uniformity in price structure. Under pressure from the Institute, Edgar closed out his interest in these stores.

2. At special meetings of directors and members on May 2, 1929, defendants' policy against combination of functions among distribution agencies was given its final form. The several refiners at once advised their brokers, warehouses, and customers affected by the ruling, that they must elect one and only one of these business activities for their future dealings on behalf of or with the refiners. In the following months, machinery was set up within the Institute to make that effective.

An enforcement committee was created; its members were high officials from a number of the refiners. Usually it met weekly, but sometimes more often. In the year following the May 2d resolution, this committee was largely concerned, as the minutes of its meetings disclose, with enforcing the policy. When a concern was believed to combine functions, the committee reviewed the evidence and determined whether or not it should be "disqualified" from acting as a broker or warehouseman. In aid of the committee, the Institute employed investigators whose function it was to obtain evidence where combination was suspected. If individual refiners discovered similar infractions, they advised the Institute which in turn circulated the information.

Each refiner submitted to the Institute the lists of its brokers and warehouses, which were then circulated among all the refiners. Defendants insist that: "The only significance of a name appearing on the list is that the broker or warehouse is being used at the moment by some member. The only significance of a name not being on the list is that it does not happen to be in use at the moment." Fact Brief, p. 132. But clearly the purpose of thus circulating the lists was to aid in the enforcement of the policy against combination of functions. When brokers or warehouses were "disqualified," they would as a matter of course be dropped from the lists of the respective refiners, unless the disqualification was disregarded; this, however, rarely if ever occurred. If refiners wished to use a warehouse not on the list of any refiner, they were required to notify the Institute of their intention "so that" as a representative of one de-

838

fendant put it, "other Institute members can voice any objection they may have" (Ex. 400–D–1), and so that the Institute might have opportunity to investigate the proposed warehouse. At first, only 48-hour notice had to be given; the period was extended from time to time, until finally six days notice was required.

In an opinion so voluminous, it would serve no useful purpose to discuss fully the conclusive evidence of defendants' definite understanding that refiners should refuse to deal with a broker, warehouseman, or customer who admittedly or by the committee's finding was acting for any of them in other than the one selected capacity. Thus a broker-warehouse concern could not deal as a broker with one refiner and as a warehouseman with another. Moreover, he was confined to the one selected activity not only in dealing with all refiners but also with all others in the sugar trade, such as beet and offshore interests. The evidence demonstrates that defendants' activities in this connection were designed to and did effect the distribution of practically all sugar sold in the United States including beet and offshore sugar. Co-operation of the Domestic Sugar Bureau, offshore interests, and Edgar was sought and obtained. If a broker stored sugar belonging even to "non-members * * * it was the opinion of the Enforcement Committee that these facts * * * would result in the automatic suspension of the brokerage concern involved as a broker for any Institute member." Ex. 27, p. 7. In July, 1929, the Institute's executive secretary, writing to Hershey re storage in a certain warehouse, said: "I trust you will see fit not to leave this one instance in the entire country, where any distributor of cane or beet sugar is still using a broker's warehouse with all its attendant evils." Ex. 389–R. Other evidence likewise demonstrates conclusively that the refiners adhered quite rigidly to their obligation. Thus in November 1931, the Institute writing to a refiner about his failure to abide by an executive committee [9] ruling relating to a broker, said: "It stands on our records as one of the rare instances in which members have deliberately and openly disregarded the findings of the Executive Committee in such matters." Ex. 436.

Certain other facts are illuminating in revealing the arbitrary manner in which defendants' policy was made effective. Defendants assert that they were "ready to hear any complaint" about "the Institute's findings and to rescind or modify any unfavorable finding upon good reason shown." Fact Brief, p. 137. But under the Institute rules and practice, in order to be reinstated after disqualification, application had to be made by an Institute *member*. The disqualified concern itself had no standing.

Confronted by special cases where even the possibilities of the "evils" of which defendants complain were so remote as to be practically nonexistent, defendants made no effort to devise a system for correcting abuses which would not involve such serious injustice. In its brief, plaintiff has discussed a number of such cases; another is mentioned in argument. There must have been more. These were cases both of customer-warehouse and broker-jobber concerns. A Tampa, Fla., broker was president of and owned stock in a grocery merchandizing concern whose business because of the freight situation, was necessarily conducted entirely outside of the territory in which the broker operated. The enforcement committee's opinion was that this state of facts warranted no exceptional treatment. Ex. 27, p. 1. It is typical of the cases cited by plaintiff. While they may be, as defendants insist, extreme cases, nevertheless they involved important and substantial interests in the distribution of sugar. Only complete disregard of the effects of their policy upon third parties can explain defendants' failure to make some substantial effort to devise a policy less harsh to such concerns.

In another respect, too, defendants seem to have been disregardful of the hardships which they caused. A sudden election of but one of several activities naturally disrupted business set-ups of long standing. The severance could not well have been and was not effectuated without hardship. Judge Ballou expressed defendants' attitude in a letter of June, 1929: "In all matters of this kind refiners must conduct their business in accordance with average business experience, and the fact that some honest merchants may suffer inconvenience cannot be weighed against the necessity for rules based upon the accumulated experience of the practical working of a certain set of conditions." Ex. 314–A.

[9] The executive committee took over the enforcement committee's functions in 1930.

While "average business experience" may have demonstrated evils in the pre-Institute situation requiring cure, defendants went much beyond this. That a concern which combined two or more of such functions may have thereby acquired a preferred position is not, as will appear * from the discussion of the law, an evil justifying the concerted action which defendants took. They could readily have ended the secret concessions originated by them. The Institute staff, the individual members, and others in the trade were constantly on the alert to find grants of secret concessions and in this they were not unsuccesful. Formal and informal investigations were made and effective action taken to persuade wayward refiners to adhere to the code provisions against such concessions. Defendants have not shown that these activities would not have sufficed reasonably to prevent secret concessions. Defendants assert as the basis of their insistence on prohibition of such function combination as the only remedy for the fraudulent practices of brokers and warehousemen that they had no way of discovering specific instances of delayed reports of withdrawals from warehouses and of charges for unearned storage. They urge that if the prohibition were effective, then the independent warehouseman could usually be relied on to report withdrawals and storage items accurately. While some such specific frauds might well escape detection, many of them clearly could have been discovered by proper concerted action. Indeed, the sales manager for National (upon whose testimony defendants rely in many matters) went further; he stated in one of his letters: "All refiners have in their own office the ability to detect any irregularities which might be resorted to, either intentionally, or unintentionally, by a broker." Ex. 408–W.

Defendants, themselves, in giving reasons why it was, in their view, impossible effectively to check up on the wrongful practices, provide a clue to what might have been done in dealing with the problem, without resort to coercive tactics. They state in their brief: "The two largest refiners who did most of the storing with customers employed traveling auditors to check consigned stocks and to detect instances of delaying billing. In many instances such detections were made and the facts reported to the refiner. It was the auditors' business to prevent, in so far as possible, such irregularities and by their periodic checks and reports let it be known to sugar purchasers that such irregularities would not be tolerated. But what chance did the auditors have to detect the irregularities in most instances, or the refiner to protect himself against imposition and fraud? The auditors could only check the stocks once or twice a year. The rest of the time the purchaser was in complete control of the situation. No one was there representing the refiner to watch each and every delivery made by the customer to himself. No amount of checking could verify the dates upon which the purchaser took the sugar from himself as warehouseman. The only way the auditors could detect any irregularity was by periodically making a physical count of the stock against the refiner's records of the stock that should be on hand, and if there was a shortage he would know that billing was being delayed. But then the purchaser would always have the way out of saying the discrepancy represented sugar which was just taken out last night and he had not had a chance to report it." Defendants' Fact Brief, pp. 119, 120.

. At another point they say that brokers "by juggling their records * * * insured themselves against detection and upon the periodical visits of the traveling auditors they explained any stock discrepancies with the statement that the sugar had been withdrawn that morning or the night before. Sometimes they were caught and in those instances they were reported to the refiner. But here again the refiners had no satisfactory means of ascertaining the facts. * * *" Fact Brief, p. 126.

Thus it appears that some of the refiners were neither inexperienced nor entirely unsuccessful in checking up on brokers and warehousemen. And there is reason to doubt that pre-Institute investigations were carried on by the "unethical" refiners in more than a half-hearted way. One fraud more or less would be of little moment when these refiners were secretly permitting similar practices. If all frauds could not be detected, at least it should have been possible to determine by investigations which brokers and which warehousemen were worthy of confidence. Moreover, had the collective effort of all of the refiners been directed to this end

---

*See 15 F.Supp. p. 900.

through the efficient Institute, it cannot be doubted that far greater success would have resulted than individual refiners attained in pre-Institute days. That such collective effort might well be successful where individual effort had theretofore been a partial failure is indicated by the familiar trade association activities in collecting credit information. Somewhat as credit risks are determined, the trustworthiness of brokers and warehousemen might have been established. It might well have been necessary to devise an elaborate system of investigations, inspections, and circulation of data, such as those employed in the Cement Case (Cement Mfrs' Protective Ass'n v. U. S.) (1925) 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104, to deal with fraudulent practices. It might even have been necessary to give publicity to evidence of irregularity. The record indicates that such a device might have been effective in checking frauds. Thus, when the vice president of American told a representative of Edgar that he felt justified in exposing certain irregularities which American's auditors had discovered, it is quite clear that the Edgar representative feared the effect of such a step when he "asked" that "such action" be not taken and said that "he would look into the matter." R. 9716. Moreover, Edgar did make adjustments to cover irregularities found by auditors.

Such investigations, inspections, circulation of data, and the like, if they had proved necessary, certainly should not have taxed unduly either the finances, the efficiency, or the ingenuity of the Institute. The record abundantly reveals the Institute's unlimited resources in these respects. The means actually adopted by defendants to deal with this problem necessitated very extensive and expensive activities on their part. Those of the enforcement committee have already been adverted to. High officials of the refiners themselves at times visited various cities to attend to such matters. Investigators were employed by the Institute; in one year, 1930, expenses for investigations were listed by the Institute at nearly $30,000. Up to December, 1931, some 86 brokers and 135 warehouses were thus "investigated." In addition, individual refiners conducted their own less exhaustive investigations. These bare facts give but a scant view of the extent of defendants' activities.

The conclusion is irresistible that had defendants used the same effort in discovering and dealing with actual fraudulent practices as they used in abolishing all function combinations, such frauds might well have been practically eliminated.

The moral effect of the pre-Institute secret concession system on brokers and warehousemen, while not specifically proven, must have been considerable. Some refiners, dominant figures in the industry, demonstrated to their agents that honesty was not deemed by them to be the best policy, thus setting an example that their brokers and warehousemen might well be expected to follow.

Defendants, in addition to the actions hereinabove described, also agreed (1) upon the commissions to be paid brokers and (2) the contracts which they required brokers and warehousemen to sign.

(1) The justification alleged for concertedly maintaining fixed brokerage rates appears to be that the rates paid prior to the Institute never varied and that those subsequently adopted involved an entirely fair increase. There is no substantial evidence that the commissions agreed upon were not fair. But the minutes of a directors' meeting, at which this matter was considered at length, clearly show that the actual reason for adopting the agreement was to prevent a growing competition in bidding for brokers' services. Ex. 21–26, p. 345. Commissions did not vary prior to the Institute, probably because other inducements were then offered brokers by individual refiners, such as storing sugar with them. When such inducements were prohibited by the Institute's code, competition in bidding for services, if permitted, would naturally result in varying commissions.

(2) The Institute recommended that all refiners should obtain from each broker and from each warehouseman an agreement in the form recommended by the Institute. The evidence is clear that the refiners understood that they were not to deal with any broker or warehouseman who did not sign such an agreement. The evidence also shows beyond question that the Institute checked up on the several refiners and saw to it that this understanding was carried out.

The essential provisions of the warehouse agreement were: "If the Warehouse Company shall at any time during the life of this Agreement pay or concede to any customer of the refiner any amount or consideration of value whatsoever

(whether by way of commission, rebates, reduction in rates for storage, remission or reduction of rent, or reduction of other charges for services whatsoever) not commensurate with the consideration received in exchange therefor by the Warehouse Company from such customer, the charges to the Refiner for storage hereunder shall be reduced by such amount or the value of such consideration. Such amount or the value of such consideration paid or conceded by the Warehouse Company to such customer in violation of the foregoing shall immediately become due and payable by the Warehouse Company to the Refiner, and at the option of the Refiner may be either deducted from any charges thereafter becoming due to the Warehouse Company from the Refiner or may be collected by the Refiner in an action against the Warehouse Company. Any amount or consideration of value paid or conceded by the Warehouse Company to any customer of the Refiner shall be presumptive evidence that such amount or consideration is not commensurate with the consideration given by such customer to the Warehouse Company, unless such amount or consideration of value paid or conceded by the Warehouse Company to such Customer shall be paid or conceded by the Warehouse Company at a rate open to every other tenant of the Warehouse Company." Ex. B-6.

The brokers' agreement which had to be sworn to by the broker under oath was quite a lengthy document imposing upon the broker generally an obligation to uphold the code and the interpretations thereunder. Among the important undertakings of the broker were the following:

"That he will carefully peruse all letters, circulars or bulletins received by him containing interpretations of the Code of Ethics of the Sugar Institute or regulations thereunder, and will conscientiously uphold the spirit and letter of the same in all transactions, except when otherwise specifically authorized by the refiner;

"That the broker will not give, pay, rebate or divert all or any part of the money or commissions paid by the refiner for services rendered in the purchase or sale of sugar, syrup and/or other products either directly or indirectly by any means or subterfuge of any nature whatsoever to the factor ordering or to the purchaser or to any of their employees or to any firm, corporation, or individual designated by or connected with them." Ex. D-6.

Defendants contend that the brokers' pledge was merely a statement of the brokers' functions and duties as generally understood in the trade. Obviously, however, it went much further in requiring general support of the Institute and its code.

## VII. Defendants' Activities Relating to Transportation.

### A. Code 3 (c) and Delivered Prices

Very substantial parts of the briefs and much of the oral argument were devoted to discussion of the issues in the case relating to these matters. The controversy in this respect centers chiefly about the question of what defendants have actually done during the Institute period.

It is manifestly impracticable to discuss in full the numerous relevant specific incidents. The facts are frequently bitterly disputed; an outline of the important ones will suffice, in my judgment, to make clear the bases of my conclusions.

### 1. Pre-Institute Situation.

In describing the general background prior to the Institute, I paraphrase at times the statements in defendants' brief. The cost of transporting defendants' sugar from the several seaboard refining points to interior trade areas is a substantial element in the ultimate cost of sugar to purchasers. As the basis f. o. b. refinery price of the several refiners was usually the same or varied only slightly, if sugar had in fact been sold f. o. b. refinery in all cases, leaving to the purchaser the payment of the actual cost of transportation, the sales of each refinery would have been practically restricted to the territory in which its freight costs were as low as or lower than those of all other refineries. In fact, however, the refiners sold in larger areas by paying or absorbing so much of the transportation charges as was necessary to meet the competition of refiners having lower transportation costs.

The freight applications of the refiners selling at a given point have always been the same at any given time, because any refiner who failed to meet a lower freight application would for all practical purposes lose the market. The amounts absorbed by the several refiners thus differ in accordance with the actual freight charges from their respective refineries.

The extent to which the refiners sold in territory beyond that of their lowest actual freight costs varied, dependent principally

on individual policy in the matter of absorptions. Some refiners would absorb no more than 10 cents to 15 cents per hundred pounds and normally even less; others like the California refiners would absorb as high as 30 cents. This they could afford to do because of certain advantages in purchasing raw.

The custom of the trade was to quote sugar f. o. b. refinery. The refiner usually shipped freight prepaid and billed the customer for the basis price plus a fixed amount, usually called the refiner's "ruling freight basis" or "freight application" for the particular destination. If the refiner shipped collect instead of prepaid, he would invoice the customer for the basis price plus his freight application to destination and deduct the amount of freight actually paid by the customer; the result would thus be the same.

Prior to the formation of the Institute refiners never refused customers the privilege of purchasing f. o. b. refinery, except in two areas; in these, refiners sold only on a delivered price basis.

(1) In Central Freight Association territory [10] to which the freight rate from Baltimore was generally 1 cent per hundred pounds under Philadelphia, which was in turn 2 cents under New York, the Philadelphia rate was generally used. The only Baltimore refinery was built by American in 1922; prior thereto, the Philadelphia rate, as the then lowest, had determined the basis in Central Freight Association territory and this practice continued. American, by refusing to sell f. o. b. Baltimore while actually shipping from there and charging the Philadelphia rate, could effect a freight pick-up of 1 cent. The other Philadelphia and New York refineries also continued to use the Philadelphia rate, so that this practice was established long before the organization of the Institute.

(2) In territory to which the Texas refiners had *lower* rates than New Orleans, the freight applications were based upon the New Orleans rates. The Texas refiners refused to sell f. o. b., thus effecting a pick-up. As defense counsel stated during the trial, "for many years the Texas refineries substantially lived on this freight pick-up." R. 581–a. Comparison of the profit statements of these companies with statements of their freight pick-up indicates the truth of the remark. Exs. F–17, E–17. This practice had prevailed at least since 1917.

On the other hand, the middle western and western beet sugar producers, who generally sold on a delivered price basis using the cane sugar refiners' freight applications, made a substantial profit on transportation, since their own actual freight rates were generally much lower than the lowest cane refiner's rate. This was a practice of long standing in the industry.

The freight situation was complicated in certain markets which were served by differential routes, that is routes which were slower than the standard all-rail routes and involved water transportation. Because of the disadvantages incident to the differential routes, such as their seasonal character, slower transportation than by all-rail routes, and added risks of damage due to transshipment, the rates via these routes were lower than the all-rail rates. The most important of these routes served various areas in the Middle West from the Atlantic Seaboard refineries and in the Mississippi Valley and tributary areas from the Gulf refineries.

In common with other phases of the industry, freight applications were affected by the growth of secret concessions, sometimes given in terms of transportation charges. The customer would be given the benefit either of a cheaper differential rate though the sugar had not thus moved or of a rate to another than the actual destination. Such practices were equivalent to a price concession. With the elimination, after the Institute, of these and other secret concessions, the prior ostensible stability of the freight rate situation ended. Refiners were deprived of their former competitive devices. Probably as a result, competition developed in the freight applications themselves; similar developments have been noted in respect to other practices in the industry. Such developments, with the abolition of the unsatisfactory and unfair pre-Institute system, would naturally be expected. But the story of the post-Institute transportation system is to a large extent although not entirely, a story of the concerted steps taken by defendants to suppress this new competition.

The most serious transportation problem which confronted the founders of the

[10] The territory east of the Mississippi river, north of the Ohio river, and west of a line from Buffalo to Pittsburgh.

Institute, apart from secret concessions, arose because of the differential routes. It is apparent from the list of the most important,[11] that they offered opportunities for transportation substantially cheaper than was possible by all-rail service. A difference of 5 cents or even less per 100 pounds in the cost of sugar was a substantial item.

Taking advantage of the situation, sugar merchants at interior points purchased large quantities f. o. b. refinery for shipment by the differential routes. Refiners, too, in shipping to consignment points used the differential routes extensively. The figures for the pre-Institute period are not available, but the evidence indicates that such differential shipments must have been very substantial. Although the situation has changed somewhat since the Institute, the incomplete figures, made available for the latter period, give some idea of the volume of sugar moving in this way.

Thus a government exhibit reveals that all sugar moved into Wisconsin, Illinois, Indiana, and Michigan in 1928 [12] on refiners' own account was shipped over differential routes. Ex. 528. Refiners maintained consigned stocks in all these states. Complete figures on volume of shipments by all refiners over various routes from the eastern seaboard are not available. In the case of American, however, there are figures to show that of nearly 3,000,000 bags of sugar delivered between April, 1929, and May, 1931, in Detroit, Cleveland, and Chicago, over 30 per cent. moved by eastern differential routes. Ex. K-5. Another exhibit showing volume of shipments on refiners' account over differential routes out of New Orleans to states served thereby (twenty-one in all) shows very substantial shipments for the period 1929–1931. The totals—1929, 2,556,111 bags; 1930, 2,511,743; 1931, 4,756,643—represent a substantial percentage of all defendants' sugar delivered in the United States in those years.[13] For the same period, total sugar moved by the same routes into these twenty-one states at customer's request, were: 1929, 5,205,148 bags; 1930, 3,603,744; 1931, 1,533,688. Ex. 454.

Defendants state that: "Prior to the Institute, as a general rule, it was only the customer who used a differential service and took the disadvantages incident thereto who paid the differential rate over the particular route, instead of the refiners' regular freight application which applied to all-rail service and deliveries from consignment." Fact Brief, 178. Defendants qualify the statement to this extent: First,

---

[11] Exhibit L-4 represents graphically these differential routes. The routes are (figures on rates are taken from Exs. J-5, L-4):

(a) Ocean and rail route via Norfolk, available to New York, Philadelphia, and Baltimore refineries, serves points in many midwestern states. Rates: E. g. New York-Chicago, April, 1929, 51½ cents per 100 pounds (cf. with all rail, 56½ cents); Philadelphia-Chicago, 49½ cents (cf. with all rail, 54½ cents).

(b) Rail and lake route, available to same refineries, serves points in many midwestern states. Rates: E. g. New York-Chicago, April, 1929, 51½ cents per 100 pounds; Philadelphia-Chicago, 49½ cents.

(c) Canal and lake, available to New York and Philadelphia refineries, serves points in New York and in many western states. Rates: E. g. New York-Chicago, April 1929, varied from 29½ cents to 36 cents per 100 pounds; Philadelphia-Chicago, 37 cents.

(d) National Despatch, available to New York and Boston refineries, serves points in many midwestern states. Rates: E. g. New York-Chicago, April, 1929, 51½ cents per 100 pounds, Boston-Chicago September 1931, 54½ cents.

(e) C. A. T. line, available to New York and Boston refineries, serves points in many midwestern states. Rates: E. g. New York-Chicago, April, 1929, 47½ cents per 100 pounds; Boston-Chicago, September, 1931, 47½ cents.

(f) Barge services out of New Orleans, via Mississippi and Ohio rivers, and by rail to interior points, provide differential service chiefly throughout the south and middle western states. Rates: E. g. New Orleans-Chicago, April, 1929, 44 cents (cf. all-rail rate of 54 cents).

(g) Barge service out of New Orleans up Warrior river and other waters and thence inland by rail. R. 6012, 6013. This service available to points in Alabama, Kentucky, Tennessee, and Indiana. Saving over all-rail varies, thus rates in Alabama range 6–7 cents less than all-rail (R. 6013).

[12] Nearly 15 per cent. of all sugar delivered in United States in 1928 went to these states. Ex. S-7. Well over half of this was defendants' (Ex. E-15) of this much must have moved ex-consignment.

[13] Total deliveries by defendants in the United States during this period, see note 2, supra.

traditionally in the industry, sugar delivered at Great Lake ports, regardless of how it actually moved, was sold during the season of open navigation on the Philadelphia lake and rail rate; second, during 1926 and 1927, sugar had been sold in the Warrior River area [14] at a barge rate regardless of how it actually moved. Fact Brief, pp. 178, 217.

The two general areas affected by these breakdowns were, as the evidence plainly shows, of vital importance; in them, competition among the refiners was especially keen; the most important steps taken by the refiners in transportation matters were addressed chiefly to the problem in these areas.

The problem was this: At the lake ports and in the Warrior River area, refiners from different points competed. One, Savannah, had access to no differential routes into these territories. The differential routes available to others differed in rates and efficiency of service. Thus the situation of New Orleans, Philadelphia, and New York refineries differed in these respects. Refiners accessible to routes combining low rates and reasonably efficient service naturally were inclined to promote the sales advantage of their position. Thus a New Orleans refiner might be able to take from Savannah an Alabama customer by showing the advantage in using barge transportation which was cheaper than the rail route from Savannah. To meet this competition, Savannah would give rail shipments or shipments out of consignment to Alabama customers and charge only the barge rate from New Orleans as if the shipment had actually been made therefrom, absorbing the difference. Such a step by Savannah would compel the New Orleans refiner, if he wished to keep the customer, to quote still more favorable terms because, obviously, a rail shipment or delivery out of consignment by Savannah provided more rapid service than the New Orleans barge service. To meet the competition, therefore, the New Orleans refiner might give the Alabama customer actual delivery by rail or ex-consignment and charge only the barge rate. Or he might ship by barge and give to the customer as a sort of bonus the difference between the barge and rail rate.

There was a somewhat similar situation at the Great Lake ports where Eastern, New Orleans, and California refiners competed, and where many differential routes with varying rates and service served further to complicate the set-up.

In a word, there was a tendency in these territories for freight applications for all sugar, regardless of how it actually moved, to be broken down to the level of the cheapest service carrying a substantial traffic. This tendency increased after the Institute was formed.

Before considering the steps taken by defendants to prevent such breakdowns, it is necessary to explain more fully the nature of ex-consignment service. Defendants state: "A delivery from consignment * * * had always been classed with the all-rail shipment, since the service to the buyer was even faster and *the cost to the refiner usually equal to or greater than all-rail.*" Fact Brief, p. 184. (Italics mine.)

This statement does not give an accurate picture of the actual situation. It is not shown that the cost of consignment service was "usually equal or greater than all-rail." Defendants rely on testimony of American's traffic manager. He stated: "The cost to the refiner of consignment service was in most cases higher than the differential—well, in all cases it was higher *than the actual cost of handling via the differential route,* because a delivery out of consignment meant we had to take the warehousing charges, interest on our money, and fire insurance and things of that character. So that it actually cost the refiner in excess of the freight rate that they paid." R. 6008. (Italics mine.)

It is plain that this testimony does not support defendants' statement. The testimony simply gives the obvious fact that the total cost of consignment service is necessarily higher than the transportation charges to consignment points, because of warehouse charges, etc. Other evidence shows quite plainly that the total of freight charges by differential routes *plus* these additional costs was frequently substantially less than all-rail rates. Thus defendants estimate the cost of consignment service at 10 cents per 100 pound [16] bags; New York refiners could ship to Chicago at a rate as much as $27\frac{1}{4}$ cents per hundred less than the rail rate. Examples might be multiplied, but this suffices to illustrate the op-

---

[14] Alabama, Tennessee, Kentucky, and parts of Indiana.

[16] This figure may be accepted as approximately correct although of course the cost would and did vary in different localities.

portunities open to the refiners in varying degrees for making deliveries ex-consignment substantially below the cost of all-rail service.

Defendants show that with the exception of the Texas and Imperial, the refiners have suffered net losses on freight absorptions, even without including the additional cost of consignment service, in each year of the period 1927–1931 (Ex. F–17, as qualified by R. 10034 et seq.).[17] But these figures cover the entire country. The statement reveals nothing with respect to particular trade areas. In it, freight pick-ups effected at some points or in some transactions would merely offset absorptions elsewhere. The important fact is that refiners could effect substantial freight pick-ups at many points even in selling out of consignment stocks, if the selling price included the all-rail rate for sugar actually moved into consignment by differential routes. And even if they sold ex-consignment and charged for transportation at a differential rate, they might still effect a pick-up by actually shipping to the consignment point by a still cheaper differential route, e. g. by shipping canal and lake New York to Chicago at 29¼ cents to 36 cents and charging rail and lake rate of 51½ cents or even New Orleans barge rate of 44 cents.

## 2. The Post-Institute Situation.

The government's chief complaint of defendants' activities in these matters relates to their actual and alleged steps to prevent (1) "sale" of transportation below "cost," and (2) sale of sugar f. o. b.

(1) The effort to prevent the "sale" of transportation below "cost" engaged the attention of the Institute during the first year. At the pre-Institute organization meetings, there was discussion of a proposal: "That the Institute shall incorporate into its Code of Ethics or Trade Practices for the industry a provision to the effect that the rates over differential routes shall not be used on deliveries made from consignments, and that such rates shall be applicable only on direct shipments made over differential routes at customer's request." Ex. V–2, Meeting 12/29/27.

The discussion evidently resulted in approval of the proposal as it was incorporated in Code, par. 3 (c). Defendants' policy was amplified in the following Code interpretation: "1. General Use of Differential Routes. Absorbing freight means the selling of transportation at less than cost, which is unsound in principle and necessarily throws an undue burden on the consumers at and near the primary markets. It is realized, however, that the use of differential rates on consignments cannot be prevented in all markets at all times. The customer has the right to ship over differential routes from refinery points, taking the slower service at his own cost and risk of the market during the transit period. If the quantity thus shipped is in fact inconsiderable, it should be ignored rather than break down the freight application actually paid on the preponderating quantity of sugar. If, however, sugar can be and is shipped by customers in this manner in sufficient quantity to break the market at the destination point and to render it difficult for refiners to sell their own sugar on the all-rail application, then this competition must necessarily be met. It is a question of fact in every instance, and the Executive Secretary should be fully advised, before sugar actually paying a higher rate is sold on the differential rate, of the necessity of this departure from the strict letter of the Code of Ethics."

Defense counsel offers, as the ground of the Institute's belief in the uneconomic results of selling transportation at less than cost, that it throws an undue burden on consumers at markets in which transportation is on a cost basis. As defendants appreciate, if this theory were acted on, there would be no absorptions. In practice, however, no effort was made to go so far; the principle was applied solely to prevent quotation of a differential rate on an all-rail or ex-consignment delivery.

It is entirely clear that the discrimination involved in absorption did not give defendants the least concern. Their whole purpose was to prevent the breakdown of the freight structure, chiefly in the Great Lakes and Warrior River areas.

---

[17] The figures for C. & H., whose freight losses amounted to more than 70 per cent. of the losses for the industry as a whole during each year of the period 1926–1930, are not comparable to those for other refineries, as C. & H. had a special arrangement with producers of the raws that it purchased, in effect to assume freight absorptions. Freight losses for the industry as a whole including C. & H. ranged from $2,326,855.37 to $3,974,674.44 per annum during the period 1926–1931. Ex. F–17.

During the early months of the Institute, desperate efforts were made by the executive secretary and those refiners that profited by the principle, to make it effective. But other refiners, chiefly Savannah, McCahan, and the Californians, found themselves thereby losing business in certain territories. By the summer of 1928, despite all efforts to prevent it, the code principle had been openly violated in the Warrior River and middle western areas. It was also quite clear by that time that because of the opposition of these refiners the enforcement of this rule must eventually meet with at least partial failure in those territories.

The government devotes much of its brief to a discussion of alleged agreements to support the principle; this chiefly concerns activities in the spring of 1928. Defendants deny any agreement. They contend that the Institute merely recommended the principle and urged the economic wisdom of following it, leaving to refiners complete freedom of decision. The evidence plainly demonstrates, however, that at this time defendants went much further. Agreements were, in fact, made but they were not entirely effective and, as already indicated, by the summer of the Institute's first year, the code principle had been disregarded to some extent in the crucial areas. The principle of Code 3 (c) was effective, however, in respect at least to one important matter. McCahan, the Philadelphia refiner, announced in May, 1928, that its freight application in certain middle west areas would be the New Orleans barge rate. "At the insistent request [of] Judge Ballou," McCahan withdrew the announcement the same day it was made. Ex. 457-T. At a special meeting of the executive committee on the following day, Pennsylvania and McCahan were "prevailed upon" "to continue indefinitely the withdrawal of barge rate application western territory." Ex. 457-U. The freight application in this territory did break down during the spring and summer of 1928 to the Philadelphia rail and lake rate; it was not broken down, however, to the lower New Orleans barge rate applications, to which McCahan had sought to break it. It is clear that this further breakdown was obstructed through the efforts of the Institute.

In this connection should be noted the use of the statistics on shipments over differential routes, described in the general discussion of statistics. Their purpose, of course, was to illuminate the question suggested in the code interpretation, whether or not sugar was being shipped by customers via differential routes in sufficient quantity to break the market at destination point. With such information at hand, the refiner could tell whether or not market conditions in areas served by differential routes really necessitated revising his current freight charge policy. It is likewise clear that the statistics were in practice used for this purpose. Moreover, the statistics were useful, whether refiners were acting independently or in concert, in establishing freight applications. Concealment of such data would naturally place customers at a disadvantage, for if unaware of the true conditions, they could not know when they might reasonably insist upon a breakdown in freight charges. It is thus apparent that with respect to this data, as well as the other statistics fully discussed hereinabove, defendants dealt unfairly with the trade.

After the failure of the Institute policy in the summer of 1928, but slight effort, so far as the record shows, was made to enforce Code 3 (c). The evidence shows that it had become a dead letter at least by the fall of 1929, and probably much earlier. But it was not until September, 1930, that the code interpretation was finally formally rescinded.

(2) But transportation problems still loomed large in the minds of defendants and in the activities of the Institute. The most important were finally solved by means of a system of delivered prices with denial of the privilege of purchases f. o. b. refinery. The government's insistence and defendants' denial that this system was developed and/or maintained by defendants through concerted action raise the most bitterly disputed issues in the case.

Concurrently with the attempt in the spring and summer of 1928 to make Code 3 (c) and the interpretation thereof effective, there grew up among the defendants a definite sentiment in favor of a scheme of delivered prices in the Warrior River and Great Lakes area. Place, vice president of McCahan, was the most vigorous exponent of a delivered price system. As early as March, 1928, reporting to McCahan's president the results of a meeting of Institute members, he wrote:

"A meeting was called at the Institute on March 29th to discuss means of main-

taining the 'all rail' rate into Chicago and other western markets. Both Mr. Fox [a McCahan broker] and I believed that the purpose of this meeting was to agree to sell in these markets on a uniform 'delivered' quotation (based on the 'all rail' rate), refusing to sell on an f. o. b. basis for shipment over all differential routes. This is the system employed by the Beet Sugar Manufacturers.

"The establishment of this system would have lost to us the selling advantage of the 'lake and rail' route but we would have been perfectly willing to make this sacrifice for the sake of a stabilized market which would have been a great advantage to those refiners not enjoying differential routes. However, pending consultation with legal authority, Judge Ballou felt that such an agreement might not be enforceable." Ex. 457–C.

During the months following the writing of this letter, Place advocated the principle of such a delivered price scheme on every possible occasion.

Judge Ballou himself was interested in the project. In May, 1928, he wrote the Domestic Sugar Bureau inquiring about the practice of the beet manufacturers in this respect and clearly indicated that what he was interested in was a delivered price system with denial of the privilege of purchasing f. o. b. refinery. Ex. 457–R. Minutes of the directors' meeting for June, 1928, contain the following: "There was a discussion as to the advisability of selling sugar at a delivered price instead of upon seaboard basis as is now the practice. *It was the consensus of opinion that this would be a desirable change* but the Executive Secretary stated that he would require more time to consider the legal aspects of such practice." Ex. 21–26 p. 68. (Italics mine.) All refiners were represented at the meeting except Arbuckle, C. & H., and Western; the latter two were not then members of the Institute. The representatives were in practically every case the president, vice president, or other leading executive or official.

A month later, counsel submitted an opinion as to the legality of such a scheme.[18] This opinion was submitted to a meeting of the executive committee in July, 1928. At this meeting, important representatives, including Place, of the following refiners were present: National, McCahan, Arbuckle, Colonial, American, Pennsylvania, Federal. Ex. 21–26 p. 87.

Despite this advice, Place continued to advocate adoption of delivered prices. Thus on November 19, 1928, he wrote Judge Ballou: "To my mind, the only way to avoid this action [breakdown of middle west freight rates to the New Orleans barge rate which it was feared might occur] is to develop a 'delivered price' system of selling, based on Mr. Cody's [sales manager of Arbuckle] freight zoning plan." Ex. 473.

The freight zoning plan had been discussed at a directors' meeting November

[18] Material parts of the opinion follow:

"We understand that this delivered price would in practically every instance be the present base price, plus rail freight to the point of delivery, and that except as to localities served both by water and rail there would be no difference between the delivered price quoted and the price which the customer is now required to pay.

"The practical effect, therefore, of carrying out any such recommendation if made by the Institute would be to raise in those communities served both by rail and water, the price of that part of the sugar which the customer may now have shipped to him by water. This would apply, we understand to two considerable territories, that served by the Warrior River Barge Line and that served by lake and rail.

"We do not believe that the Institute should make such a recommendation, and we believe that it would not be lawful for the members of the Institute to enter in to any understanding or agreement, open or implied, to put into effect a delivered price.

"The question is not one of the right of the refiners to use a delivered price, or to change from their present method of quotation to another. Such is perfectly lawful. It is the agreement or understanding to change from a present method of quotation to another method of quotation which would be unlawful if thereby it results in a raise of price particularly if that raise is substantial, or affects any large part of the community. And we believe that concerted action taken by the refiners as the result of a recommendation of the Institute would be construed as an agreement or an understanding. There would be nothing unlawful in any refiner voluntarily, but on his own initiative, changing the basis of his quotations and sales. But if the example of this refiner would be followed immediately by others, such action might appear to have been taken in concert." Ex. U–4.

16, at which Place was recorded present. A minute of that meeting states: "The possibility of freight applications based upon a system of freight zones was discussed. It was stated that such a system was already in effect with respect to alcohol, the production points of which correspond closely to those of sugar, and that it was being applied in other industries. The executive officers of the Institute were authorized to ask the assistance of the various traffic managers in making a study of the possibilities along this line." Ex. 21–26, pp. 148, 149.

The zoning plan was a favorite project of the Arbuckle firm. Goetzinger, general manager of that firm, testified: "It was absolutely the antithesis of it [delivered prices] * * * the Zoning plan contemplates a common price in every market in the zone. The [delivered] prices announced at the lake ports named a separate price." R. 6898).

However, according to Taylor's testimony, he was advised by Judge Ballou "that he thought the question fell in the same category as delivered prices, that we would have no legal privilege to do anything about it." R. 6461. Nevertheless, as late as January, 1929, Place and Moog (of Godchaux) discussed the question (Ex. 457 W–2), Moog advising Place that he felt such a plan for a zone price basis "with all sugar sold on a delivered basis" was the only solution of the problem of differential routes. Moog wrote to Ballou of the conversation, but Ballou replied February 5, 1929, that: "With regard to a zone or delivered price * * * I regret to say that I have not been able to find a satisfactory solution of the legal aspect." Ex. 457 X–2.

A month later, however, Place was still engaged in his advocacy of delivered prices. On March 5, he wrote Moog: "Of course, I am heartily in sympathy with your thought of quoting delivered prices. It is my opinion that such a practice can and must eventually be arrived at by refiners." Ex. 474.

Two days later, at an executive committee meeting, as the minutes reveal, "there was a general discussion of * * * the legal aspects of delivered prices." Representatives of National, Pennsylvania, American, Federal (later Spreckels), McCahan, Arbuckle, Savannah, C. & H., and Great Western, a beet manufacturer, as

well as the executive head of the Domestic Sugar Bureau, were present.

At its meeting of March 28, 1929, according to the minutes, "there was a general discussion as to the effect of the differential shipments upon delivered prices and of the economic situation caused by the existence of differential routes which were carrying only a fraction of the total volume of sugar but enough to cause disturbance and discrimination in various markets on account of the resulting inequalities in prices at destination markets." Ex. 21–26, p. 226.

I accept the explanation of defendants' witnesses that this latter reference, "delivered prices," was not used to indicate a denial of the privilege to purchase f. o. b. refinery, but simply as a destination price. However, I think it clear beyond doubt that the discussion of the "legal aspects of delivered prices" in the meeting of March 7th referred to such prices enforced by a refusal to sell f. o. b. refinery.

The foregoing discussion has presented the important evidence of defendants' activities relative to delivered prices prior to the first actual announcement of the delivered price schedule on April 29, 1929. It reveals, in my judgment, that through contact with one another under Institute auspices: (1) Defendants became familiar with the possibilities of a delivered price scheme; (2) their sentiment was crystallized in favor of such a scheme as a solution of their transportation problems; (3) they continued to concern themselves at their meetings in some degree with the question of delivered prices despite counsel's advice. The evidence shows, too, that defendants throughout the entire period covered thereby were greatly troubled about the transportation situation and the instability thereof in the two crucial areas, caused by the tendency for freight applications to be depressed for all classes of deliveries to the lowest differential rate carrying a substantial traffic into the territory.

During April, 1929, a series of events occurred which broke down freight rates in the Great Lakes area to new low levels. Defendants thus describe these events: Arbuckle, with its refinery in Brooklyn, had failed in 1928 to develop business by the canal and lake all-water service from the east, a service most advantageous to New York refiners. This was by far the cheap-

est service available to canal and lake ports and was not matched by the routes available to the Philadelphia, New Orleans, and California refiners and the beet sugar producers, competing at the same points, or some of them. As a result of Arbuckle's failure to develop business by the all-water route, it was itself suffering from the water shipments of its three local competitors, American, National, and Federal. It studied the matter during the winter of 1928–29, while navigation was closed, and in the spring of 1929 determined to break the freight applications to the lowest rates available to any one, the all-water rates, irrespective of routing.

Meanwhile, two of the Eastern refiners, in March and April, 1929, quoted reduced rates at certain lake ports without open announcement. Moreover, Edgar was causing uncertainty because he had tied up the most desirable boats. The Institute sought, defendants state, to learn what Edgar's space was costing him and have him openly announce his freight rate quotations for the coming season, but without success.

On April 22d, Great Western, a beet sugar producer, openly cut the freight application at Chicago and Milwaukee to water rate figures, and was immediately followed by the two California refiners. Other refiners selling in those markets, with the exception of Arbuckle, followed this announcement. On April 24th, Arbuckle consummated its own plan by announcing new freight applications for nine points, all canal and lake ports except Cincinnati. The Arbuckle rates radically reduced the then freight applications at those points. Pennsylvania and McCahan on April 25th and 26th followed Arbuckle's announcement and extended it to deliveries from consignment, so that the new freight applications now applied to all classes of service.

On April 25th, Rudolph Spreckels, then president of Federal as well as a director and later president of the Institute, sent the following circular letter to all members of the Institute under the letterhead of the Federal Company:

"Members of The Sugar Institute.
"Gentlemen:

"It appears obvious that in view of developments during the past few days that the spirit of at least some of the members of the Institute is such that there is little hope of carrying out its purposes—in face of the recent creation of a committee to study situations which have caused trouble in the marketing of sugar, a much worse condition has been precipitated prior or to allowing your committee a reasonable opportunity to consider the problems involved and to make recommendations for their correction.

"Terms and conditions openly announced, which clearly break down the entire selling structure, are to be deplored. Unless all the members are wholeheartedly determined to cooperate with their fellow members in bettering marketing conditions and each is willing to discontinue discriminatory practices, in the interest of the industry as a whole, there can be no useful purpose served by The Sugar Institute, Inc.

"I had hoped that the refiners who organized the Institute had, because of past experience, resolved to cooperate and build up a constructive method of doing business. The idea that refiners would persist in practices which are indefensable in principle and destructive of orderly marketing of sugar, must either be definitely overcome or we may as well close the doors of The Institute." Ex. 257.

American, although it met Great Western's, did not meet Arbuckle's announcement. Instead, on April 29, 1929, it announced that it would sell at the important lake ports as well as some other nearby points at delivered prices only and would not sell f. o. b. refinery. The delivered prices announced were considerably higher than the breakdown terms put into effect by other refiners during the preceding few days. The other interested refiners immediately followed substantially American's announcement.

Within a few days thereafter, freight rate applications had become stabilized at the important Great Lakes ports. The then application at Chicago was 49½ cents per 100 pounds, slightly lower than the all-rail rate but substantially more than the rate by several differential routes. See note 11, supra. The Cleveland application was 36 cents; Detroit 39 cents. While these applications were slightly lower than the all-rail rate, they, too, were considerably higher than the rates by some differential routes. During the delivered price period, as one customer testified, he could have shipped sugar to his place of business in Cleveland by barge for 13 cents under refiners' freight application. R. 3129. Another stated that at one time during this

period refiners were actually shipping to Chicago at 28 cents per 100 pounds and charging an application of 51 cents. R. 1121. At Green Bay, Wis., the prepaid delivered price quoted by refiners at one time amounted to 56.2 cents per 100 pound. But for the refusal to allow purchases f. o. b. refinery, a customer in Green Bay could have transported sugar from the refinery by water for about 18 cents less per 100 pound. See R. 752, 756. It is unnecessary to multiply examples. It suffices to say that refiners' freight applications in the Great Lakes territory were substantially higher than actual freight rates over differential routes.

The government contends that the inference of agreement and concerted action in putting delivered prices into effect is clearly to be drawn from the foregoing facts. Defendants insist that there was no agreement.

Spreckels' letter they explain as follows: "It is plain that this is the outburst of a refiner who had himself been hurt, and is not a declaration of the Institute * * * Spreckels was, together with American and National, one of the three refiners that had used the water routes and benefited by the sales advantage to them which the difference in the water and rail rates afforded. But this advantage had been lost by the action of Great Western and Arbuckle in reducing the freight applications to the level of the differential rates. It was clearly as a lament because of this situation rather than a plea for, or even suggestion of, delivered prices that this letter was written." Fact Brief, p. 216.

They refer to testimony of a representative group of refiners' officials, in which it is stated that each refiner acted entirely independently in the matter of delivered prices. In explaining how and why he put delivered prices into effect, Abbott, who determined American's policy (he was then its general counsel and later became its president), testified that when he learned of Arbuckle's announcement, "I started to do a lot of thinking." R. 6613. He then concluded that a delivered price system was the only solution. He continued:

"I locked this thing first in the bosom of my own mind or conscience, and over the weekend, at my home in the country, after studying the various rates that I could use—I had some 15 rates, I think, any one of which could have been used to name a delivered price to certain of these markets, I selected the one which I thought was fair and prepared what I thought was a fair announcement for the American Sugar Refining Company to adopt as its selling policy in these markets.

"I had, up to that time, talked to no one in my own organization about it. I talked to no one outside of my own organization about it, but in view of the fact that it was a new departure for the company and involved a rather substantial question of policy, in view of the fact that I was only the general counsel for the company at that time, although I was a director of the Institute, I thought that the matter should be passed on by one of my superiors and I presented the whole matter to the chairman of our company on Sunday afternoon, April 28th * * * I told him I believed that the company, as a matter of policy should put out this announcement on the opening of business the next morning, without saying anything to anybody, even in our own organization about it.

"He acquiesced in that conclusion. He was not a transportation man, taking my recommendations as to the rates, as far as the policy was, he acquiesced in my recommendation, and on Monday morning, I came to the office and went to the general sales manager and told him to have that announcement * * * put * * * out in the regular way." R. 6616, 6617.

When asked whether he consulted with anybody connected with the Institute on this matter, he testified that he did not except that he "may have talked this over with Judge Ballou in passing," "in some conversation on some other subject this was brought up as an incidental matter." Such discussion, he testified, was months previous, and the witness did not recall any such discussions as having occurred "more than once, or maybe twice." (R. 6619, as corrected at R. 6632–6634.)

Defendants insist that American's action, and the action of its competitors in following it, resulted not from agreement, combination, or concert, but from a "competitive struggle." If the foregoing evidence were all that the government had presented, I should nevertheless be inclined to find against defendants in this matter despite defendants' testimony. True, there is no evidence of an express agreement pursuant to which the defendants acted. But, as the Supreme Court said in Eastern States Retail Lumber Dealers'

Ass'n v. U. S., 234 U.S. 600, at page 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490, L.R.A. 1915A, 788: "It is said that in order to show a combination or conspiracy within the Sherman act some agreement must be shown under which the concerted action is taken. It is elementary, however, that conspiracies are seldom capable of proof by direct testimony, and may be inferred from the things actually done." See, too, Ballard Oil Terminal Corp. v. Mexican Petroleum Corp., 28 F.(2d) 91, 98 (C.C.A. 1, 1928); American Live Stock Comm. v. U. S., 28 F.(2d) 63, 66 (D.C.Okl., 1928, Kenyon, C. J., Williams and Cotteral D. J.) reversed on other grounds, 279 U.S. 435, 49 S.Ct. 425, 73 L.Ed. 787 (1929); Farmers' Livestock Comm. Co. v. U. S., 54 F.(2d) 375 (D.C.Ill.1931).

In the present case, under Institute auspices, the desirability of a system of delivered prices as a solution of the industry's transportation problem was developed and sentiment of the. members in favor of such a system was cleared; thereafter, despite legal advice to the contrary, the scheme was advocated by individual refiners and to some extent the project was kept alive in Institute meetings and discussed at a time when it was apparent that the transportation problem would soon become acute.

With the situation thus primed, it required only some spark to set the scheme in operation. I cannot accept defendants' explanation of Spreckels' letter. The document, revealing its purpose only too plainly, indicates, too, that Spreckels was speaking not entirely as president of Spreckels but also as an official of the In-stitute. Somewhat similar exhortation has evoked the condemnation of the Supreme Court in American Column & Lumber Co. v. U. S., 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093 (1921). While there is no direct evidence that Spreckels was urging a system of de-livered prices, it is not unreasonable to infer that such a letter would naturally stimulate the adoption of the one system generally recognized as a solution of the troubles of which he complained.

It is difficult to accept the testimony of defendants' witnesses that they acted independently in following American's an-nouncement. There is some direct evidence that refiners deemed the Institute responsible for the inauguration of the de-livered prices in the Great Lakes territory. Texas, in a circular letter May 7, 1929, signed by the sales manager and sent to its brokers, made certain announcements respecting Institute policy toward com-bination of the activities of brokers, ware-housemen, and customers, and significant-ly concluded: "We consider the recent results of *the Chicago rate situation*, to-gether with the requirements now being put before us, as the strongest evidence of the appreciation by the refiners of the need and necessity of the Institute and its code of Ethics to protect the profits of the sugar refiner." Ex. 391-U. (Ital-ics mine.)

In a sense, each refiner may have formed his own judgment, but each was already tutored under Institute auspices to know what was highly desirable in solving the transportation problem. The judgment of each inevitably, though per-haps not consciously, must have been in-fluenced by the knowledge obtained through Institute activities that all the refiners were agreed as to the wisdom, from their point of view, of delivered prices. It was a judgment which must have been influenced, at a crucial mo-ment, by the strong letter sent out by one of the important figures in the industry and Institute.[19] Individual conduct so plainly influenced· and directed by col-lective activities, and the authority of one who spoke at least in part as a rep-resentative of the Institute, cannot be deemed independant in any true sense. I should therefore be inclined to hold on this evidence that defendants acted con-certedly in instituting the system of de-livered prices in the Great Lakes area. But there is direct evidence, which in my judgment, makes it clear that even if delivered prices as originally announced were not the result of concerted action, the system was maintained through such action.

Before considering this evidence, it should be noted that in December, 1929, following an announcement by Godchaux, delivered prices were put into effect at points in the Warrior River area. For some time thereafter, purchasers at these points could buy sugar only on the basis of a delivered price in which the New Orleans, Savannah, or Philadelphia rail

---

[19] The president of C. & H. spoke of Spreckels as "the founder of the Insti-tute." See Ex. 442-S, p. 8.

rate to destination was charged (depending on which was lowest to any given point) despite the fact that the Warrior River Barge route provided a substantially cheaper service. I deem it unnecessary to review in detail the facts with respect to this matter. It suffices to say that the method employed in inaugurating delivered prices in the Warrior. River territory substantially parallels that in the Great Lakes region.

In discussing the evidence of concerted maintenance of delivered prices, the government enumerates five charges:

a. That defendants, acting through the Institute, sought and obtained the assurance of the important offshore interests that they would adhere to the delivered price system. In support of this charge, it relies on certain correspondence exchanged between offshore interests and the Institute. In October and November, 1929, L. W. & P. Armstrong, a brokerage house representing an offshore refiner, was complaining to the Institute that its chief competitors, brokers representing other offshore interests, were not living up to the code; that therefore Armstrong would have to change its own policy which theretofore had been one of strict adherence to Institute principles and practice, "and meet competition as they found it." Ex. 343.

With executive committee authorization, the executive vice secretary set about obtaining co-operation from the offshore interests in "Open Price Announcements" (Ex. 21–26, p. 339). The evidence shows that the complete success of any Institute plan or practice depended upon obtaining co-operation of the offshore interests for not only did these interests offer substantial competition to one another, but their sugar competed in many trade areas with defendants' sugar. On November 29, 1929, Armstrong, the staunch supporter of the Institute, had written to it suggesting the form of assurances which should be sought from the other offshore brokers. The letter stated, in part:

"We suggest that the following letter be given by any outside party promising full cooperation in connection with the sale of refined sugars:

"'We will . . . follow refiners' . . . announcements made in connection with quoting sugars on a freight prepaid basis only to certain points * * *.'" Ex.P6. (Italics mine.)

Obviously pursuant to this letter, the executive vice secretary wrote identical letters to the brokerage firms of Lamborn and Lowry, which stated in part: "We would also like you to tell us that you will quote sugars only on a delivered price basis to such points as are being generally sold on this basis. This latter is not an Institute matter but an item of importance to all parties concerned." Exs. 343, 324. (Italics mine.)

Lowry replied in part: "In selling out of town points we use the same prepaid basis as is used by all other refiners and it has not been our practice to sell sugar f. o. b." Ex. 343A.

Lamborn replied:

"Your letter * * * has * * * been given unusual consideration by the writer [Lamborn's President] and our vice-presidents. * * * Mr. Ody Lamborn and the writer discussed the matter at great length with you on December 2nd. * * *

"We mutually analyzed with you each clause of your letter and in principle, I feel sure you agree that we are in general sympathy with its purport. * * *

"Lamborn & Company Inc. have never sold at other than the delivered price basis in those markets which the refining members of the Institute have publicly announced as delivered price markets." Ex. 324B.

Plainly, the reasonable inference from this series of letters is that the Institute was seeking assurance that the offshore sugar would be sold on a delivered price basis. From this the conclusion would of course follow, since the Institute represented the refiners, that they were acting concertedly in maintaining the delivered price system. In an effort to avoid this inference and conclusion, the executive vice secretary testified that his letter was simply designed to obtain in written form, assurances which he had already obtained orally from Lamborn and Lowry, but which in oral form did not satisfy Armstrong; that he was not interested in whether the offshore interests sold on a delivered price basis; that he was interested solely in their openly announcing whatever terms they were selling on; that in conversation with and letters to these interests he intended only to obtain assurances that they would sell on open terms not that they would follow refiners' terms.

The documents themselves are entirely inconsistent with this explanation, as the quoted excerpts as well as the general tenor of the letters plainly show. As the government points out, if the executive vice secretary had been interested only in open announcement he surely would not have included the sentence italicized by me. Defendants themselves have emphasized the Institute's interest in open announcements as the most vital of all Institute matters. Moreover, it is entirely clear that the offshore interests believed that their adherence to refiners' delivered price policy and not open announcement was the important thing. Armstrong's letter, already referred to, makes this plain. Later in July, 1930, Armstrong wrote to the Institute: "We have a dispute with Eavey Company of Richmond, Indiana, relative to the proper freight application to shipments to that point. We * * * would ask that you please investigate and confirm to us the freight basis charged * * * by members of your Institute." Ex. 369.

To this the Institute replied: "On * * * the dates mentioned in your letter, Richmond was on a delivered price basis." Ex. 369A.

What Armstrong was interested in was in following the refiners' terms. The Institute must have appreciated this from the letter. Lowry, a government witness, when cross-examined, stated that it was his "understanding" that the Institute "made a ruling prohibiting * * * sugar from being sold f.o.b." R. 575. Even though he may have been wrong in believing that there was anything quite as formal as a "ruling," at least his impression that the defendants were jointly responsible for delivered prices is clear. Lamborn, too, clearly believed that the Institute was interested in adherence to delivered price policy. In complaining to the Institute in January, 1930, that H. H. Pike & Co., Hershey's representative, had departed from Institute principles, Lamborn wrote in part as follows:

"In your letter to us of November 30th, you incorporated the following paragraph:

"'We would also like you to tell us that you will quote sugars only on delivered price basis to such points as are being generally sold on this basis. * * * *'

"We assume that on or about November 30th, 1929, you forwarded to H. H. Pike & Company Inc., a questionnaire similar to [letter of Nov. 30th] * * * sent us. We further assume that H. H. Pike & Company with reference to delivered price markets, indicated to you that they would adhere to the delivered price basis in the markets where refiners generally sold at such a basis. If our assumption in either instance is incorrect, we would appreciate your so advising us." Ex. 325.

There is no evidence that defendants ever took any definite steps to disabuse the offshore interests of the impression which they certainly had and which defendants now contend was erroneous. This fact confirms the correctness of the inference that the Institute was not interesting itself merely in "open announcements," but actively sought and obtained assurance that the offshore interests would adhere to delivered prices.

Moreover, although open announcement is stressed by defendants as the Institute's most vital policy, there is other evidence that it was interested in having the offshore refiners maintain an "open policy" with the Institute and with one another rather than with the public. Thus on October 25, 1929, Taylor, who testified that, in connection with the correspondence hereinabove referred to, he was interested only in open announcements, wrote to Armstrong as follows: "Since conferring with you over the telephone, I have been in touch with both Lamborn and Lowry, who express complete willingness to co-operate with us in the matter of open price announcements, *or some substitute for that practice that may be suitable to all parties concerned.* They point out that a number and variety of open price announcements might be a greater disturbing factor than the present system, and suggest the advisability of some clearance, for the benefit of all parties interested in their prices, *without making it public."* Ex. 363–B (Italics mine.)

b. That members refused to sell f. o. b. refinery, stating repeatedly that if they did so, they would violate their obligations to one another and to the Institute. The evidence establishes beyond question that the purchasing trade entertained the belief that defendants inaugurated and maintain-

ed delivered prices by concerted action under Institute auspices; a belief deliberately created by the Institute and the refiners.

Texas' circular letter of May 7, 1929, to its brokers has already been quoted.

The correspondence with some of the offshore sugar brokers, hereinabove described, must also have tended to create this impression among the trade generally, inasmuch as they handled domestic refined as well. Naturally in negotiating with defendants' customers, they would pass along their own impressions.

It is also perfectly clear that Judge Ballou in a conference with Edgar's attorney, Eaman, in which the latter sought to enlist the Institute's aid in breaking down the delivered price system, gave Eaman the impression that the delivered price system was necessary to prevent abuses subversive of the code principles. Eaman testified that Judge Ballou "said it [purchase of sugar f. o. b. refinery] could not be done any more." R. 700. Defendants contend that Ballou merely meant that refiners must maintain their terms as openly announced. But from Eaman's testimony as a whole, it is apparent that what Ballou actually said naturally gave him a different impression. I cannot believe that Ballou was unaware of the impression that his words conveyed.

That the Institute did seek to prevent a *breakdown* of delivered prices is indicated by the cross-examination of Cummings:

"XQ. What moral or ethical principle of the refiners—perhaps I should say what moral or ethical principle, if any, of the refiners caused the efforts of the Institute to prevent a general breaking down of the delivered price system of freight rates. A. To prevent discrimination; industrial, geographic.

"XQ. In other words, you feel that if the delivered price system calls for rates on a particular level and if there is a general breaking down of the whole delivered price system whereby the rates are quoted, all territories are affected on a lower level. A. I don't know what you mean by the delivered price system. The delivered price system was not any system of the Institute. The Institute had nothing to do with putting in your so-called delivered prices." R. 4968.

The latter answer denies merely that the Institute did anything about "putting in" delivered prices, not that it sought to prevent their breakdown.

In their correspondence, refiners deliberately gave the impression to the trade that there was an understanding among themselves on delivered prices. Thus Henderson stated in a letter to a broker: "We cannot do that [ship f. o. b.] and no other refiner will do it either." Ex. 457–Z–4

National, in a letter to a customer of May 25, 1929, signed by its president, James W. Post, stated:

"We are in receipt of your letter * * * in regard to the rate of freight to Rochester.

"We greatly regret that we cannot comply with your request in regard to granting the canal rate, as we are only selling our sugars in the Rochester market at our F. O. B. New York price plus the rate of .294 on bags and .31 on barrels, cases and containers, regardless of how shipment is made.

"*The situation has made it necessary for us to try to cooperate in uniform methods of selling.*" Ex. 457–T–3. (Italics mine.)

Again, in a letter a year later to a Detroit customer, similarly signed, National said:

"We are in receipt of your communication * * * requesting that 114 barrels of granulated sugar, the balance of a lot of 250 barrels be shipped you by Barge. * * *

"We cannot comply with this request. The contract entered into by you for the purchase of this sugar provided that this company reserved the right to route the shipments, adding the freight to destination to the price. Under this contract we will ship this lot to you via all rail Detroit, adding to the price fixed in the contract the freight charge to this point.

"In your letter you request that the reason for not observing your shipping directions be outlined. In reply to this we beg to state that the observance of the contract provision is rendered *necessary in order to insure economy of operation at this point and the stabilization of trade conditions in Detroit.*" Ex. 457–X–5.

Responsible representatives of various refiners stated that they could not sell except on a delivered price basis, because

of the Institute. Defendants insist that such statements indicate "nothing more than the refiners' observance of their own open announcements, and the occasional use of the Institute as an alibi by refiners' sales representatives." Fact Brief, p. 235. The form of many of these statements as will presently appear shows that they were intended to mean more than that the refiners must adhere to their open announcements.

"Dozens of times" one customer negotiated with different brokers for purchases f. o. b. refinery without success. The "reason * * * generally given * * * that due to rules of the Institute, the refiners were not willing to take business of that kind" (R. 767), and that barge shipments were "impossible, due to rules put out by the Institute * * * that no refiner would accept such business, only on a delivered price, with the rail rate added" (R. 760). Among the refiners represented by the brokers with whom this customer negotiated were National, Revere, McCahan, Colonial, Arbuckle, Pennsylvania, and Spreckels. R. 759, 767, 768. There is also evidence that responsible representatives of American (R. 3129), Colonial (R. 620-2), and Imperial (R. 1320, 1321) advised the trade in a similar manner when they sought to purchase f. o. b. refinery.

Defendants have introduced no evidence to show that these agents were making representations unauthorized by or contrary to the wishes of their principals. It is clear from the testimony of the government's witnesses that they were given the impression not merely that the Institute enforced open announcements, but also that it stood back of delivered prices. In reaching this conclusion, I disregard entirely an alleged statement of Institute responsibility for delivered prices, attributed by plaintiff's witness O'Riley to a certain official of American but denied by him.

The fact that such statements were so generally made by the refiners tends, in my judgment, to confirm the other evidence of an understanding among them on the matter of delivered prices. Defendants' explanation that the statements were merely alibis cannot be accepted. The Institute did seek to prevent breakdown of delivered prices, and to the extent that it did, the statements were true.

c. That pursuant to members' suggestions, delivered prices were extended to other territories. While occasionally suggestions of this kind and announcement of extensions appear to have been made, nothing came of them. There is, however, evidence that defendants concertedly sought to maintain, and for a time at least, successfully, artificial freight rate set-ups in territories other than the Great Lakes and Warrior River areas, as in Central Freight Association territory and in Texas, when there were signs of a breakdown in these areas. Some effort, too, was made to persuade Hershey and C. & H. who maintained large consigned stocks in Mobile, to refrain from quoting the lower freight rates to destinations from Mobile rather than the higher one from New Orleans. I deem it unnecessary to discuss these and other minor incidents in detail. It suffices to state that defendants did seek concertedly to some extent to maintain artificial freight rates in these matters. The fuller discussion of their activities with respect to the Great Lakes area sufficiently indicates their methods. The fact that delivered prices were in effect in C. F. A. territory and in Texas prior to the Institute does not justify concerted effort to maintain artificial rates when signs of a breakdown appear.*

d. That delivered prices violated Code 3 (c) and that by the Institute's failure to enforce this provision it indicated its approval of them. The evidence shows that when delivered prices were first put into effect, Code 3 (c) was already becoming a dead letter. Moreover, the unanimity of the refiners' action in respect to delivered prices repealed Code 3 (c) de facto, at least in the territories where delivered prices applied. In them there was no reason for further effort to enforce it. While the executive secretary personally may have been strongly in favor of delivered prices, this fact alone is no evidence of the Institute's action with respect thereto.

---

*The court's special findings of fact refrained from making any finding as to maintenance of delivered prices outside the Great Lakes and Warrior River areas, except as follows: "112. Defendants concertedly sought to and for a time at least did maintain delivered prices in Texas, as well as in the Great Lakes and Warrior River areas, when there were signs of a breakdown. (Opinion * * * modified * * * .)"

However, it is somewhat significant that the principles of Code 3 (c), its avowed purpose of preventing "discrimination," and its definite recognition of a customer's right to purchase f. o. b. refinery, were completely forgotten when another system was devised to solve the problem of the Great Lakes and Warrior River areas. For delivered prices as employed by defendants accomplished virtually the very things which they professed the desire to eliminate by Code 3 (c) for the benefit of the purchasing trade. The argument made for Code 3 (c) is that absorptions are reflected in higher basis prices which in turn produce a discrimination in favor of distant customers as against those near refineries. But delivered prices, as employed by defendants, create a discrimination in favor of nearby customers by reason of arbitrarily high prices to customers at remote points. This confirms the conclusion heretofore stated that Code 3 (c) was not actually designed to eliminate discrimination and that defendants were not concerned with the customer's right to purchase f. o. b. refinery. Their real purpose was to solve, in a manner advantageous to themselves and without consideration of the trade, a troublesome transportation problem.

The discrimination, however, is much more real in the case of refusal to sell f. o. b. coupled with an arbitrarily high delivered price. The extent to which the delivered price is higher than actual cost of transportation definitely measures the discrimination. But the extent to which absorptions are reflected in higher base prices is largely speculative.

e. That the Institute's policing of alleged violations of refiners' delivered price announcements was part of the scheme to maintain delivered prices. Defendants insist that the policing activities were merely in aid of the policy of open announcement, for the purpose of discovering departures therefrom and of persuading adherence thereto. However, since the other evidence shows that delivered prices were in fact maintained by the concerted efforts of the combination, the policing activities would of course be illegal, if it be illegal concertedly to maintain delivered prices.

Delivered prices were withdrawn in the Great Lakes area, May 5, 1931, a little over a month after the bill in this suit was filed; they had broken down in the Warrior River about the end of May, 1930. They eventually broke down, too, to a large extent, in C. F. A. territory and completely in Texas, but just when this occurred is not clear.

In my judgment, it is unnecessary to speculate as to the relation of the withdrawal of delivered prices in the Great Lakes area and the pendency of this suit or as to the cause of their breakdown elsewhere. It suffices that there is a substantial danger that unless restrained, defendants may again attempt to inaugurate delivered price set-ups. Thus, in November, 1931, American again sought to put such a system into effect. All refiners followed except Arbuckle. Accordingly, the attempt failed. About this time, a customer was told by a broker representing one of the refiners that on advice of counsel, defendants would not raise the 36.1 cent Chicago rate, announced in May, 1931, to the 51 cent rate theretofore in effect, until after this case was over. But regardless of this evidence, I think it abundantly clear that there is a strong probability that defendants, unless restrained, will again seek to solve their transportation problems by the same means that were heretofore used.

## B. Institute "Information Service" in Transportation Matters.

Defendants describe the essential activities of the Institute with respect to this service, substantially as follows:

1. The Institute has relayed announcements of changes in freight applications since soon after its formation. A code interpretation recommends: "Any change in the application of freight rates should be reported to the Institute in the same manner as a price change. It will be handled in the same manner." Nevertheless, because of the greatly increased number of freight application changes since the Institute, it gradually ceased telegraphing all of them. All announcements are relayed immediately, but only the important ones by wire; the remainder go by mail. While price announcements are always telegraphed by the refiners to the Institute, freight announcements come in also in various slower ways. The only change since the formation of the Institute in refiners' announcements of changes has been to send it copies simultaneously with or after the communication to the trade.

The majority of changes are announced as effective immediately; some are made retroactive to meet announcements of competitors. Changes to take effect in the future are extremely rare. A refiner receives freight announcements like price announcements from trade sources direct, as well as through Institute relays.

Freight announcements were sent only to the members of the Institute, the Domestic Sugar Bureau and certain brokers; the Institute, however, sent freight announcements and gave information of freight applications to anyone who asked for them. The announcements, because they are essentially local in character, were not sent to news agencies. Since 1930, the Institute has sent all announcements to all members regardless of the territory affected.

2. In 1929, the Institute started a "freight book" which was later supplied to each refiner. It is a loose-leaf volume, with a section for each state, except the eleven western ones. Each state contains three kinds of sheets, giving respectively the selling terms then in effect, such as cash discount periods, price guaranties, special payment plans, etc; the then freight applications with any special rates or exceptions which have been announced, in each case with the names of the refiners who have announced them; and a list of those trucking companies used by the various members, which have signed nonrebating agreements. The sheets were summaries of information already sent out in the relayed announcements of refiners; they contained nothing new except during a short period when sheets were used to relay some announcements. Although the original idea was to keep the book up to date at all times by the use of supplements, of which a great many were issued, the number of changes in freight applications became so great that in fact the book was often months behind.

3. The government charges in effect that the system of freight application announcements and the "freight book" were used by defendants in aid of and to make effective certain of their allegedly illegal activities. Defendants virtually concede that the system was used by the Institute in aid of its efforts to make Code 3 (c) effective. See Fact Brief, p. 199. It is, likewise, entirely clear that the system was a vital link in the Institute's activities to maintain the delivered price set-ups and

that the "freight book" was used in aid of the concerted activities with respect to transportation matters generally and contract terms. An example of the latter use of the book is hereinafter described in the discussion of the "four payment plan." Individual refiners had accurate freight books of their own. At best the Institute service could be justified, if at all, as a slight "convenience."

### C. Miscellaneous Transportation Matters.

#### 1. Transiting and Diversion.

Plaintiff charges undue restraint of trade by defendants' concerted endeavors to limit buyers in transiting and diverting sugar.

Defendants assert that these privileges are granted by the carriers and are subject to rules and conditions contained in tariffs filed with the Interstate Commerce Commission. Transiting (sometimes called retransiting or storage in transit) permits storing a shipment at an intermediate "transit point" designated by the carrier and subsequently forwarding it to a point beyond. Diversion (sometimes called reconsignment) permits a change of destination or consignee while goods are in transit. In both cases the through and not the higher combination rate is applied from point of origin to ultimate destination via the storage or diversion point respectively.

Under the tariffs, the transit privilege is granted to the shipper or consignee. The transit billing, on a shipment by a refiner to a consignment point, was its property and could be transferred only by its endorsement. On a refiner's shipment ex-consignment from the transit point, it would have had to take large absorptions but for the transit billing, since the purchaser at the point beyond was charged a freight application based on the lower through rate to such point.

Defendants contend that the use of their transit and diversion privileges by others since the Institute, has been of concern to them only where the original shipments were made by the refiners and then only in two respects: (1) in so far as they might be used to defeat the refiners' freight applications, and (2) as the refiners might become involved in possible charges of violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. through the misuse of these privileges; beyond this, they claim never

to have taken steps to restrict or interfere in any way with the transiting or diversion of sugar.

As to violation of the Interstate Commerce Act, plaintiff contends that defendants concertedly sought to limit a rule of the "transit tariff" by deliberate misinterpretation and to compel customers, especially Edgar, to abide by their interpretation. This incident is now of no importance inasmuch as the new "Boyd tariff," hereinafter† considered, has clarified the matter. Defendants' interpretation of the original tariff is admittedly not unreasonable; whether or not it was made in good faith, I need not inquire. Plaintiff charges, in connection with this matter, that an Institute investigator encouraged by Institute officials sought to bribe an Edgar employee to reveal certain records of that firm; in my judgment, as to this, the burden of proof has not been sustained.

Because of the artificiality in the freight applications charged by the several refiners both before and increasingly since the Institute, there were opportunities for using transiting and diversion privileges to get sugar to ultimate destination at a cost to the purchaser below that of the announced freight application of the refiner. Thus, prior to the Institute, a blanket freight rate of 84 cents from the Pacific Coast covering the entire territory from the Rocky Mountains east to Chicago and St. Louis was in force, and in the western part of this territory, too remote for eastern and southern seaboard refiners to compete, it was the actual rate charged the purchasers. But at points farther east, at which the tariff rates from the eastern and southern seaboard were less than from the Pacific Coast the California refiners, in order to compete had to absorb part of the freight by making freight applications lower than 84 cents. Sugar bought from California refiners for delivery at more easterly points on the lower freight application might then be diverted to a more westerly point; refiners' higher application for that point would, thus, be defeated. Texas offers another illustration. Prior to 1928, blanket freight rates were in effect at Texas points both from New Orleans and from the Texas refining points; the Texas refiners always charged the New Orleans rate which then was 17 cents

higher and refused to sell f. o. b. refinery. In 1928, Texas was put on a mileage and New Orleans on a zone basis. Dallas and Hearne, being in the same zone, bore the same tariff rate, 58 cents from New Orleans; but from Sugarland, Tex., Hearne was 28 cents and Dallas 38 cents. The refiners' freight application from either New Orleans or Sugarland to Hearne was 45 cents, to Dallas 55 cents; in each case, the Sugarland tariff rate plus 17 cents. On an order placed with the New Orleans refiner for shipment to Hearne, Tex., the refiner would prepay the actual freight at the rate of 58 cents, billing the customer for the freight application of 45 cents; the refiner thereby absorbed 13 cents. If, before the car reached Hearne the customer diverted it, or from Hearne transited it to Dallas, there were no additional freight charges. Thus, the buyer had the sugar in Dallas at a transportation cost of 45 cents instead of the refiners' freight application of 55 cents to his Dallas competitor.

The evidence shows that both before and since the Institute, diversion and transiting have been used by customers to defeat freight applications either by misrepresenting to the refiners the actual destination and then transiting or diverting the sugar, in effect practicing a fraud upon the refiner, or with the refiners' consent, either secretly as a screen for a secret concession or openly.

Obviously, transiting and diversion, if used to defeat freight applications, would disturb the artificial rate structure. The advantage of the Hearne dealer, in the example given, would naturally cause the Dallas dealer to press the refiner for a reduction in his freight application with a consequent tendency to break down the freight rate structure. Defendants contend that their object in regulating these privileges was to prevent frauds upon themselves and secret concessions by their competitors with resulting discrimination. But it is clear that concerted action was unnecessary to combat the fraudulent use of these privileges. Indeed, the recommendations of the Institute with respect thereto contemplated merely that the individual refiners would take steps individually to make sure that frauds were not practiced upon them. In the final analysis, prevention of secret concessions through these privileges depended upon the honest

---

† 15 F.Supp. pp. 859, 860.

desire of the individual refiner to eliminate them. And the discrimination that resulted from their use, if they were used openly, was neither more nor less vicious than the discrimination inherent in the artificiality of freight structures which the defendants either independently or in concert employed. The agreement on the part of defendants to prevent transiting and diversions was essential to the success of their concerted efforts since the Institute to maintain artificial freight rate structures.

Defendants' activities are indicated by the detailed recommendations in Code Interpretation, § 1, pp. D1–D4, with respect to the action that the individual refiners should take to make certain that no transiting and diversion defeated the refiners' freight applications. These recommendations, based on the collective experience in the industry, may have represented the most effective means for discovering frauds; but in so far as they aim to have the refiners prevent even such transiting and diversion by customers as the refiner might be willing to consent to, their only purpose was to aid in maintaining the artificial freight structure.

A further charge against defendants is their concededly concerted endeavor, in part successful, to have the railroads make certain changes in the transit tariffs. Defendants' description of the facts (paraphrased in part from their brief) conforms substantially to the record:

The different transit rules, adopted from time to time by individual carriers, while similar, were not altogether uniform; there were, too, minor difficulties over their interpretation. The refiners as shippers desired to obtain better control over the transiting of their own sugars and sought the simplification which would result from one uniform, master tariff. The railroads, in conjunction with the National Industrial Traffic League (the national association of shippers) and with the advice and consent of the commission, have set up a procedure by which shippers may propose changes in railroad tariffs. It contemplates the presentation by shippers to the railroad officials of request for changes in tariffs and for notification to shippers of changes proposed by the carriers themselves. All proposals are placed on a public docket which is printed in the "Daily Traffic World," a publication subscribed for by persons interested in tariff changes. Hearings, at which all interested parties may present their views, are held before the railroad traffic officers. There is provision for appeal to a committee of higher traffic officers, and of course, after a tariff embodying a change has been filed and published, there is recourse to the Interstate Commerce Commission for its investigation and suspension.

This procedure was followed in the present case. The idea of a master transit tariff was first advanced in the fall of 1929. In November, 1929, the representatives of the refiners and beet sugar interests met to prepare a draft. This draft was then sent to various railroad representatives throughout the country with the request that it be formally docketed for discussion. The draft was revised somewhat by the carriers' representatives, who then put it out not as a shippers' request but as a railroad proposal. Public hearings were held by the railroad traffic officials in both the east and west early in 1930; the matter was then taken up at a joint public hearing held in Chicago in March, 1930. At this hearing, there were represented freight associations, individual railroads, the refiners and beet sugar interests, warehousemen, municipal traffic bureaus, chambers of commerce, associations of shippers, and individual sugar buyers. A railroad representative opened the meeting by stating: "The purpose of revision is to make the rules more specific, prevent misinterpretation and consequent misapplication—a practice which has prevailed more or less with respect to present rules, defeating the lawful rate; to establish uniformity, thereby avoiding undue discrimination and complying with the requirements and answering the criticisms of the Commission with respect to transit abuses." R. 6164. A discussion of the rules followed. The carriers then began working on a tariff ultimately filed by them with the Interstate Commerce Commission in June, 1931, to become effective in July. Petitions were filed with the Commission to suspend the tariff and the Commission did suspend one item; this suspension was later made permanent by consent. The remainder of the tariff became effective throughout the country in July, 1931. This, the "Boyd Tariff," superseded the individual tariffs of the several railroads.

So far as the record shows, the defendants' actions in this matter were entirely fair and open. They were such as might normally be expected of any group of shippers desiring to obtain tariff changes. In my judgment, they provide no basis for a charge of unreasonable restraint of trade.

### 2. Water Carriers and Private Charters.

Admittedly, defendants sought and in the spring of 1930 obtained from transportation companies operating on the New York State Barge Canal, an agreement that they would carry sugar only on the basis of openly announced rates and terms from which they would not deviate without open announcement. In code interpretations, the Institute recommended that members should refrain from employing water carriers that did not publicly announce rates and terms or in any way deviated therefrom. Section XII, par. 1(a) and 1(b).

The government refers to one incident of alleged boycott, but any withholding of business from the carrier in question was only temporary; defendants insist that there is no evidence that they actually refrained from dealing with any water carrier. The important fact, however, is that the threat of such action resulted in the open announcements which the Institute sought. Defendants justify their action as reasonably designed to prevent secret rebates by the carriers. There is little evidence that the carriers indulged in the practice of secret rebating and the defendants themselves rely upon "rumors" rather than actual knowledge that such practices were engaged in. In my judgment, an important purpose of the defendants in seeking these agreements was to effect a stabilization of transportation rates.

Code Interpretations, § I, p. C2, contain certain recommendations with respect to shipment by private charters:

"(b) Refiner's Account: No member of the Institute should ship sugar on his own account by private charter except when such charter is arranged directly between refiner and carrier, and refiner is satisfied no broker, buyer, nor warehouseman is participating in the rate.

"(c) Terms of Charter: Members are requested, before shipment (and regardless of whether the sugar is sold on delivered prices) to submit the terms of every such private charter to the Executive Secretary, so that he may scrutinize it for any indications of rebate or other violation of the Code of Ethics."

Defendants assert that "rumors" of rebating led to the adoption of these recommendations and that the purpose thereof was to prevent rebates. But here, too, the recommendations went further than was necessary to accomplish the ends; in my judgment, the real aim was to assist in the preservation of the price structure.

### 3. Pool Cars and Pool Cargoes.

As minimum cargo was often as high as 2,000 bags and minimum carload usually 600 bags, customers, unable to purchase in such large quantities, could, by clubbing together, obtain cargo or carload rates. Defendants, acting under Institute recommendations, concertedly refused to aid customers in making up the required minima by themselves participating in such pools with sugar shipped on their own account. In justification they urge the discrimination that would result from participations inasmuch as, due to refining schedules and sales requirements, they could not grant this privilege to all customers. But there is nothing unfair in an apparent discrimination which results solely from the necessary limitations of a refiner's capacity in this respect.

### 4. Mixed Cars of Sugar and Syrup.

Plaintiff contends that defendants sought concertedly to restrict the making up of mixed carlot shipments by including syrup. Refiners to whom this arrangement was not available used consignment service, and thereby affected defendants' program for reduction of consignment points. While defendants were troubled by this situation and discussed it on several occasions, no effective agreement or understanding with respect thereto appears to have been reached.

"It was the concensus of opinion" at one meeting that effort should be made to induce syrup producers to refuse to include their syrup in mixed cars, Ex. 459-0. Evidently nothing came of this, for there is evidence that mixed car shipments continued and continue to be made as before. There is also evidence that the Sales Manager of Imperial sought successfully to have carriers limit the

transit privilege on mixed cars. In my judgment, there is no basis for a charge of illegality in such action. In the absence of evidence to the contrary, I accept defendants' explanation that the carriers in so acting were merely interpreting their transit tariff.

### 5. Trucking.

In respect to trucking, which as a means of transportation has become increasingly important in the sugar industry in the past few years, defendants' policy was similar to that regarding brokerage and warehousing; they agreed to use only trucking concerns not affiliated with any buyer, broker, or warehouse and then only under nonrebating contracts. This, they insist, affected the warehouse trucking for refiners but not for its own customers. But in any event, the alleged justifications, similar to those offered as to brokers and warehouses are equally without merit.

### 6. Switching.

Plaintiff charges that defendants have restrained the absorption of switching charges by members. For a substantial period of time it was recommended in a Code Interpretation that members should "adopt in all territories the practice of not absorbing switching charges on deliveries from consigned stocks to buyer's warehouse or spur" with certain exceptions. Section VII, p. 2, par. 4. This provision remained in effect until May, 1931, after the bill in this suit was filed. In justification thereof and of the actions of the members pursuant thereto, defendants urge that absorption of switching charges increased the expense of consignment service and therefore intensified the inherent discrimination in such service as against those customers who could not enjoy it. However, as hereinbefore pointed out, defendants could and did recoup themselves at some points for the expense of consignment by charging for transportation ex-consignment at a higher rate than they in fact paid in moving their sugars.

### 7. Additional charges, denied by defendants, are of concerted action (a) respecting freight applications on l. c. l. deliveries at some points; (b) restraining delivery service at some points from docks to the buyer's place of business. I pass them inasmuch as the evidence in support of plaintiff's contentions concerns only a few incidents of minor importance.

### VIII. Consignment Points.

1. Prior to 1925, refiners maintained on their own account stocks of sugar at a relatively few strategic points throughout the country, known as consignment points; from them, sugar was distributed locally and to the surrounding area.

During the period 1925–1927, consignment points increased; refiners put in stocks at numerous points solely for the local trade. But to hold their trade and to share in the advantage accruing to the first consignor, competitors followed his example; a substantial increase in consignment points resulted, as is indicated by the testimony that C. & H. increased from about a dozen in 1925 to about 100 in 1927. R. 6775, 6777, 6778.

Defendants regarded this increase as one of the "outstanding evils" of the industry. Fact Brief, p. 155. Explaining the remedy adopted, they say:

"The defendants freely conceded throughout the trial and still concede that this was a matter in which they acted concertedly, in the sense that all recommendations of this Institute as to consignment points were made only by unanimous consent of the members. * * *

"The defendants contend that it was an entirely proper and legitimate function of the Institute to recommend, and for the members concertedly to proceed with, the reduction in consignment points" because "the tremendous expenditure required for the maintenance of consignment points, which the entire consuming public ultimately had to pay, resulted in no real advantage to anyone and therefore represented sheer waste." Fact Brief p. 154.

They concede, too, that the Institute sought and obtained the co-operation of the Domestic Sugar Bureau and other nonmembers and assert that no reduction could otherwise have been effected. Fact Brief, pp. 170, 171.

The Institute attempted to bring about reductions in three important areas:

1. The northeastern and central states.
2. The South.
3. States in Northwestern Mississippi Valley territory.

Defendants assert that refiners were under no compulsion to follow an Institute recommendation for reductions, that after approval they were later disregarded. On the whole, they say, the Institute program

was unsuccessful as consignment points increased from 344 to 468 and total consigned stocks from 670 to 1796, between 1927 and 1931 (Ex.S–6), while deliveries from consignment increased from 26.28 per cent. of all deliveries in 1928 to 32.53 per cent. in 1931, Ex.W–6. These facts, however, are immaterial. Controlling is the concession of an agreement to eliminate consignments at many important points and of the success of the Institute program in many important areas. Thus, between 1927 and 1931, they decreased in the New England states from five to none; New York, five to three; Pennsylvania, nine to two; Ohio, sixteen to three; Indiana, seventeen to four. In the southern states east of the Mississippi, deductions were even more marked. See Exs. Q–6, R–6, S–6. All reductions were admittedly effected by Institute activities. The increase in total consignment points 1927–1931, was in part due to the increase in Illinois, Missouri, and Arkansas, as to which refiners were unable to agree on a program. In these states alone, there was an increase of 121 during this period. In some other states, the increase evidently was due to the failure to effect an agreement with beet manufacturers.

Plaintiff charges also that defendants agreed upon the elimination of (1) reconsignment points "where sugar is stored only for forwarding in carload lots," (2) reconsignment warehouses, and (3) ports of entry where according to the government contention, "members may sell at the same price as at refinery points." Government Brief, p. 423.

While reconsignment points were separately dealt with by the Institute only in the South where all of the usual ones were retained, obviously a recommendation of these specific points was a restriction to the points named and as such tended to prevent an increase. Therefore, defendants' assertion that "the recommendation had no practical importance" (Fact Brief, p. 159) cannot be accepted. There is, however, apart from the Institute's general program with respect to warehouses, no other evidence of a restriction of reconsignment warehouses.

Defendants assert that plaintiff's description of ports of entry as "points where members may sell at the same price as at refinery points" is entirely erroneous; that in fact some of the cities described as ports of entry had freight applications until recently. They maintain, too, that though in recommending consignment points in the South, ports of entry like reconsignment points were separately classified, this was without significance. It is quite clear, however, that ports of entry did present a special problem; Wilmington, N. C., port of entry used by Hershey, was admittedly (Fact Brief, p. 161) eliminated as a storage point through Institute activities, notwithstanding that as Judge Ballou stated: "it is difficult to say how they [Hershey] can do business at all at or through Wilmington unless they break bulk at Wilmington, which involves a maintenance of stock at that point." Ex. 331, p. 2. Defendants insist that the Institute was not interested in ports of entry as such but only in so far as they were used as storage points. Regardless of defendants' motives, it is clear that limitation of ports of entry would be more serious than elimination of ordinary consignment points; at least in so far as it shuts a competitor out of a particular territory, it could not be justified.

Concerted action to reduce consignment points was proper, defendants urge, because (1) the ex-consignment business of the small refiner, unable to finance as many stocks as his large competitor, was necessarily restricted and he therefore was not adversely affected; (2) consumers in communities where consignments were not maintained were damaged because the expense of this allegedly free service elsewhere was necessarily reflected in a higher basis price for sugar generally; and (3) numerous consignment points involved economic waste.

(1) While the situation of the small refiner is obviously as stated, the conclusion therefrom is not so certain: There are certain disadvantages to him if compelled to limit consignments. Thus, the New York sales manager for Colonial, in commenting to his home office on the likely effects of consignment reductions, wrote: "* * * at times when the trade are on a hand to mouth basis and if forced to order in carload lots, it is quite probable that the order will go to the refiner who can supply softs, powdered and fancy grades. If, however, they withdraw from consignment stocks, we would probably share in the business by

specifying for some of the grades we make and a portion from refiners who make soft sugars." Ex. 447–A.

(2) While the cost of increased consignment points might well be reflected in a higher general basis price, there is no assurance that the savings effected through some reductions thereof would be passed on to consumers generally. The result in either case is largely speculative. The savings might in the long run be kept by refiners or used, perhaps as in this case, to install new consignment points elsewhere. Moreover, as already pointed out in the discussion on transportation, defendants did not always give consignment service free. By shipping sugar to consignment over a differential route and charging for transportation on ex-consignment sales, as if shipped over a higher rate route, defendants could and did recoup themselves at times for the service.

(3) Defendants declare: "Consigned stocks are * * * of no real value to the customers, and are used when available only because of the human tendency to rely upon them and to fail to order in advance * * * this small element of possible convenience * * * can alone be advanced as a possible justification for the expenditure of millions of dollars annually."[19a] Fact Brief, pp. 167, 168. Defendants conclude "that consignment expense represents a sheer waste." Fact Brief, 167–178. Plaintiff's witnesses testified to these material disadvantages suffered by customers from elimination of consigned stocks: as demand could not be accurately forecast, customers might be left with a shortage of one assortment and surplus of another; inadequate stock facilities restricted market areas; financing larger stocks was difficult for customers; there was a loss of the convenience of getting deliveries in less than carload lots. A defense witness, too, testified to the convenience of the consignment service (R. 8312); and the competitive advantage to the refiner who gave the service was concededly so substantial that other refiners "usually had to follow and establish their own consignment stocks." Fact Brief, p. 155.

In their endeavor to show that consignment service is a waste, defendants estimate its cost to themselves as 10 cents per bag, and then seek to show that if refiners eliminate consignments, this expense is not shifted to the customer because the latter has vastly smaller storage and insurance charges and a rapid turnover which eliminates carrying charges. Fact Brief, pp. 165, 166. This may have been true of some customers, but for others, the cost of warehousing, the largest element in the refiners' cost of consignment service, is shown to have been as large as that of the refiners. It may be doubted, too, whether refiners could not have reduced cost of consignment by more efficient management; thus defendants' own evidence indicates that excessive consigned stocks were piled up prior to the Institute through their lack of knowledge of the real market conditions. This was one of the reasons given for the need of statistics. It may well be that if refiners had addressed themselves to the proper use of the statistics provided by the Institute rather than to the elimination of consignment service, they might have effected more substantial economies.

Defendants refer to evidence that customers effect savings in trucking charges and obtain fresher stocks by using direct as against ex-consignment delivery. While this is true as to customers in a position to use these advantages, it demonstrates not that consignment service is sheer waste but only that there are some disadvantages attached to it. That customers unable to buy in carload lots could buy l. c. l. quantities through pool cars or that refiners gave customers adequately prompt service without local consignment, aids their argument only insofar as it tends to show that consignment service, however convenient and valuable, was not absolutely essential.

Two results in this matter indicate further evils of defendants' program.

First. The community eliminated as a consignment point might suffer as against a neighboring one because of the advantage thereby accruing to the latter point. Fort Wayne, Ind., but not Indianapolis, was eliminated. Fort Wayne's Chamber of Commerce complained that this gave

[19a] Defendants estimate the cost of consignment service during the Institute period as varying from $2,500,000 to $2,900,000 annually. This estimate does not take into account the extent to which defendants recouped themselves at particular points by charging a higher freight application than their actual cost of transportation.

Indianapolis an advantage. In reporting to the president and vice president of C. & H., counsel for that company said: "The Fort Wayne Chamber of Commerce may have a good case. If jobbers situated in Fort Wayne and Indianapolis are competing against each other for business in outside territory common to both cities, it stands to reason that the Indianapolis jobber has all the advantages and can do business with less overhead and more profit to himself." Ex. 407–N, p. 2. A similar situation is shown as between other cities.

Second. The elimination of consignment points also had the effect of eliminating from the distributing agencies, one type of jobber, the "desk jobber." These distributors were enabled to do business without any stock of their own, solely because of the refiners' consigned stocks.

Defendants have shown no valid reasons for eliminating cities like Fort Wayne, as against Indianapolis, or for eliminating desk jobbers. In view of the obvious hardship and unfairness resulting therefrom, defendants' policy could be justified only on the strongest considerations. As already indicated, these have not been shown.

2. In August and again in September, 1928, the Institute recommended a service charge on l. c. l. deliveries ex-consignment. Soon thereafter a 5 cents charge was put into effect by all members; there is evidence that this amount was agreed upon. The charge was discontinued early in 1929. Agitation by some members for a renewal thereof in the fall of 1930, was unsuccessful.

Defendants contend that this concerted action was entirely proper because of the cost to them of consignment service. But, as heretofore shown, refiners could and did recoup the consignment expense at some points by charging for transportation on ex-consignment service at a rate higher than the cost. The charge moreover was discriminatory because there is admittedly as much reason for a service charge on carlot as on l. c. l. ex-consignment deliveries. Defendants' action, in my judgment, was entirely without justification.

IX. Activities Relating to Miscellaneous Contract Terms and Conditions.

A. Long-Term Contracts.

Plaintiff charges, and defendants deny, that they agreed to make, and with certain exceptions made, no sales or contracts calling for sugar deliveries over a period longer than 30 days; further, that the agreement was enforced through the Institute. Defendants assert that with rare exceptions, the 30-day contract was the well nigh universal custom before the Institute, and that longer period contracts necessarily resulted and would result in discriminations.

The evidence establishes that before the World War, 30-day contracts were customary for all except manufacturers who were granted 60 days. While there was no definite practice since the war, long-term contracts were certainly not infrequent. During the immediate pre-Institute period, at least two refiners gave them; the California refiners, to the Pacific Coast canners, and Revere, "to any of our customers who were in a position to use it." R. 5547. Moreover, contracts calling on their face for delivery over a period in excess of 30 days were entered into during the immediate pre-Institute period, by American, National, Federal, McCahan, Godchaux, Imperial, Savannah, Pennsylvania, and Henderson with merchandisers of sugar, chain stores, and manufacturers. This last class had readily obtained them at all times prior to the Institute. The terms and conditions of the various contracts differed. Some called for deliveries in stipulated amounts at definite periods, others, for a stipulated amount to be delivered at the buyer's call; Revere's provided for a 10-cent concession off its basis price at the time of delivery; others specified a fixed price for all the sugar called for by the contract. Furthermore, the practice was widespread to contract for thirty days delivery although both parties then knew that the refiner would, as he did, extend the time to 40, 50, or 60 days.

Defendants insist that the long-term contracts other than Revere's and the Californians' were secretly arranged with favored buyers and carried discriminatory concessions. But even the ethical refiners appear to have given their long term contracts on the basis of private negotiations. Thus Revere "offered it to a good many of our * * * customers that we thought it was advantageous to both of us to have"; but these contracts were not announced to the trade generally. R. 5547, 5548. Henderson, another ethical refiner, also gave long term contracts to some of its trade, apparently without general open announcement. As a practical matter, it was probably

necessary that such contracts should be made on the basis of private negotiations, because their terms were necessarily somewhat complicated and would depend upon the needs and situation of the particular customer.

The economic value of such contracts in this industry is apparent. As is hereinafter pointed out in connection with quantity discounts, contracts like Revere's, requiring that a stipulated amount of sugar be delivered at definite intervals over a long period, would tend to bring about greater evenness of production through the year and this, as defendants virtually concede, would effect economies for the refiner. But perhaps of more importance is the value of long term contracts to the purchasers, specifically to manufacturers who use sugar in the making of another product. Especially if they announce their sales price long in advance of manufacturing, it is vital for them to know as early as possible the costs of the various elements entering into their finished product. The evidence shows that the astute refiner could protect himself against fluctuations in the raw market by hedging through sugar futures far more readily than the customer, because more familiar with and accustomed to such operations; Lowry* testified that one who knew his business could offer a long-term contract even with a guaranty against price decline and not lose money.

Defendants' assertion that subsequent to the Institute, long-term contracts were not barred by any agreement, is so inconsistent with the evidence that I deem it unnecessary to discuss in detail the testimony of the several witnesses and the exhibits which have been introduced on this subject; indeed, the contrary was virtually conceded in argument, at least as to the first year of the Institute, when counsel stated: "I submit there is nothing in this record that furnishes any real foundation for the claim that there has been an agreement among these refiners, *at least since the end of 1928*, not to offer longer than thirty day contracts." Tr. of Arg. p. 730. (Italics mine.) I can find, too, no substantial change in the situation subsequent to 1928.

At the organization meetings in December, 1927, the refiners agreed not to enter contracts calling for deliveries in excess of 30 days while the formal arrangements for setting up the Institute machinery were being completed. Thereafter, at a directors meeting held in February, 1928, "It was finally and unanimously agreed to recommend that the present trade custom of contracts not to exceed thirty days withdrawal should be continued without exceptions." Ex. 21–26, p. 17; recommendation printed in Code Interpretations, § XI, p. I, issue of 2/17/28. Not only did the defendants agree among themselves with respect to this matter, but efforts were made by the Institute to induce Hershey to abide by this ruling. Because California refiners objected to a change in their custom of granting long-term contracts to the canners, an exception was made in that respect for the three Pacific Coast states, and Hershey was notified that it "might have the same opportunity as members of the Institute to meet this competition" in those states "only." Ex. 428–D.

During the first year of the Institute, because of strong protests by manufacturers against the abolition of long-term contracts, a committee appointed by the Institute to devise a special contract, recommended, and at their meeting in November 1, 1928, the directors approved, a contract calling for deliveries up to sixty days after the usual contract period, sugar thus sold to be packed in a distinctive container (the committee suggested a 175-pound cotton bag, suitable to the manufacturer's needs but unattractive to merchandisers); furthermore, the contract was to provide for a service charge, no guaranty was to be given, the "usual" differentials were to be charged and the buyer was to declare at the inception of the contract, the delivery dates with the amounts to be withdrawn at each date. · Ex. 21–26, p. 144.

Defendants assert that when this recommendation was made, the code interpretation against long-term contracts became ineffective. A subsequent printing of Code Interpretations does omit this ruling, but the evidence does not make clear just when it was dropped. More important, however,

---

* Lowry, whose testimony is frequently referred to, was, at the time he testified, president of the National Biscuit Company. Prior to that, he had been president of Lowry & Co., brokers representing offshore and other sugar interests. Just prior to the Institute, he was interested in the operation of the Pennsylvania Sugar Company under a lease arrangement. Before that, he was connected with a firm representing raw sugar producers; until 1920, he was general sales manager for Federal.

the committee's recommendations adopted by the board of directors in November appear not to have been made effective. The minutes for the directors meeting held in January, 1929, state: "The proposed special contract for manufacturers was discussed. Several members expressed the opinion that in the form proposed, that is, with a carrying charge to cover the added cost of deferred delivery, such a contract would not be acceptable to the trade. In view of this opinion no further action was taken." Ex. 21–26, p. 190.

No sugar appears ever to have been sold under such a contract; customers' endeavors since the Institute to obtain longer than 30-day contracts from defendants appear never to have been successful. The practice which the Institute originally fostered continued despite the change in the Code.

There is, too, other evidence of an agreement subsequent to November, 1928, not to offer long-term contracts. In answer to a circular letter of April, 1930, from the Institute's office manager (Ex. 418–E), counsel for C. & H., who frequently displayed a very careful attitude, cautioned Institute officials against writing letters indicating that there was an agreement against long-term contracts when, as he said: "So far as I know, sugar refiners have not agreed" in the matter and "such an agreement might be illegal." Ex. W–8. Taylor in reply stated that "the language used in this circular was unfortunate." But it is significant that so far as appears, no supplementary circular was issued to members to correct the impression which the "unfortunate" language must have caused. In October, 1930, Henderson was complaining that Hershey was selling on 90-day contracts, although the Institute claimed it was doing what it could "to hold them [Hershey] somewhat in line." Ex. 420–H-3. In May, 1931, Moog, vice president of Godchaux, in writing to one of their brokers said: "One of the limitations of the Institute is a 30 day contract so we are unable to dicker with the W. & W. Pickle Co. on basis of an absolute price for shipments deferred until July, August and Sept." Ex. 419–F–4.

While representatives of various refiners testified that they had felt perfectly free during the period of the Institute to offer long-term contracts, subject only to the requirement that it be done openly, I cannot but believe that any such freedom was purely illusory. Though subsequent to 1928, there may have been no formal agreement against long-term contracts, the evidence, in my judgment, clearly establishes that throughout the entire history of the Institute, the refiners actually had an understanding that they would not grant them.

While denying that they had the agreement, at least subsequent to 1928, defendants point out the alleged evils involved in making long-term contracts. But even if, as they contend, the "unethical" refiners, by granting them to some and arbitrarily refusing them to others under like conditions prior to the Institute, had unfairly or illegally discriminated as between customers, that is no valid reason for their complete post-Institute elimination. Even those unethical refiners might in the later period have granted them fairly, as did Revere in the earlier days. Whether or not a refiner, by long-term contracts, could more readily conceal special arbitrary concessions, is at best speculative; the Institute had ample facilities to prevent secret discriminations.

Defendants urge, too, that had such contracts been limited to manufacturers, it would have been difficult, if not impossible, to prevent them from selling the sugar instead of using it for their own products, thereby effectuating an unfair discrimination as against other distributors. While this would be possible, there is no substantial evidence that manufacturers had sold or were likely to sell their sugar. Moreover, a long-term contract could be offered generally by individual refiners as Revere had offered them or one type of such contract might be given to distributor customers and another granted to manufacturers, the latter in such form that it would have been impracticable for the manufacturers to sell the sugar.

In my judgment, concerted action, whether in prohibiting all long-term contracts or only in insisting on open announcement of any such contract that may be offered, is without justification. An obligation to adhere to such open announcement would tend to prevent many entirely fair contracts. While the abolition of long-term contracts was effected largely through defendants' definite agreement, the requirement that prices and terms must be openly announced in advance of sales, aided in the elimination. The vice president of Revere testified that that company's refusal, subsequent to the Institute, to enter into long-term contracts, was based upon the

consideration "that that was not selling on our openly announced prices and terms.". R. 5548. Many long-period contracts, because of their complicated terms, would necessarily have to be arranged by private negotiations. The Godchaux-Edgar contract, for example, hereinafter considered, was for an unusually long term; in it, Edgar assumed an obligation to lend financial aid to the refiner. Perhaps no sugar customer other than Edgar could have used a precisely similar contract. That fact, however, does not make the contract necessarily unfairly discriminatory. Edgar's position was unique. The requirement of announcement of all contract terms in advance of sales would make many long-time contracts practically impossible; the purpose of insistence thereon must be deemed to be the prevention of such contracts.

Clearly, here as elsewhere, defendants were concerned not with unfair discrimination between customers but with precluding the mere possibility of secret concessions and more important, with the preservation of the price structure. Clearly, too, by their agreement not to offer such contracts, they have entirely disregarded the interests of their customers.

2. Long-term contracts obtained by Edgar in December, 1927, were the subject of special Institute action. Shortly before or during the December, 1927, Institute organization meetings, long-term contracts were negotiated between Edgar and Godchaux and between Edgar and Revere, hurried by Edgar's belief, probably shared by these refiners, that the terms would be prohibited if and when the Institute should be organized.

Godchaux, renewing with some changes an earlier long term contract, contracted to supply Edgar with 10,000-15,000 bags of sugar weekly for two years commencing in December, 1927, at 20 cents under the market price of American and National. Although Godchaux long-term contracts were not openly offered to the trade, they were also given to others besides Edgar. See e. g. Ex. 62.

The Revere-Edgar contract called for 1,000-5,000 bags weekly for one year commencing December 10, 1927, with a 10-cent concession from list price, a "type of contract that was offered to any of our [Revere's] customers who were in a position to use it." R. 5546, 5547.

Admittedly, the Institute sought and obtained from Edgar an assurance that he would maintain "refiners prices" and not take advantage of the opportunity afforded by these contracts to cut prices. Fact Brief, p. 364; Tr. of Arg. pp. 383-385, 425, 427. At least during most of the period of these contracts Edgar did maintain Institute prices.

By the terms of his agreement with the Institute, Edgar was deprived of the competitive advantage of cutting prices and the consuming trade was kept from participating in the benefits of lower prices. Effectively to tie the hands of one of the refiners' most active competitors plainly constituted an unreasonable restraint of trade. Defendants assert that these contracts threatened to wreck the whole Institute project and that their "existence * * * undermined the very cornerstone on which the Institute was built." Fact Brief, p. 363. The contracts threatened the Institute only in so far as the Institute was concerned with uniformity of price structure.

3. It was at times impracticable to enforce to the letter the usual 30-day contract. Extensions were often granted. The enforcement committee during the year in which it made recommendations as to the extensions which should be granted was guided in part at least by the periodic statistics of the customers' position on their contracts. See Ex. 27. These statistics were withheld from the trade. On one occasion, the committee recommended that members should "advise the trade" that specifications on outstanding contracts must be furnished by a certain date, while at the same time it was "the opinion of those present" at the committee meetings "that the seven days' latitude for effecting delivery of these contracts should be granted at the option of the refiner, but that the trade should not be advised regarding this extra time." Ex. 27, p. 124. See, too, Id. pp. 108, 110, 127.

Thus defendants in concertedly enforcing contracts violated the Institute's most important principle, that of open announcement. In my judgment, too, there is no justification for concerted action in determining whether and to what extent to relax a contract term of this character.

B. Quantity Discounts.

At one of the pre-Institute organization meetings in December, 1927, representatives of the refiners present adopted a resolution: "That it is in the interests of the public and the trade generally that no dis-

counts shall be allowed on account of quantity purchases." Ex. V–2, Meeting 12/15/27, p. 7.

Thereafter and before formal organization was completed, representatives of the refiners conferred with Department of Justice .officials; the proposed quantity discount provision was discussed, and then and there redrafted to include the reason therefor, that "no economies were to be derived by the industry by reason of" quantity sales. R. 4825. See Code 2. Defendants insist that the scope of the rule is to prohibit discounts based solely upon quantity and this, because it would involve an arbitrary discrimination for the reason stated; only to this extent, do they seek to sustain it. Indeed, a distinguished economist who testified for and those who submitted a brief on behalf of defendants emphatically said that if economies are attributable to quantity sales, a. discount is entirely legitimate. To this, defendants assent, although in their law brief the suggestion is made that at least in the case of sales to chain stores, the quantity discount may be economically unwise even if economies are thereby effected.

Prior to the Institute, there was no systematic practice of giving quantity discounts. More frequently than not, it was the large buyer, the powerful bargainer, who obtained them. But they were often granted to the smaller buyer as well. Moreover, the amount of the discount bore little relation to the amount of the purchases. This was but natural in view of the pre-Institute secrecy in concessions given by the "unethical refiners." The "ethical refiners," except in the case of the Revere long-term contract, apparently gave nothing which might be deemed a quantity discount.*

The code and the practice under it went further than merely to prohibit unsystematic and secret quantity discounts; even a discount systematically graded according to quantity was prohibited. To sustain their contention that quantity discounts would effect no economies, defendants present in

some detail their version of the costs of producing and distributing sugar.

Were the facts as defendants represent them to be, both as to the scope of the rule and the conditions in the sugar industry, there would then arise the legal question whether or not, under the Sherman Law, a concerted restraint is reasonable in such circumstances. But in my judgment it is clear on this record that the actual facts are entirely inconsistent with defendants' position.

Defendants analyze separately direct and indirect cost. With respect to direct cost, the argument is: (1) That the refiners get no discount for quantity purchases of raws which constitute about 80 per cent. of the cost of refined; (2) that quantity sales effect no appreciable direct savings in manufacturing costs; or (3) in bookkeeping, deliveries, storage, etc.; or (4) in brokerage. With respect to indirect cost, it is argued that quantity sales, (1) because of the custom of the trade in buying and in taking delivery of sugar, do not effect "greater evenness of production," and (2) because of the inelasticity of the demand for sugar, effect no economies through increased volume in production.

As to cost of raws, brokerage and direct manufacturing costs, plaintiff has referred to and I find nothing that refutes defendants' contention.

As to savings on cost of bookkeeping, deliveries, ·storage, etc., the testimony of defendants' witnesses that large sales effected no appreciable savings with respect to these items, conflicted with Lowry's testimony, the more credible on this point. Some large sales at least would effect very substantial savings in these incidental costs; in sales to those manufacturers and distributors that can take deliveries of their sugar in carload lots direct. from the refinery instead of ex-consignment, as many prefer, there are substantial savings in delivery, storage, bookkeeping, and other incidental expenses. While it may be true, as defendants contend, that such savings

*The court's special findings of fact modified this as follows: "156. Prior to the Institute there was no systematic practice of giving quantity or other (opinion * * * modified * * *) discounts. The majority of discounts were given to the large buyer. But discounts were often granted to the smaller buyer as well, and the amount of the discount bore little relation to the amount of the purchases or the method of taking delivery. This was the natural result of the pre-Institute secret concession system. The 'ethical' refiners, except in the case .. of the Revere long term contract, apparently gave nothing which might be deemed a special (opinion * * * modified * * *) discount."

would result not from the quantity sold but from the method of taking delivery, the evidence shows that the large purchaser, other than the chain store, was more likely to take deliveries in this way. It does appear that no savings would be effected in large purchases by chain stores; this is because a large sale in such cases amounts in effect, in view of the method of taking delivery, to nothing more than a series of small sales to the individual stores in the chain. An agreement not to allow discounts on such sales would present a different question of legality, on which it is unnecessary to express an opinion.

As to greater evenness of production, defendants correctly say that the volume of sales in large quantities substantially follows the same peaks and valleys throughout the year as does that in smaller quantities. But the long-term contracts prior to the Institute not infrequently carried the stipulation that the amount called for in the agreement should be delivered in specified weekly or monthly amounts over a considerable period of time. This was true of the Revere long-term as well as the Godchaux-Edgar contracts. There is evidence, too, that Godchaux had such contracts with Coca-Cola as well as with another distributor in 1927. Of course, the prohibition against long-term contracts precluded such arrangements subsequent to the Institute. The extent to which such contracts might effect greater evenness in production may be indicated by those 1927 Godchaux contracts which are in the record. Godchaux's capacity was about 120,000 bags per week. Ex. W-7. The Edgar contract called for 10,000 bags weekly for 52 weeks; Coca-Cola, 10,000 bags monthly for three months; the distributor, 3600–6000 bags monthly in approximately equal shipments under a "continuing contract." Exs. 62, 123, 141.

Defendants assert that sugar demand is inelastic and that a single purchaser of 100,000 bags a year contributes no more to the volume of production than would 100 buyers of 1,000 bags each. Therefore, they contend, encouragement of large sales through quantity discounts, whether by the individual refiner or by the industry as a whole, would not in the long run build up total production. This theory was developed at considerable length by an economist witness and in the Economics brief. In my judgment, it is unnecessary to consider the merits of the economic argument because defendants have not sustained their claim that demand is inelastic; elasticity has been clearly proven. Between the years 1916 and 1926, annual per capita consumption, according to the figures published by Willett & Gray, increased from 79.34 pounds to 109.30 pounds and for 109 years up to and including 1921,* the average yearly increase in total consumption was 4.964 per cent. During the period 1927 to 1931, the total consumption of sugar increased but slightly; but because of the inclusion therein of the depression years 1930 and 1931, the figures for this period offer no reliable basis for a fair forecast, especially in view of the substantial increase in per-capita consumption during the previous decade.

Whatever be the situation as to wholesalers generally, the record affirmatively shows that a quantity discount, at least to those selling to manufacturers as well as to manufacturers buying directly from the refiner, might well result in a substantial increase in sugar consumption. Defendants, perhaps unwittingly, have all but pointed this out. They assert that in the case of a proprietary or trade name article with a market capable of almost indefinite expansion, it is entirely legitimate to offer a quantity discount if, to do so, will result in the expansion of demand. But they say, this is impossible in the case of a standardized commodity such as sugar. According to the testimony of one of their principal witnesses, one-third of all the sugar sold by defendants is bought for use in the making of other products. R. 4601. As these may well have "a market capable of indefinite expansion," a quantity discount to a manufacturer of such a product would enable him in turn to dispose of more of his product; increased demand for sugar would necessarily follow. Coca-Cola offers an example; from 1926 to 1929, its sugar purchases increased from 1,240,000 bags to 2,250,000 bags (R. 1542), an increase equivalent to nearly 1 per cent. of all sugar consumed in the United States during 1929.[19b] That defendants did not regard the demand

---

*The court's special finding of fact No. 161 stated: "'1921' * * * should be * * * '1931.'"

[19b] Subsequent to the Institute, when Coca-Cola was refused special terms by the defendant refiners, it purchased principally from Hershey which never conformed entirely to Institute practices, and from a small Louisiana nonmember refiner. R. 1543–4.

as inelastic is shown by the fact that in four years they spent through the Institute about a million and three quarter dollars for advertising. R. 5232. Nor were they neglectful of these possibilities for increasing consumption; an Institute official testified that it advertised not sugar but such products as *"ice cream, cereals and various other things with which sugar would be consumed."* R. 5098. (Italics mine.) It is clear that, at least in many cases, a discount based solely on quantity would have been justified even under defendants' economic theory.

Defendants have asserted* that the Code provision did not condemn discounts, if a refiner chose to offer them for even deliveries of a fixed quantity of sugar at regular intervals or for any other type of deliveries which might involve a real saving to the refiner. Although the language of the Code might be so interpreted, in practice the Code prevented discounts, regardless of the special circumstances of any particular transaction or class of transactions. The understanding among the refiners not to offer long-term contracts precluded, as a practical matter, contracts providing for even deliveries. The only types of contract, so far as the record shows, that ever carried such provisions, were those like the long-term Revere and Godchaux contracts. The Institute effectively ended this type.

Sugar buyers tried to obtain discounts for purchases which would clearly have resulted in savings to refiners. Thus, a C. & H. customer, who sought a discount for taking direct rather than ex-consignment delivery, the latter being considerably more expensive to the refiner, was told: "You know I cannot do that. That is against the code of ethics." R. 2399. This and similar efforts were unsuccessful, in my judgment, because of the understanding among the refiners that no special discounts of any kind should be allowed regardless of the economic justification therefor.

The crux of the matter is that the refiners preferred to have all sugar sold in any given trade area at precisely the same prices and terms rather than to effect economies in its sale and distribution. They prohibited deviation from the uniform sales arrangements in order to (1) preserve the uniformity of price structure, (2) prevent unscrupulous refiners from cloaking secret, arbitrary concessions in the form of a special practice. Such purposes furnish no legal justification in the circumstances of this case, for action which, judged even by defendants' own theories, produces uneconomic results.

### C. Tolling.

Plaintiff charges that tolling has been abolished by the Institute. Under the tolling arrangement, the refiner accepted raw sugar from its owner and gave him refined; not his own sugar but an equivalent quantity, usually 93 pounds for each 100 pounds of raw, the 7 pounds difference representing the loss in refining. A charge was made for the refining service.

Pre-Institute tolling agreements were made by the refiners with one another, with producers of raws, with manufacturers of products containing sugar, and with sugar merchants; they were not common, however, and were always a matter of special arrangement. National's representative testified that he had never heard of an open tolling announcement and that while his refinery did a limited tolling business, it accepted only a few such contracts because they affected its ability to serve its regular customers. R. 8979, 8980. The refiner's benefit from tolling was in not having to finance the raw sugar.

Some agreement on the subject was effected during the preliminary organization meetings in December, 1927, but whether to toll for no sugar customer or to except from the ban manufacturers of products containing sugar is not clear. See Exs. 434–E, 434–I.

In July, 1928, Savannah entered a tolling agreement with Coca-Cola and so notified Ballou. The unanimous opinion of the executive committee was that the arrangement violated the provisions of the Code against discrimination. Ex. 434. Savannah advised Ballou that it would abide by the unanimous decision of the directors so far as future business was concerned. Ex. 434–E. The directors concurred with the executive committee; Code interpretations covering the matter were adopted. One was designed to prevent tolling for purchasers of sugar, another to regulate tolling for raw producers. Code Interpretations, § I, p. cl.

Conforming to these recommendations, the refiners when tolling for raw sugar producers exacted an agreement that the sugar should be sold in accordance with the Code; except for the one Savannah con-

*Fact Brief, p. 103.

tract, they did not toll for a sugar purchaser.

Defendants justify the Code rules on the ground that as open announcement was not practicable and tolling in any event could not be availed of by all sugar buyers, it necessarily gave some a discriminatory advantage; further, that if the tolled sugar were not used by the owner in manufacturing his own products but sold, the refiner might become a participant in code violations, if the sales were made contrary to the Code of Ethics principles.

In my judgment, the rules were in fact adopted principally because of the refiners' fear that the tolled sugar would compete with their own and jeopardize the price structure. Cf. Ex. 434–E.

### D. Credit Terms.

The chief practices in the sugar industry, with respect to credit arrangements, were the four-payment plan, split billing, and the cash discount. In varying degrees, the Institute has concerned itself with each of these practices; while all are more or less closely interrelated, for convenience, they will be considered separately.

#### 1. Four Payment Plan.

I paraphrase defendants' description. As it was offered in 1928, the buyer was given immediate possession of a carload of sugar. It was treated, however, as the property of the refiner, merely on consignment with the buyer. He was obligated to withdraw or take title to only one-quarter of the carload each week, the purchase price of the amount withdrawn then becoming payable on the usual 2 per cent. seven-day terms; he was at liberty, however, to withdraw and dispose of the entire carload immediately, but had to report this to the refiner, as the purchase price of the sugar then actually withdrawn became payable on the usual terms. If the refiner's price declined, the buyer received the benefit of the new price on any unwithdrawn portion of the shipment. If the refiner's price advanced, the buyer could immediately call any "unwithdrawn" balance at the old price. The purchase price of sugar thus called, thereupon became immediately payable. Since about 1930, several changes in the terms have been made by various refiners, to render the plan more attractive to the buyer.

The plan was originated by Savannah some years before the Institute. In 1928, it was offered in Georgia, North Carolina, and South Carolina. Defendants cite the extension of the four payment plan, since the Institute as: "One of the most striking examples of the keen and aggressive competition among the various defendant refiners since the formation." Fact Brief, p. 328.

In November, 1929, and in December, 1930, it was extended to other southern states or to parts of them. After a trial, it was withdrawn in some sections. But since the filing of the government's petition herein, it has been extended throughout the entire country, with the exception of the eleven Western states. Ex. T–17.

While criticizing the plan as open to abuses practically identical with those resulting from the storage of sugar in customers' warehouses, defendants maintain that: "With one possible exception which occurred for a brief period in 1929, the Institute has never attempted to define or limit in any way the territory in which the four-payment plan might be offered, although Taylor * * * regarded it as a violation of at least the spirit of the Code of Ethics and closely related to the practice of storing sugar in customers' warehouses, which practice was condemned expressly in the Code of Ethics. The possible exception referred to above consists in a recommendation contained in a report submitted by the Committee on Southern Consignment Points at an Executive Committee meeting on June 6, 1929. In connection with a recommendation that Atlanta be added as a consignment point, the Committee recommended that the practice of trade consignments on the four-payment plan be discontinued in the State of Georgia, apparently considering that with Atlanta a consignment point, the facilities of the four-payment plan would be superfluous or unnecessary." Fact Brief, pp. 331, 332.

The evidence shows, however, that defendants busied themselves to a far greater extent in seeking to suppress the extension of the four-payment plan. That the withdrawal of Georgia, in the summer of 1929, as a four-payment plan state required some forceful persuasion on the part of the Institute, is indicated by Ballou's letter of August 1, 1929, to Hershey's representative. After pointing out that a complaint had been received by the Institute from one of its members to the effect that Hershey was still offering the four-payment plan in Georgia, the following sharp comment is made: "We would call your attention to the

fact that the four payment plan was discontinued in Georgia in June upon adoption of the Southern Consignment Committee's Report, copy of which you already have in your files. We are attaching hereto that part of the Report which specifically states under the heading 'Georgia' that the present practice of trade consignments on the four payment plan is to be discontinued." Ex. 389–A–1. But even before this time, the correspondence of Institute members revealed that they were interested in more than merely "open announcements" with respect to the four-payment plan. Thus, a letter from Savannah to the Hershey representative, dated December 18, 1928, stated that Hershey "seems to be unaware that Florida is a state where the four-payment plan is not permitted." Ex. 457–R–2.

After the extension late in 1929 and subsequent withdrawal, Arbuckle pointed out that the boundaries of the territory in which the plan was then to apply still included Pikeville, Ky., and that because of the conditions prevailing in that territory, the result would be that the plan would have to be extended to West Virginia and Ohio. Obviously pursuant to the suggestion of Arbuckle, the Institute circulated among its members the following letter bearing date November 29, 1929: "At the time Northern Kentucky was withdrawn from trade consignment privilege it was intended to withdraw Pikeville, Kentucky, as it is in a chain of competitive jobbing points that are very closely related to Ohio and West Virginia points. It is suggested that Pikeville be considered as withdrawn at once from the list of four payment plan points and that you wire your acceptance of the withdrawal." Ex. 420–V–1.

In answering this circular, at least two of the members, Colonial and McCahan, stated that they would withdraw Pikeville provided the other members did so. Exs. 420–W–1, 447–E–1. McCahan evidently did not receive a prompt answer from the Institute; a few days after its provisional acceptance of the suggestion, it inquired "as to the decision regarding the application of the four-payment plan in Pikeville, Kentucky." 420–X–1. The next day, the Institute's office manager telephoned McCahan that Pikeville had been withdrawn but that: "Sullivan and Cromwell have frowned on our exchange of wires on 11/29 as laying ourselves open to prosecution by Dept. of Justice." Ex. 420–X–1. It is perfectly clear that the withdrawal of Pikeville was the result of concerted action on the part of the defendants.

Nor did this end the Pikeville incident. Arbuckle in a letter to the Institute August 19, 1930, recapitulating the circumstances with respect to it, complained that occasionally there were still offerings in that city on the four-payment plan, and added:

"Don't you think it would be advisable to circularize the refiners giving them a boundary that definitely eliminates Pikeville? Knowing the territory as I do, my concern is due to the fact that if the plan was offered in Pikeville, it would spread down the Sandy Valley and through Ashland, Ironton, Ohio, Huntington, W. Va., etc.

"We suggest that you describe the four-payment plan territory in Kentucky as follows:

" 'South of the line drawn east and west through and including, Louisville, Lexington, Jackson and Elkhorn, Ky.' " Ex. B–8.

At the executive committee meeting of August 20th, to which this letter was referred, it was determined that a circular on the matter should be prepared and submitted to counsel before mailing. So far as appears, such a circular letter was never mailed; on September 10, 1930, however, the minutes of the traffic committee note: "A letter which had been received concerning the status of Pikeville as regards the four-payment plan, was discussed. It was pointed out that the Institute *freight sheet* Kentucky No. 4, specifically covered this point." Ex. 457–N6 (Italics mine.)

The next day, the Institute wrote Arbuckle:

"That the only function of the Institute in this matter is to circularize the announcements of the several refiners.

"The Kentucky Selling Term sheet No. 4, issued June 2, 1930, covers the objections you have raised. Apparently, the refiners selling in Kentucky have stated that they will not offer the four-payment plan at Pikeville.

"The notation on the rate sheet reads as follows:

" 'Note: The territory in which four payment and deferred payment plans have been announced is the territory south of the Louisville-Lexington line (including these two cities) which passes through Williamson, W. Va. The plans will *not* apply at Williamson or any points south of it along the Big Sandy River. The plans are *not*

in effect at Pikeville.' " Ex. C-8. (Italics in original.)

There are other indications, too, that the refiners were concerning themselves with the regulation of the four-payment plan. An extension of the plan in a wide territory, which was later withdrawn, occurred early in 1930. In connection with this, the vice president of Pennsylvania on February 5, 1930, wrote to the president of Savannah: "I suppose you will be up at the meeting next week. Hell seems to be breaking loose in the West in regard to the extension of the four-payment plan and 3% discount. The whole situation does not look very cheerful to me. Perhaps we will be able to get things ironed out at the meeting." Ex. 420-Y-1. The minutes of the directors' meeting of February 13, 1930, contain no entry with respect to four-payment plan matters. But the next weekly issue of Willet & Gray, on February 20, 1930, carries announcements by American, Spreckels, McCahan, Pennsylvania, all dated February 14, and Colonial dated February 15, that they were withdrawing four-payment plans in some Western states.

The attitude of members may be indicated by a letter from Godchaux to the Institute dated March 6, 1930, stating:

"Referring to your [request] * * * for suggestions * * * of agenda for the meeting of March 13th * * * the most important topic * * * is the necessity for determining whether the discussion held at the meeting of the first week of December as to announcements of changes of terms was intended to be observed.

*"I consider that one of the most important matters discussed at that meeting was the adoption of a policy by all members that before they made any drastic changes in the selling terms, they would, if possible, await a Directors' Meeting at which this question could be discussed by all at interest, or if the matter was of vital importance, that a special Directors' Meeting would be called for a discussion of same before action were taken, rather than after the taking of the contemplated action.*

"* * * I have specifically in mind * * * action taken by * * * American * * * in announcing the Four Payment Plan in Texas, which * * * spread all through the United States, and was then withdrawn and left in effect only in the original territory where it applied." Ex. 394. (Italics mine.)

In March, 1930, the directors created a Southern enforcement committee; the matter of the lack of uniformity in four-payment contracts was referred to it for investigation and recommendation. Ex. 21-26, pp. 405, 407. The subsequent minutes of this committee with respect to this matter are not illuminating, but, in my judgment, the evidence shows quite clearly that the Southern refiners must have been concerning themselves with the substance and extent of the four-payment plan rather than, as defendants would create the impression, merely with definitions. Cf. Ex. 420-M2.

I have gone into this and some other matters more fully perhaps than their intrinsic importance justified, because of the light cast by the documents on the motives that actuated defendants and the methods adopted by them.

In my judgment, they concertedly sought substantially to limit the four-payment plan, and until the bill in this suit was filed, successfully, at least in part.

### 2. Split Billing.

The essential and undisputed facts are that the practice of split billing was originated by the California refiners in the middle western territory to offset the disadvantages resulting from the difference between the 80,000-pound carload minimum prescribed by the railroad tariffs on shipments from the Pacific Coast and the 60,000-pound minimum from the Atlantic Coast and Gulf points; a purchaser from a California refiner would have to take an additional 20,000 pounds to secure the carload rate. To overcome this, Pacific Coast refiners made two billings to buyers in competitive territory, the first for 60,000 pounds, payable within seven days after arrival, and the second for the balance, payable within fourteen days after arrival. Elsewhere split billing, while not commonly practiced, was occasionally used by some refiners as a form of secret concession.

Defendants, although stating in effect that the practice "has always been regarded in the sugar industry as unsound and without economic justification" (Fact Brief, p. 381), maintain that the Institute "took no position either for or against deferred payment terms as such." Fact Brief, p. 381. It is perfectly obvious, however, that the attempt to prevent the spread of split billing to territories where there was no difference in the carload minima, is a definite position against the

deferred payment plan. Split billing was condemned in Code 3 (b).

Plaintiff contends that there was an understanding among defendants against split billing and that the Institute used coercive tactics in preventing its spread. Defendants' position is that they merely subscribed to the economic wisdom of Code 3 (b); that their only obligation was to adhere to it until deviation therefrom was publicly announced. In my judgment, the contention of the government is clearly supported by the evidence.

The first instance of Code 3 (b) violation was by C. & H., which at the end of February, 1928, engaged in split billing in Texas because other refiners competing in that area had an advantage in that they could make up carloads of sugar and syrup which two commodities together enjoyed a carload rate.

Judge Ballou, seeking to persuade C. & H. to cease the practice, pointed out that: "If members were free to violate the Code of Ethics for reasons such as advanced by you, the Institute would not last a week." Ex. 386-A. Shortly thereafter, the acting president of C. & H. visited New York and "following a personal interview" the Institute informed the members that C. & H. was discontinuing, on all new business, split billings on 60,000-pound cars. Ex. 386-B.

A year later, C. & H. resumed it in Texas. At that time, the reason given by them to the Institute was its necessity, in order to compete with refiners who, unlike C. & H., carried consigned stocks there. Thereupon, at the directors' meeting of June 27, 1929, the following resolution was adopted: "Certain competitors are admittedly split billing on sixty thousand pound cars at El Paso and adjacent points in violation of the Code of Ethics of their own association * * * in order to meet the competitive situation thus created, members of the Sugar Institute are hereby authorized to split bill sixty thousand pound cars in the same territory. This authorization shall be withdrawn whenever the Executive Secretary shall notify the members concerned that such competitive practices have ceased." Exs. 21–26, p. 267.

Two weeks later, the Institute circulated the following announcement among its members: "Competitive practices justifying split billing sixty thousand pound cars in Texas have ceased as to all points except El Paso. Institute members will therefore discontinue such split billing at so-called adjacent points." Ex. 420-E-2.

A few months later, the carload minimum from the Pacific Coast was reduced to 60,000 pounds. At the same time, some of the refiners wished to extend their business into some middle western states where intrastate carload minima were lower than the 60,000-pound interstate minimum. These were states in which there was very substantial beet sugar competition and the Domestic Sugar Bureau, in its code, had made provision for split billing. The entire situation was cleared up in the following letter from the Institute to all of its members:

"Effective September 1st, 1929, the carload minimum from the Pacific Coast was reduced from 80,000 pounds to 60,000 pounds. There is therefore no longer 'an 80,000 pound minimum rate' as referred to in the Institute's Code of Ethics.

"Under these circumstances, members are Authorized to meet the competition on split billing as stated in the announcements of various members of the Domestic Sugar Bureau.

"It is recommended that the announcement of the California & Hawaiian, dated September 11, 1929, and circulated by the Sugar Institute under date of September 20, 1929, be taken as the authoritative statement of present terms and conditions by those desirous of meeting these split billing terms." Ex. 420-F-2.

While originally the split-billing plan developed to take care of differences in carload minima, yet, as the C. & H. situation in Texas shows, the practice could very conveniently be applied as a competitive device to meet other forms of competition. Defendants have shown no evil in the practice, except to the extent that, prior to the Institute, it may have been used to give a secret concession, which, however, could have been prevented without prohibiting the practice itself.

The defendants point out that this entire subject is now unimportant because as the four-payment plan has been effective since February 10, 1932, in all states where split billing was formerly practiced, there is no longer any need for it. This extension of the four-payment plan, however, occurred subsequent to the filing of the present suit; the government may well fear further concerted action in respect to split billing unless restrained.

### 3. The Cash Discount.

Plaintiff complains of an alleged agreement by defendants fixing at 2 per cent. the cash discount to purchasers. Defendants insist and the government practically concedes that the discount had always been 2 per cent. The evidence shows quite clearly that it was taken for granted among the defendants that this rate would be continued. A uniform contract form, recommended by the Institute and sent out to members in 1929, carried such a provision. The strongest evidence of concerted effort to maintain the rate are Taylor's letters to Lowry and Lamborn, already referred to in connection with the subject of delivered prices; he said: " * * * It is desirable that we should know that * * * your publicly announced price basis will be less 2% * * *." Exs. 324, 345.

As already noted in other aspects of the case, the post-Institute period was one in which theretofore stable terms either threatened to or did break down, probably because of the elimination of the unfair competitive devices, the secret concessions. During the post-Institute period, a 3 per cent. discount was announced twice; it was effective, however, for not more than ten days. In this connection, Pennsylvania's letter to Savannah, quoted in the discussion of the four payment plan, should be noted. Ex. 420-Y-1. The 3 per cent. discount there referred to, appears to have been withdrawn before the directors' meeting of February 13, 1930. See Willett & Gray, issue of February 13, 1930. The inference of concerted action with respect to the withdrawal of the four-payment plan already suggested could, therefore, scarcely be made with respect to the withdrawal of the 3 per cent. discount.

Nevertheless, the Institute recommendations and the letters to offshore interests must have had some effect in keeping the discount stabilized at 2 per cent. Moreover, it is unlikely that defendants did not appreciate that the elimination of secret concessions would tend to cause competition to manifest itself by other means; the steps taken to preserve the 2 per cent. discount must have been designed to prevent competition in this respect.

Defendants' leading activities regarding the cash discount did not, however, concern the rate but the time within which payment must be made. Traditionally this was seven days after arrival by rail or seven days after withdrawal from consignment, with three days of grace; in all "ten days had practically become a custom of the trade." It was hoped to abolish the grace period. Exs. 21–26, p. 32. But when an Institute committee recommended a list of uniform terms, a ten-day period was suggested. Exs. 21–26, p. 190-A. A directors' meeting finally agreed to recommend seven days. Exs. 21–26, p. 207. Defendants assert that the three days of grace has nevertheless been continuously allowed.

The important question, however, was as to when the discount period should begin on shipments by differential routes, especially in the middle western territories served by many such routes, some accessible to eastern and some to New Orleans refiners. It occupied defendants intermittently at least until delivered prices were put into effect in that territory. A brief discussion of this situation will serve to show that the "uniform definitions" agreed upon by defendants went much further than merely to embody, as defendants contend, "substantially the existing practice and the most liberal provisions offered by any member." Fact Brief, p. 310.

Early in 1928, when the Institute was endeavoring to enforce Code 3 (c), Godchaux, a New Orleans refiner, complained that eastern refiners were soliciting business by the rail and lake route on the all rail discount terms of 2 per cent., 7 days after arrival. Godchaux in shipping by Mississippi barge had theretofore quoted 2 per cent., 14 days after *shipment;* because of slowness of barge service,[20] these terms were obviously less attractive than those of eastern refiners via differential routes. Godchaux wired the Institute that to meet the eastern competition, it should be privileged to "quote during season eastern water rail movement barge shipment terms payable seven days after arrival." Ex. 457. Judge Ballou, in circulating this complaint among New York refiners, suggested that eastern differential shipments should carry no more favorable terms than New Orleans barge shipments. Ex. 457. A few days later, he wired Godchaux: "It is the opinion of the Executive Committee that ship-

---

[20] Average transit time by barge New Orleans-Chicago, 20 days. Ex. L-4.

ments to Chicago from Atlantic Ports over differential routes should not carry any more liberal terms of payment than those in effect from New Orleans stop solicitation of such business based on payment after arrival has not been authorized and will be discontinued." Ex. 457-B.

The next day, Ballou issued a circular to the New York, Philadelphia, and Boston refiners, calling a special meeting of the directors who represented them, together with their sales managers and traffic managers, to discuss "freight application at Chicago and lake ports during season of open navigation," and requested therein that they "make no announcement as to time of payment on shipments over differential routes at customer's request until after this conference." Ex. 457-A. According to Place, of McCahan's, in reporting to his superior officer, Ballou there suggested that eastern refiners should quote terms 2 per cent., 14 days after shipment on differential route deliveries. "The purpose of this," as Place put it, "was to discourage shipments over this route thereby attempting to maintain the 'all rail' basis into western markets." Ex. 457-C. Place feared that if Godchaux quoted "arrival terms" on barge deliveries, the attractiveness of low rates and liberal credit for such shipments would necessitate eastern refiners breaking down freight applications in the middle west. To make certain that the opportunities of the New Orleans refiners would be equalized, "pressure" was brought to bear upon McCahan to quote 2 per cent., 10 days after shipment on rail and lake movements, on the ground that, by thus shortening the Philadelphia refiners' credit terms, New Orleans with its barge service, slower than the rail-lake [21] route to Chicago, could more readily compete by offering terms, 2 per cent., 14 days after shipment.

In May, 1928, freight applications did break down at some Great Lake points to the Philadelphia rail and lake basis, despite the Institute's efforts to prevent it. To meet this competition, New Orleans refiners quoted 2 per cent., 7 days after arrival on barge shipments. McCahan expressed to the Institute the fear that quotation of such terms on New Orleans barge shipments "will inevitably lead to breaking down basing rate to barge

basis." Ex. 420-L. A few weeks later McCahan's "fear" materialized in an announcement that it would sell at the New Orleans barge rate in certain western states. "At the insistent request [of] Judge Ballou," however, McCahan withdrew this announcement the same day (Ex. 457-T); a special meeting of the executive committee held the following day "prevailed" upon that company "to continue indefinitely the withdrawal of barge rate application Western territory." Ex. 457-U.

Nevertheless, Godchaux apparently continued to quote "arrival terms," that is, 2 per cent., 7 days after arrival, on barge shipments, for early in 1929 when the comprehensive list of "uniform terms" had been developed by an informal Institute committee, Godchaux stated that "payment terms on barge shipments into territory taking lake and rail selling basis should be the same as at present, that is, based upon arrival." The uniform terms were amended to meet this objection. Exs. 21–26, p. 190, as qualified by R. 8914, 8915. Finally, however, on April 11, 1929, Godchaux withdrew his objection, Exs. 21–26, p. 233, because, as Place testified (R. 8918), eastern refiners in March, 1929, had also begun to quote "arrival terms" on all water shipments, which they had theretofore refrained from doing and which the "uniform terms" recommended by the Institute condemned. This action nullified the advantage that Godchaux had first obtained.

To treat in detail the comprehensive set of "uniform terms" actually recommended by the Institute would serve no useful purpose. The foregoing discussion sufficiently shows that the defendants were much more concerned with "equalizing" their opportunities, than they were with devising "uniform definitions." Credit terms on differential shipments from New Orleans and the east were the subject of keen competition between the refiners. I find no justification for the restraints which defendants obviously sought to impose thereon.

Defendants urge further that these Institute recommendations are now of no importance because the breakdown of the freight structure resulted in the "discount period being universally reckoned from the date of arrival on all types of shipments

---

[21] Average transit time from the east via rail and lake route to Chicago, seven to eight days. Ex. L-4.

* * * the most liberal practice in the history of the industry." Fact Brief, p. 314. The breakdown in freight structure in the Great Lakes area, the important area so far as this matter is concerned, occurred however after the instant suit had been brought. There is in my judgment a very substantial danger that, unless restrained, defendants may again engage in activities similar to those hereinabove described.

### E. The Price Guaranty.

Prior to the Institute, refiners offered in some localities a guaranty against price decline between the date of entering the contract and that of delivery. The California refiners especially were favorably disposed to such contracts because they served to equalize the advantage enjoyed by the other refiners in the shorter transit periods from eastern and southern points. Plaintiff contends that the restraint by defendants of this type of contract provision is unreasonable.

Defendants admit disapproval by the eastern and southern refiners of guaranties, but on the ground that they were speculative and might result in heavy losses to the refiner. Lowry's testimony indicates, however, that an astute refiner could readily avoid such losses by hedging operations on the Sugar Exchange. R. 522, 523.

While there is some evidence that the eastern and southern refiners withdrew the guaranty late in 1927, Judge Ballou in a letter stated that it was withdrawn "at the beginning of 1928." Ex. 467, p. 3. California & Hawaiian, however, continued to offer it, thereby causing considerable concern to those that had discontinued it. During the early months of the Institute, efforts were made to induce C. & H. likewise to withdraw the guaranty and in May an Institute committee conferred with the president of that company to this end, but without success.[22] Thereupon the eastern and southern refiners reinstated it. They were careful to go no further than absolutely necessary in order to meet C. & H.'s then terms, pursuant, as plaintiff contends, to an agreement. Defendants deny the agreement and insist that each of them acted independently in adopting an individual policy to this effect. Plaintiff relies on the following excerpt from the minutes of the executive committee meeting of June, 1928, as the chief evidence of an agreement or concerted action:

"The question of the form of guarantees which had been generally announced for certain territory was discussed. Mr. Abbott, General Counsel for the American, was asked to attend the meeting and to express his views."

"It was pointed out that the C. & H., whose guarantees created the competitive situation now being met, was selling on the Eastern lake and rail basis in the competitive territory. Nevertheless it did not guarantee on barge shipments but required the buyer to elect, at the time of entering his contract, between a guarantee contract calling for rail deliveries only, and a non-guarantee contract which permitted barge shipments. Mr. Abbott stated that the policy of the American would be to follow the principle of this practice, confining routings on guaranteed contracts to all-rail deliveries and such differential routings as were comparable in rate and in time of transit to deliveries from the Pacific coast * * *. Routings by the slower routes, such as Mississippi Barge Lines, all-water routes and the C. A. T. Line would not be available on guarantee contracts both because of the time element and because their lesser rate would give the buyer a freight preference as well as a guarantee in the same contract. * * *

"No action was taken as a result of this discussion but each member reserved the right to announce his own detailed guarantee terms after further consideration." Exs. 21–26, pp. 75, 76.

The policy outlined by American became the policy of all the eastern and southern refiners. Thus while prior to the Institute, guaranteed contracts had been entered into by refiners for shipment over the Mississippi Barge Line, subsequent to the Institute and until some time in May, 1931, a customer could not obtain the guarantee on such a barge shipment. Somewhat similarly, in the case of the C. A. T. Line, a differential route available to eastern refiners, while some pre-Institute guaranteed shipments had

---

[22] Some time later in explaining C. & H.'s general policies to the Institute the president of that company wrote: "If we have done anything that seemed contrary to the policy adopted by the Institute, you must admit (and I know you do) that it has been done openly *the Guarantee for instance.*" Ex. 442-S. (Italics mine.)

been made over that route, they were discontinued for a considerable period of time during the post-Institute period. Representatives of Federal, American, and Arbuckle referred to the Institute, officials of the C. A. T. Line who called upon them to have guaranteed shipments made over that route. Judge Ballou wrote C. A. T. Line that:

The eastern refiners "did not wish to take any action which would invite retaliation to the extent of a guarantee on large shipments from New Orleans. * * *

"Routings by the slower routes such as the Mississippi Barge Lines, all-water routes and the C. A. T. Line would not be available on guarantee contracts both because of the time element and because their lesser rate would give the buyer a freight preference as well as a guarantee in the same contract." Ex. 132.

He added that "competition" by the C. A. T. Line, because of its shorter transit time in comparison to the Mississippi barge line plus its "unrivaled" freight storage facilities, was "a cause of grave concern to those refiners who have not a corresponding route to offer their customers. It seemed to be the general opinion that if the Eastern refiners should add a guarantee to this freight preference' they would not only be going beyond the competitive situation which they were trying to meet but would invite further breaking down of the rate structure by both the Pacific Coast and the New Orleans refiners in an endeavor to equalize the new condition."

He further sought to make clear in this letter, however, that he was simply explaining the views of the individual refiners; that this matter had never been the subject of a recommendation by the Institute; that C. A. T. was free to go to any of the shippers and persuade them to change their policy; and that the only responsibility to the Institute was to make public announcement of any change in terms. Ex. 132.

But plainly during the early months of the Institute, eastern and southern refiners acted concertedly in refraining from entering into guaranty contracts. The discussion at the meeting in June, 1928, demonstrated to them how far they had to go to meet C. & H. and the dangers to the general Institute program, if they went any further. Subsequently, the courses followed by the individual defendants in offering a restricted guaranty were identical. Such conduct naturally resulted from the careful preparation made therefor under Institute auspices and cannot be deemed the independent action of the several refiners.

In justification of the eastern and southern refiners' disapproval of the guaranty, defendants urge that they were troubled by its discriminatory nature. They say that as the guaranty was offered to customers in some localities and not in others, unfair geographical discrimination resulted. This argument is obviously an afterthought. Defendants' activities with respect to delivered prices have demonstrated beyond question that they were not genuinely interested in eliminating geographical discriminations.

### F. Containers and Used Bags.

The petition alleges, and the answer denies, that: "Defendants have agreed to restrict and limit, and have concertedly restricted and limited the use of certain varieties of bags and other containers used in the packing, delivery, and sale of sugar."

Defendants added an admission: "That the Institute recommended to members that they discontinue the practice of making an allowance to customers for the return of used bags, or for the use of customers' bags, and recommended to members that they discontinue the use of unbranded bags, for the reason that such practices resulted in discrimination between customers, or were so open to abuse as to be likely to result in and promote such discrimination, and for the reason that such practices were unbusinesslike."

The most important restriction was the prohibition of any allowance to customers for returned used bags. Certain other activities may first be disposed of.

From the minutes of the directors' meeting of February 7, 1928, it appears that: "The matter of selling sugar in bulk was discussed, one refiner stating that he had in contemplation something in the nature of a tank car, while another stated that he was figuring on ton containers to be loaded on trucks. It was the consensus of opinion that deliveries in bulk would further add to the complexities of a business where standardization and simplification of packages were more needed than further diversity and

that the Institute should recommend that experiments in selling in bulk, should be discouraged." Exs. 21–26, p. 19.

This "consensus of opinion" was embodied in a code interpretation, section XI, p. 1.

In December, 1928, the executive committee recommended a resolution, which shortly thereafter appeared as a code interpretation, as follows: "New and Unusual Methods. All propositions submitted to or originated by a member of the Institute, involving new or unusual methods of the sale of sugar in any form (not including refiner's syrup, table syrup, invert syrup, or molasses) should, before acceptance, be submitted to the Executive Secretary for consideration as to their possible effect as involving discrimination, or otherwise violating the Code of Ethics." Code Interpretations, § I, p. A1.

So far as appears from the record, the only subsequent reference to this provision is in the minutes of the executive committee for February 21, 1929: "Two refiners reported that they had been approached upon the proposition of packing sugar in 300 pound bags with paper lining and that, while the proposition had been declined in both instances, they wished to report it under the head of a new and unusual sales proposition." Exs. 21–26, p. 212.

The precise purpose of the proposal for packing sugar in bulk or in paper containers does not appear from the record. It seems quite obvious, however, that these methods must have been designed to effect economies and greater convenience in bagging and/or shipping. The discussion and "consensus of opinion" of February, 1928, and the resolution of December, 1928, indicate the Institute's determination to discourage "experiments" in this direction.

The restrictions on used bag arrangements also show that the Institute entirely disregarded any interest the public might have in the development of more economical methods in the distribution of sugar.

Between 1923 and 1925, a limited practice had developed on the part of some refiners of making to certain customers an allowance for used bags. Two methods were used:

(1) Only the one initial charge was made for refiners' bags if after using their contents the customer would return them to be refilled; (2) no bags charge was made if the customer supplied his own bags.

The economic advantage of the second method lay in the fact that the customer, in supplying his own containers, would purchase a better quality of bag, which could be refilled oftener than the refiner's bag. The evidence shows that the re-use of old bags would result in an average saving to the customer of from 5 to 10 cents for each bag of sugar purchased, a very substantial sum, without material expense to the refiner.

At the directors' meeting of February 7, 1928, "the matter of making an allowance on used bags returned to the customer or on the re-use of customers' bags was * * * debated. It was pointed out that unless such allowance represented the exact value of used bags, which it would be very hard to determine, it would constitute a special allowance and that, in any event the practice was so open to irregularities and abuse that it should be discouraged." Exs. 21–26, p. 19.

This expression of opinion resulted in the code interpretation: "The making of an allowance on used bags returned by the customer or for the use of customer's bags, constitutes a special allowance and the practice is so open to irregularities and abuse that it should be discouraged." Code Interpretations, §§ 1, C1.

Since the Institute, refiners have from time to time received requests from customers for used bag allowance; the Institute as well as the Domestic Sugar Bureau, co-operating with each other, took steps to make certain that none of their members granted it. At the January, 1931, directors' meeting, National's proposal to amend the code interpretations so as to permit of an allowance was "unanimously" rejected. Exs. 21–26, p. 615.

Defendants' position is thus stated: "Allowances for used bags are not in themselves harmful to the industry or to anyone engaged in it; they only are harmful when distributed as discriminatory favors to particular customers and it is only for that reason that they are condemned by the Institute. The difficulty is that as a practical operating matter it is impossible to handle returned bags from all customers." Fact Brief, p. 398.

This "impossibility" is said to be due to the inadequacy of refiners' facilities for keeping each customer's bags separate and assorting and storing them.

Defendants also insist that: "There was never any 'substantial competition' in the sugar industry with respect to used bag allowances. Purchasers of sugar in one hundred pound bags have always either made use of the empty bags themselves or disposed of them to second hand dealers." Fact Brief, pp. 404, 405.

Any practice of granting an allowance was of very recent origin. The plan had been first hit upon by Lowry, who operated Pennsylvania under a lease arrangement up to the year 1927. He made such allowances to the National Biscuit Company, but, as he testified: "I am not sure that I would not have extended that had we continued the management with the Pennsylvania, because the thing in itself has some merit. It is a question of judgment. I always like savings and where savings can be effected without costing anybody anything, I think it a good thing to do.". R. 543.

Other refiners adopted somewhat similar arrangements. Among them were National, American, and some of the beet sugar manufacturers. If, as Lowry testified, the plan did have merit, the ban upon it in 1928 prevented its development. As there never were any open offers to the trade to make used bag arrangements, and as the plan for used bag allowances never had any real trial, it is largely speculative as to whether or not the refiners could have accommodated those customers who might wish to take advantage of it. If facilities of individual refiners proved inadequate to accommodate all customers who sought an allowance, they might have offered it openly to a special class whose business methods were such that they could use the privilege without inconvenience to the refiner. The resulting discrimination would be entirely legitimate if the classification were fairly made. Or the refiner might have offered the allowance to all customers up to the limits of his capacity. Or perhaps because the plan was still in an experimental stage and because on that account individual refiners might not have been able to tell how far they could go in offering it, it might have been necessary for each to enter into arrangements for the allowance, on the basis of private negotiations. But even such arrangements need not be unfairly discriminatory. Moreover, publicity with respect to such transactions, after they are closed, would make unfair discrimination virtually impossible because competition among purchasers was so keen that if there were no economic justification for the discrimination, the refiner would have had to grant the same privilege to other customers in a similar position.

The evidence indicated that merchandisers would probably have found it impracticable to save their bags, but merely because some customers could not have taken advantage of an offer of an allowance is no fair reason for denying the privilege to those who because of the nature of their business would be able to profit thereby.

Defendants' real objection was that the used bag plan might conceivably be made a cloak for secret concessions, although it does not appear to have been so employed prior to the Institute, and Lowry testified that so far as he knew, it had never been used for that purpose. Neither the open announcement method for such a plan nor any other interested defendants. They preferred to deny the privilege to all, relying for justification on the entirely speculative possibility that the allowance would necessarily prove discriminatory. Thus under the guise of preventing discrimination, defendants closed the door to a practice which promised substantial economies in sugar distribution.

### G. Private Brands.

Prior to the Institute, some of the refiners packed sugar under private brand names for various customers. Defendants assert that the practice "has always been very limited." Fact Brief, p. 373. However, some time in 1929, the vice president of C. & H., in a letter to the Domestic Sugar Bureau said that it was "growing." Ex. K-6. The government charges that defendants concertedly restrained it. They, on the other hand, while admitting "that the tenor of the discussion at Institute meetings * * * was against" it, seek to show that they did no more than try to discourage it. Fact Brief, p. 375. In fact, they went much further. (See for preliminary activities in this matter Exs. 21–26, pp. 199, 200, Executive Committee Meeting, January, 1929; p. 210, Directors' Meeting,

February, 1929; p. 270, Executive Committee Meeting, July, 1929.) In July, 1929, Judge Ballou circulated a questionnaire among the members asking whether, and if so for whom, they were packing private brands, the amount of such business, whether a service charge was made, and other matters. Information thus obtained was to serve "as a basis for recommendations." Exs. 21–26, p. 272; see, too, Exs. 21–26, 281, 313, August and October meetings. At the November directors' meeting, "it was the consensus of opinion that in the interests of the industry earnest efforts would be made on the part of all refiners engaged in the business of packing private brands to reduce such accounts, and that no one should accept any new private brand business without personally bringing the subject to the attention of a Directors' Meeting." Exs. 21–26, p. 333. In February, 1930, at an executive committee meeting: "The question was asked *whether it would be considered a violation of the Institute's recommendations* for refiners to pack new brands for exclusive sale by certain distributors. * * * It was moved and unanimously voted that Exclusive Brands be classified as coming under the same rulings and recommendations as Private Brands." Exs. 21–26, p. 396. (Italics mine.)

This together with other evidence reveals at least an understanding on the part of defendants not to accept private brand business without first reporting it to their competitors, that such reports were in fact made, and that the purpose thereof was to afford opportunity for applying concerted pressure against acceptance. The restraint is made more apparent by Place's statement that at least some refiners felt "that private brands were a good thing and they wanted to continue it." R. 7697.

Moreover, the reasons given by refiners on several occasions when they advised the trade that they could not pack private brands are illuminating. These were that the "refiners recently decided not to pack any private label goods" (Ex. 420-T-1, Pennsylvania letter of August, 1929, signed by office manager); that "rules of the Sugar Institute forbid" it (Ex. 294, Revere letter of May, 1930, signed by credit manager); that "it is contrary to the Code of Ethics of the Sugar Institute" (Ex. 413-L, Savannah letter of February, 1932, signed by sales manager). Defendants assert that these statements were made simply for the purpose of providing the individual refiners with an alibi, by shifting responsibility to the Institute. However, they were made by responsible representatives of the respective refiners. The evidence does not show that the statements were false. On the contrary, they are in line with the informal recommendations which issued from the various meetings. Moreover, Savannah's letter was written subsequent to Cummings' speech in May, 1931, in which he cautioned members against shifting responsibility to the Institute in matters as to which defendants acted independently. Exs. 21–26, p. 654. In such circumstances, I cannot accept defendants' explanation. The statements, in my judgment, throw light on the actual purport of the discussions and recommendations referred to in the minutes of the various meetings and justify the conclusion of an understanding among defendants that private brand business was not to be accepted generally if at all.

In justification of their conduct in this matter, defendants argue: (1) That private brand business was discriminatory in that it could not be accepted from all customers; (2) that it involved deception because all defendants' sugars are in fact the same quality; (3) that it was an expensive and wasteful practice.

(1) Defendants have utterly failed to prove that private brands could not have been used for all customers desiring them. That the demand therefor is limited, as defendants assert, is all the more reason for packing and openly granting them.

(2) The argument that private brands are deceptive is plainly an afterthought; they are neither more nor less deceptive than the brand names under which defendants sell their products.

(3) Doubtless the practice does involve some trouble to refiners who engage in it, inasmuch as it necessitates keeping a separate stock of containers for each customer using a private brand. But some containers would have to be provided in any event. There is no substantial showing that the printing of a name different from the refiners own brand or the additional handling involved would entail substantial expense. In any event, there is no reason why individual refiners if they choose, might not make a service

charge for such business, if it in fact involves additional expense.

I find no substantial justification for the restraint; defendants' fear that the practice might be used as a means of granting discriminatory favors motivated in part at least the action taken. The possibility of such abuse is on this record entirely speculative. In my judgment, packing under private brands is plainly a legitimate competitive device. As to whether or not it is an advisable one, opinions may, as those of the several defendants did, reasonably differ. A fear that the practice may become burdensome to them and may be abused does not suffice to make the restraint of competition reasonable.

## H. Secondhand Sugar or Resales.

Plaintiff contends that the defendants have unreasonably restrained sales of "secondhand" sugars, known as "resales."

A secondhand sale occurs when a purchaser, usually before he has withdrawn his sugar under the contract, sells all or part of it. Resales by the original purchaser are ordinarily made to dispose of sugar either contracted for in excess of his needs or bought as a speculation, to sell on a rise. Resales are always made at a differential below refiners' prices, because customers prefer on equal terms to buy direct from the refiner.

Prior to the Institute, refiners at times used an ostensible resale transaction to cloak what was in fact a secret concession. Thus after a favored customer had contracted for an amount known to be in excess of his needs, the refiner might offer to resell to another customer after the sugar had been withdrawn, thus saving him the cost of brokerage on the resale. If the sugar had not as yet been withdrawn and the market had dropped, the refiner would simply cancel the contract with the customer or credit him with a similar amount of sugar, to be applied on a new contract, thus saving him the loss that he would have incurred if he had been compelled to withdraw the sugar at the original higher price; the refiner would then record the transaction on his books as a resale, for the purpose of making it appear that no concession had in fact been given.

Defendants contend that the steps which they have taken to regulate secondhand transactions have been solely for the purpose of preventing these "fictitious" resales. They assert that this was the purpose of Code 3 (h), reading, as they quote it: "The Institute condemns * * * as unethical, except when practiced openly * * * (h) the sale of second-hand sugars *by refiners.*" They also say that: "All other recommendations of the Institute will be found expressive of this same principle to preserve the legitimate interest of the trade in the resale privilege but to eliminate the *fake* and *fictitious* resale." Fact Brief, p. 378.

But Code 3 (h) on its face went further. In addition to condemning refiners' resales as unethical "except when practiced openly," it also states that they are "in any event * * * wasteful and unbusinesslike"; it states, too, that if resales be "uniformly employed they amount to a general price concession which should frankly take the form of a price reduction." It is apparent, therefore, from the code itself that defendants were interested in discouraging refiners from making legitimate as well as fictitious resales.

Defendants' other activities with respect to secondhand sugars may be gathered from the code interpretations. It was provided:

"In the case of the sale of secondhand sugar, the sugar should, without exception, be invoiced to the original buyer."

"No resales of unwithdrawn sugars should be recognized after the due date of the contract.

"In case specifications have been received on or before the due date, but shipment has been delayed by the inability of the refiner to make prompt shipment, changes in the specifications may be made at the request of the customer, as well as changes in destination to points where the customer is known to be in business, but no other change in destination." Code Interpretations, § VIII, P. 1.

With respect to the provision requiring the sugar, regardless of resale, to be invoiced to the original buyer, plaintiff does not answer defendants' argument that the purpose is to have the bookkeeping entries accurately portray the transaction as it is; if it be a bona fide resale and not a fake one to conceal a secret concession. While I concur in defendants' con-

tention that this involves no substantial restraint, a substantial restraint is imposed in so far as the code aims to prevent the refiner from negotiating a legitimate resale for the customer. Defendants have failed to justify the prohibition of such a transaction.

Nor have the defendants justified the code interpretation against recognizing resales after the due date of the contract. While each refiner individually might refuse to honor the customer's contract assignment, made subsequent to the due date thereof, there is no justification in my judgment for an agreement or concerted action to prevent individual refiners from allowing their customers to make such assignments. There is even less justification for the recommendation where delay is due to refiner's inability to make prompt shipment.

A further restraint on resales may be described in the terms of the resolution adopted with respect thereto and made effective by the defendants in 1929: "If a refiner has more than one price and/or different terms (including guarantees) either in the same territory or in different territories, at the time of entry of an order, buyer shall elect and specify at that time the price and/or terms desired. Delivery shall be made only within the territory in which said price and/or terms were applicable at time of entry of such order. The territory to which such price or terms applies shall be incorporated in the contract, either specifically or by reference in the contract to previous announcement. No exception to this rule shall be made in instances of any resale permitted by a refiner." Exs. 21–26, p. 214.

The purpose of this resolution is indicated by the minutes of the executive committee meeting in which the need therefor was suggested. It is there recorded that: "Attention was called to the fact that the terms of some refiners' contracts would permit the sugar booked under a guaranteed contract to be resold in non-guarantee territory, which resale would carry the privilege of slow shipments not permitted by the original contract. It was the concensus of opinion that this privilege would allow the original buyer a discriminatory advantage to be taken when the market was strong while reserving the guarantee when the market was weak. Attention was again called to the

necessity, in order to prevent such discrimination, of requiring the buyer to elect definitely at the time of entering the contract between the guarantee form, where such was available, and the non-guarantee form, and to allow no subsequent switching by resale or otherwise." Exs. 21–26, pp. 196, 197.

Defendants have likewise shown no justification for this resolution. Anything discriminatory which it sought to prevent resulted from the fact that individual refiners had different prices for different territories or different terms for different or the same territories. I can find no reasonable justification for defendants' efforts to minimize the effects of these differences as long as opportunity is fairly granted to secure diverse terms and prices.

One further action was taken by defendants with respect to the resales; at a directors' meeting in June, 1929, the following resolution was adopted: "For the prevention of discrimination arising out of irregular brokerage practices, the Institute recommends to its members that full brokerage should be paid upon all resales and that members should advise their brokers to this effect." Exs. 21–26, p. 268. This was later rescinded as not practicable. Exs. 21–26, p. 322. Subsequently, however, in January, 1931, a resolution was adopted by the directors amending the pledge which the Institute contemplated requiring brokers to sign, and providing that if "in any resale of any sugar * * * the brokerage commission charged is at a rate lower than that charged by the broker to the refiner," the broker should thereupon suffer a certain forfeiture to the refiner. Exs. 21–26, p. 617. The vice president of Godchaux, in commenting upon this amendment in a letter to the president of that company, said: "I believe that this amendment of the brokerage pledge is going to be very beneficial to the refining industry when same is accomplished and properly enforced, *because it narrows the spread for the resale buyers and we should therefore have less resale sugars coming on the market.*" Ex. 451-J, 1. (Italics mine.) At the directors' meeting on May 21, 1931, at which Cummings spoke about the pending suit, the resolution was rescinded. Exs. 21–26, p. 655.

The Godchaux letter illuminates the situation, further portrayed by editorial com-

ments in Willett & Gray.[23] Because of the differential, these resales affected defendants' "first-hand" sales adversely. But this, in my judgment, is no justification for defendants' program which goes much further than their reasonable needs, if their aim were solely the legitimate one of preventing fictitious resales made to conceal secret concessions.

## I. Damaged Sugar and Frozen Stocks.

The government charges that: "The Members have agreed to report, and have concertedly reported, the location, amount, exact description, and reason for selling damaged sugars and frozen stocks of sugar, as a condition precedent to selling such sugars at a price lower than the respective Member's reported price. The Members have further agreed to report, and have concertedly reported, each instance of sale of such sugars, the date of sale, the amount sold, the name and location of the buyer, the selling price, and the character of the damage. The Institute disseminates to all Members such information relating to the proposed and to the completed sales of such sugars. Pursuant to agreements, understandings, and concert of action among the defendants, the Institute is empowered to restrict, limit, and control the sale of such sugars; and in many instances the Institute has restricted, limited, and controlled such sales."

While defendants refer to Exhibit R–7 showing that the volume of deliveries of damaged sugar and frozen stocks, 1928–31, never exceeded one-half of one per cent. of total deliveries, Cummings testified that "the volume of sales of second-hand sugars and frozen sugars is quite large." R. 5010.

Defendants deny either agreeing to report or reporting damaged sugar or frozen stock intended to be sold at a concession, as a condition precedent to making such a sale. They admit reporting the price of such completed sales and the issuance by the Institute to its members of a monthly summary thereof. They deny, however, that the Institute has ever attempted to "restrict, limit, and control" in any way the sale of damaged sugar or frozen stock, or that it has ever been authorized or "empowered" to do so.

Plaintiff refers to considerable evidence inconsistent with defendants' denials.

Since the early months of the Institute, Code interpretations provide:

"Concessions in prices may be made to move damaged sugars without violation of the provision of the Code that sugar shall be sold only upon open prices and terms publicly announced. In such cases members should give prior notice to the Executive Secretary of the Institute of the location and amount of such sugar with statements as to its condition and the reasons for selling it below the refiner's openly announced price, in order that the Secretary may be prepared to answer complaints that may be made against the member for selling sugar at other than an open price publicly announced."

"Frozen stocks may be sold at prices under the public price of the refiner without violation of the Code, but only to clear out consignments not to be replaced. In such cases, as in the case of damaged sugar, notice of the purpose of the refiner should be given to the Executive Secretary to enable him to answer possible complaints of violation by the refiner of the Institute's Code of Ethics." Code Interpretations, § I, pp. B1, B2.

As late as February, 1931, Taylor advised Henderson in very definite terms that members were "expected" to observe these code recommendations. Ex. 430-S. There is, moreover, substantial evidence that various refiners so understood the matter. White, American's sales manager, testified, however, that this was not Amer-

---

[23] "There has not been much buying directly from refiners at the 5.20¢ basis as second-hand sugars are obtainable at lower prices." Willett & Gray, Issue of January 30, 1930.

"All refiners are now offering at 4.95¢ basis . . . There has been little demand at this basis as the situation continues unsettled, but any sugars offered below refiners' prices by second-hands are quickly taken." Issue of February 20, 1930.

"The refined sugar situation has continued unchanged, all refiners quoting 4.-90¢. There has been little new buying as second-hand sugars are available at from 4.75¢ to 4.80¢." Issue of April 24, 1930.

"Refiners continue to quote 4.90¢ but there is no business at this quotation as sugars are available from second-hands at from 4.60¢ to 4.65¢ and any new business received is taken care of by such second-hand sellers." Issue of May 15, 1930.

ican's practice. In respect to a letter of July, 1930, to a customer from one of American's brokers reading: "Perhaps you will recall that several weeks ago I stated that the American had a few bags of Fine Granulated in the warehouse which were not in shape to put out to the trade in the regular manner. At that time you made an offer of 4.50 for this sugar F O B the warehouse. *I in turn submitted it to the American and they have eventually come through with a letter stating that it was necessary for them to refer the matter to the Institute before they could sell it at less than the market quotation,* and therefore, they are now in a position to receive the offer of 4.50 which they in turn will submit to the Institute for final confirmation." Ex. 430-Q. (Italics mine.) White testified: "I would like to see the advice from the company for the instructions given to this broker. I have no recollection of giving a broker any such instructions." R. 5296, 5297.

But among memoranda, which White admittedly prepared to guide himself in conforming to the code, was one which stated:

"We will be permitted to sell damaged sugars at a reduction in price.

"Before offering this sugar, we will advise the Institute of the amount to be resold and name of the market." Ex. 385-F.

In explaining this notation, White testified: "I have no recollection of ever advising the Sugar Institute or being instructed to advise them before the damaged sugar was sold." R. 5278.

In view of the contrary documentary evidence, I cannot accept White's testimony in this matter as accurate.

Defendants refer to testimony of Taylor that of approximately 2,000 reports received by the Institute of sales of damaged sugar and frozen stock, less than 100 came prior to the actual sales. While failure of the members scrupulously to observe the Institute recommendations may have minimized the effects of the Institute's policy, not only did the recommendations remain in force, but the Institute in writing to members urged that the prior notice be given.

Defendants contend that the recommendation is, in any event, entirely reasonable because otherwise the Institute would not be thoroughly informed of the facts and thus would be unable to meet charges from members or others of arbitrary concessions by the refiners. But obviously notification after rather than before the transaction would fully serve this purpose.

Clearly, the notice before sale did enable interference therewith and was sought by the Institute not or not only to meet charges of arbitrary concession but to prevent market disturbances. Thus on December 13, 1928, Worcester, vice president of Revere, stated at a directors' meeting that, "It was desirous of closing out at a concession" a stock of sugar in Chicago. "The matter was referred to the Executive Secretary." Exs. 21–26, p. 167. A few days later, Ballou, in writing to the Domestic Sugar Bureau in reference to this matter, said in part:

"It would perhaps be a debatable question whether this comes strictly within the definition of 'frozen stocks not to be replaced' *but I am inclined to give permission to name an open price on this limited stock if you think it would not unduly disturb the market for the members of the Bureau.*

"While my notice does not state specifically that this stock is not to be replaced, I understand that this is the position of Revere. * * *

*"Will you kindly give me your opinion as to whether you think the sugar can be thus sold without unduly disturbing market conditions."* Ex. 430–1. (Italics mine.)

On another occasion in 1929, American had shipped sugars through a clerical mistake to a point where it had no ready sale. Abbott, then president of American, wrote Ballou:

"We can sell it at the market, in Wheeling, but may perhaps have to parcel it out, or make delivery at customer's place of business, in order to dispose of it, as Wheeling is not a consignment point.

"We should like permission to make the best disposition we can of it at the present market price in the City of Wheeling. If you do not feel that you can pass on this, would you mind holding it for the next Enforcement Committee meeting?" Ex. 430–M.

Ballou replied:

"Upon proper showing I have always authorized a businesslike settlement of situations resulting from clerical and other bona fide errors. I do not think it neces-

sary to refer this case to the Enforcement Committee for decision. * * *

"Under the circumstances detailed in your correspondence I should advise and authorize the selling of the balance to the Anderson Caramel Company at Wheeling, to be delivered some time within the next two weeks. * * *

"If this offer of the Anderson Caramel Company is no longer open, *I should like to be advised of any other proposed distribution. The main thing to avoid is a promiscuous offering of the sugar on the open market.*" Ex. 430–N. (Italics mine.)

· In April, 1929, Ballou, on receiving reports of damaged sugar sold by Federal from its New York warehouse, wrote:

"We have your various reports of this date detailing sugars sold at concessions in * * * Bush Terminal, New York.

"We look with general disapproval upon the idea of disposing of damaged sugars in New York, or other refining points, and we would view with alarm any general practice upon the part of refiners to sell such large quantities as you report at such a substantial concession in these markets.

"*The question of permission to dispose of warehouse set sugars in substantial quantities at refining points has been consistently discouraged by the Institute,* and other means of meeting the problem have been found. We believe that the best interest of all concerned have been served by such action.

"We would appreciate your assurances that you will endeavor to avoid such practice in the future." Ex. 430–D. (Italics mine.)

In my judgment the Institute's efforts to prevent market disturbances were entirely without legal justification.

In two other respects, defendants restrained sales of damaged sugar and frozen stocks:

In January, 1931, a resolution was adopted by the directors that:

"The application of frozen stocks or damaged sugars on contracts not calling for such sugars affords an opportunity for discrimination and unfair practice. * * *

"It is recommended that frozen stocks * * * and damaged sugar be not applied to any contract not originally calling for them." Ex. 21–26, p. 613.

Defendants' explanation is that the condemned application (1) involves the re-pricing of a contract and thus conflicts with the principle of open price; (2) it opens the door to discriminatory practices, in that refiners might apply such sugars at a lower price to the contract of a favored customer on a later market decline, a course that the customer would prefer. Methods for continuing the prohibited practices without unfair discrimination, which individual refiners might have devised, were thus condemned in advance.

At one executive committee meeting, it was the concensus of opinion that damaged sugar or frozen stock should not be sold except in spot transactions. Exs. 21–26, p. 215. Place spoke of this as an "Institute regulation." Ex. 430–G. Defendants explain this concensus of opinion as simply expressive of the traditional practice; that, however, does not justify the Institute's efforts to maintain the practice, the obvious purpose and effect of such clearance of opinion.

### X. Alleged Agreement on Basis Prices and General Effect of Institute on · Price Levels.

Plaintiff contends in effect that defendants have concertedly fixed prices not merely indirectly by the regulation of trade practices that affect prices but also directly by adopting from time to time a basis price and maintaining it during the period that they concertedly desired it to be in effect. Virtually conceding on the oral argument (Tr. p. 769), that there was little direct evidence of basis price agreement, counsel seek to draw an inference thereof from several documents coming from the files of some of the defendants, especially Exs. 442–R and S, 449, 452–W–2, and 463. In my judgment, these lend no substantial support to the charge. They show, at most, (1) that after *one* price change, the reasons therefor were discussed in a correspondence between Ballou and C. & H. in which Ballou criticized C. & H. for reducing its price merely because of a suspicion of secret cuts by competitors and C. & H.'s president in reply, charged eastern refiners with having attempted to advance the price despite a weak raw market (Exs. 442–R and S, 463; see, too, Ex. O–3, price change of May 9, 10, 1929); (2) that at *one* meeting "refiners generally" may have expressed the opinion that "market * * * will improve next fortnight" (Ex. 452–W–2); (3) that Ballou, in writing Hershey shortly after the Institute was formed, said:

"refiners usually follow price changes, either in whole or in part"; the context of the letter neutralized, however, any inference that Ballou was urging Hershey to do likewise (Ex. 449).

Officials of the Institute and leading representatives of many refiners definitely and unequivocally denied any concerted action on basis prices. The Institute's office manager who had attended nearly all meetings since 1929, after emphatically denying any discussion of prices or price changes at any of those meetings, added: "I have heard a discussion begin and work around where somebody might have conceived it to be a price change discussion, or prices, I should say, and invariably one or two or three or more refiners have gotten up and said, 'This is not a proper subject for discussion and we won't stay if this type of discussion continues.'" R. 5194–95. See, too, cross-examination. R. 5195–97. A number of witnesses were those who determined the price policy for their respective refineries; each testified that he had acted entirely independently of the Institute and of his competitors in such matters.

In corroboration, defendants have analyzed in some detail practically all price changes during 1928–1931, inclusive (Ex. O–3), with more complete analyses of certain of the changes (Ex. N–3). The analyses show that frequently an announcement by one refiner of an advance would result in a series of announcements by others, ultimately leading to a decline; often, too, the advance would be withdrawn because one refiner would refrain from following the announcement. Except in a few instances, a decline announcement was followed by all.

Plaintiff, while not denying that defendants' sugars are in fact thoroughly standardized, contends that through advertising and other means, a preference has at times been created for one brand or another and that therefore the several brands are not, from an economic standpoint, standardized; for this reason and if free competition prevailed, it urges, the difference in the strength of the preference for the several brands would be reflected in price differences and the price uniformity which has in fact prevailed, would be lacking. The evidence shows, however, that this preference was generally not sufficiently strong either before or after the Institute to enable one refiner to obtain a higher price for his product than

another, except in so far as the other might be giving a lower price by secret concessions. Lowry testified: "The purpose of advertising is to bring down sales resistance and these two brands [the widely advertised American Domino and National Jack Frost] are very well known and it is natural to suppose that with many consumers they are more acceptable than other brands. But sugar is very standard in quality and it has been rather difficult to get the consumer to call consistently for any particular brand of sugar." He added, however: "There is no doubt in certain sections that this brand or the other brand has the call." R. 412.

But, at best, the testimony of Lowry and of plaintiff's other witnesses shows only that there were certain exceptional cases or occasionally certain localities in which such a preference was strong enough to command a higher price for a particular brand in sales from a *dealer* to his trade. In sales by refiners to manufacturers of products containing sugar, which account for about one-third of the sugar consumed, price not brand is always the vital consideration. Plaintiff's and defendants' witnesses agree that one *refiner* could not ordinarily by virtue of preference for his brand, obtain a higher price than another in selling to his trade. One of plaintiff's witnesses, a buyer for a large wholesale grocery concern which merchandized an average of 175,000 bags of sugar annually, testified that as between the several defendants' sugars, "any inducement, even of a cent or two [per 100 lb.] would take the business, as far as I know." R. 790. The evidence shows that defendants' product is in all respects a standardized product; uniformity of basis price in any given area is therefore to be expected under a regime of free competition, Cement Mfrs' Protective Ass'n v. U. S., 268 U.S. 588, 605, 606, 45 S.Ct. 586, 69 L.Ed. 1104 (1925).

Prior to the Institute, it is true, Arbuckle and Federal frequently sold openly below the announced prices of the other refiners. But as to Federal, this was because of its reputation for inferior quality, lack of a full assortment of grades and packages, and because of limited production, with consequent inability to assure filling of orders. As Federal some time after the Institute improved its methods, it sold on the same basis as its competitors. Arbuckle, which never gave secret concessions, sought in pre-Institute days to meet

its competitors' underhand methods by "bargain days"; that is, it would decline its price for a day only. When, as happened at times, other refiners did not directly meet the decline, some would equalize conditions for favored customers by secret concessions. Since the Institute, Arbuckle's bargain day prices have been openly met by other refiners; indeed, they have sometimes led to announcements by other refiners of a general decline not limited to a single day. It is thus apparent that these pre-Institute instances of lack of price uniformity were of an exceptional nature and do not lessen the strength of defendants' contention that uniformity in price is not necessarily evidence of illegal restraint. Willett & Gray's pre-Institute published prices of the several refiners were not uniform; but, as already explained, these were merely nominal quotations.

Plaintiff refers to another post-Institute change in the price situation. Price variations in different trade areas throughout the country, frequent before the Institute, have been less marked since that time. Defendants, however, point out that though each refiner does not sell in all parts of the country, a considerable overlapping of sales territories has a tendency to cause a decline announcement by one to be followed by all, but an advance to be withdrawn if any one refiner fails to follow it. Obviously the spread of a decline might be retarded by the pre-Institute secret concessions; but, as these no longer prevail, the tendency now is for prices throughout the country to be depressed to the lowest price anywhere prevailing. Of course, this does not mean that post-Institute sugar prices have been lower than pre-Institute; indeed, they have been relatively higher. It does tend to show, however, that the elimination of territorial differences in basis prices is not due to direct agreement.

Plaintiff also urges as evidence of wrongful restraint of trade, the fact that the number of price changes for refined as compared to raw sugar has been relatively less since the Institute than before. The relation of refined to raw changes, as computed by plaintiff, was successively from 1924 to 1930, 41.74 per cent., 37.37 per cent., 49.41 per cent., 38.29 per cent., 28.71 per cent., 23.08 per cent., and 20 per cent. As cost of raw is the most

important factor in the price of refined, the reasonable inference from these figures, plaintiff asserts, is that the post-Institute price of refined has been artificially maintained. As further proof, it adduces the testimony of refined sugar buyers that since the Institute, notwithstanding the fact that the cost of raws constitutes about 80 per cent. of refined cost, they were no longer able to anticipate changes in the refined market from raw market trends, because refined price changes have not responded as closely as before to changes in raw. Defendants' explanation is: (1) That the price of raw has declined so greatly in recent years that fluctuations therein are too small to translate themselves into immediate changes in the price of refined (Fact Brief, pp. 448, 449); (2) that this impression of the unresponsiveness of refined prices to raws is due to the fact that because of the allowance of a definite period of grace on each price move for purchases at the old price, these purchasers no longer needed to watch the raw market as closely as before (Fact Brief, p. 56).

In my judgment, however, the explanations do not remove the suspicion of price fixing. The post-Institute decrease in the percentage of refined to raw price changes, despite a pre-Institute tendency in this direction, is too marked to be explained by the drop in raw prices; thus, in 1925, 1926, and 1927, when the average price of raws per pound, according to defendants' figures, was 4.431, 4.263, and 4.778 cents, respectively, the relation of refined to raw price changes was 37.37 per cent., 49.41 per cent. and 38.29 per cent.; in 1928, when the average cost of raws was 4.278, it was 28.71 per cent. See Defendants' Fact Brief, p. 454; Government's Memo in Reply to Defendants' Statistical Memo, p. 14. The witnesses who testified to the lack of sensitivity in refined prices to raw were expert sugar buyers who, regardless of whether they could be certain of a definite period of grace on each move, naturally studied market conditions carefully in order to determine the opportune time for buying.

Defendants have analyzed, in considerable detail, statistics relating to profits and margin [24] during the pre- and post-Institute period, to show that there has been no such increase as to warrant an in-

[24] The margin is the difference between cost of raw to defendant and prices at which they sell the refined.

ference of concerted action unreasonably to restrain competition. It would, I believe, serve no useful purpose to review at length the evidence and the arguments as to these matters; it suffices to point out that the post- compared with the pre-Institute period shows a marked increase in margin and a substantial increase in profits despite a concededly large excess capacity.[25] This would naturally follow maintenance of refined price with concurrent raw declines and the evidence shows that prices for refined as compared with raws have been maintained at levels which tend to negate the prevalence of free competition, and to support the inference of concerted action, with the effect, normally in these circumstances to be anticipated, of the rise in margins and profits.

The government argues that defendants' financial statements do not represent their real condition, in that among other things they are overcapitalized, have excess capacity and obsolescent plants; the accounting methods of some of them, too, are subjected to criticism. These matters, however, I pass, because, as the government contends, it is unnecessary to inquire whether or not defendants made excessive profits except in so far as these would tend to indicate concerted restraint. What is condemned, of course, is not profits large or small, but the shackling of the forces of fair competition whatever the financial result.

Factors which may account in part for the post-Institute price levels are:

First, the collection and dissemination among the refiners of the statistical information which tends at least to stabilize conditions in the industry [cf. Maple Flooring Mfrs' Ass'n v. U. S., 268 U.S. 563, 582, 45 S.Ct. 578, 69 L.Ed. 1093 (1925)], and withholding it in large part from the purchasing trade; this aids the individual sellers in their effort to maintain high prices.

Second, the steps taken by the defendants to maintain the uniformity of price structure, that is, not uniformity in the basis prices at any given time but in the prices and contract terms at which the several participants in the distribution process obtain their sugar. See note 8, supra. The uniformity of price structure was maintained by specific restraints on numerous competitive practices. Thus they restrained long-term contracts; if these were made at a fixed concession, as the Revere-Edgar contract was, the purchasing distributor would get his sugar at a lower price than his competitor who could not or did not avail himself of such a contract; a similar advantage could be created through quantity discounts, tolling contracts, combination of distribution functions, use of cheap differential route transportation, purchase of damaged or frozen stock sugar and the like. By imposing substantial restraints thereon, defendants sought to eliminate the possibilities of price variations to distributors or ultimate purchasers at any given time with the opportunity by underselling to disturb the price structure; refiners were thereby relieved, too, of the pressure to reduce prices that would otherwise have been exerted upon them by those who could not or did not get the lower prices or better terms, as has been indicated in the detailed discussion of these restraints. Such relief, too, would tend to aid the individual refiners in maintaining a higher price level.

Third, the stabilizing effects of the friendly co-operative spirit [26] which the

---

[25] Overcapacity, it is urged, is necessary because close to the maximum is used during the rush periods by most refiners. This argument, however, has little merit in view of defendants' admission in their answer that the industry suffered from 50 per cent. over capacity and of their insistence therein that this over capacity was a cause of the undesirable sales conditions prevailing prior to the Institute. Defendant refiners' annual capacity, 1927, 17,571 million pounds of raw; annual capacity 1931, 16,665 million pounds. The reduction is accounted for by the elimination of Spreckels in 1930; its capacity was 1,200 million pounds. Since 1927, Imperial, Western, and National have slightly increased their capacity. Between 1927 and 1931, notwithstanding elimination of Spreckels, the percentage of defendants' annual melt to capacity has decreased from 61.67 per cent. to 56.01 per cent. Ex. W–14. They have lost much business to the offshore refiners; and at least a substantial part of this business has been lost because the offshore interests, despite cooperation with the Institute, did at times give terms denied by defendants, such as long term contracts.

[26] Cummings testified that just prior to the Institute, "Many of the refiners were not on speaking terms with each other; there was the utmost bitterness in the industry." R. 4727.

Institute brought to the industry (cf. Ex. 463).

Fourth, the assurance which the open price system under the Institute gave to each refiner that the only prices and terms he need meet were those openly announced in advance of sales by his competitors. Prior to the Institute, the refiners were able to keep only roughly informed of one another's prices because of the widespread but carefully concealed concessions. Price declines in those days might sometimes have resulted merely from an unfounded belief that other refiners had made secret cuts. Since the Institute, on the other hand, the opposite tendency has prevailed. Each refiner is encouraged to maintain or raise prices by the assurance that until public notice is given, his competitors will not lower · their announced prices; and even if they believed that market conditions warranted a decline, the tendency would be to defer it until "the traffic would no longer bear" the then prevailing price. The letter of C. & H.'s president to the Institute (written in June, 1929), hereinabove referred to is illustrative. While C. & H. did there lower the price, it charged that the eastern refiners were attempting "to get the trade to load up on a very weak raw market * * * which the trade has resentfully protested against times innumerable." Ex. 442-S, p. 7.

In my judgment, these factors are largely responsible for the stability of prices and the maintenance of price levels, regardless of supply and demand, observable since the Institute.

There is no substantial direct evidence that defendants by agreement fixed or maintained basis prices in the sense of agreeing from time to time to maintain, lower, or raise the current basis price. Any such agreement, express or implied, was strenuously denied. The fact that from time to time, one refiner would maintain or lower the price after another's advance thereby causing the latter to be withdrawn, tends to confirm this testimony. Indeed, a direct basis price agreement was not vital to defendants' purpose; in part at least they were able to maintain prices through preserving the price structure, withholding statistics from the trade and effectuating the open price scheme.

In the light of the entire evidence, I think it clear that while defendants' common purpose was concertedly to maintain relatively high price levels, no agreement

to fix basis prices directly, may be reasonably inferred.

## XI. Miscellaneous Activities.

### 1. Fines and "Trials."

(a) Plaintiff charges that defendants agreed to a system of fines to be imposed upon members for violations of the code. While a resolution to that effect was adopted by the directors in June, 1930, pursuant to the recommendation passed at a members' meeting (Ex. 21–26, pp. 445–449), no fine seems ever to have been imposed and in six months the resolution was formally rescinded (Ex. 21–26, p. 618). Defendants contend and plaintiff denies that because the vote was not unanimous, the original provision for fines never in fact became effective and that the repeal was merely formal, to clear the record.

When C. & H.'s withdrawal of consent, based clearly on a belief in its illegality, was reported to a directors meeting on July. 24th, it was expressly excepted from the operation of the fines provisions. Ex. 21–26, p. 486. Various members sent out notices to their brokers that the members were subject to fines, and one such announcement was given further currency by the Institute in a circular as late as July 14, 1930. Ex. 402. Defendants' actions, the announcements to the trade despite Colonial's protest, and the express exception of C. & H., indicate that the fines provision was deemed operative; plaintiff refers as well to other evidence of like import.

On the other hand, there does appear to have been confusion among defendants as to whether or not the provision ever became operative. Thus, Revere's sales manager in a letter to Taylor, December 8, 1930, said of it: "It is my understanding that this section has never been made operative. Am I correct?" Ex. 403. On December 10th, he was advised that it was operative. See Ex. 403A. But Worcester, vice president of Revere, testified that his company did not "believe" the advice of the Institute that the provision was operative (R. 5582), and several other defendants testified that the provision never went into effect.

In view of the genuine confusion prevailing among the members as well as the fact that there was evidently never any attempt to impose a fine despite code violations during the period June, 1930, to January, 1931, I must deem defendants' abor-

tive attempt to devise a system of fines as of no importance.

Plaintiff, however, contends that despite the repeal of this provision, fines may still be imposed under Institute rules. In support, it refers to the provision in the General Rules of Procedure for the Executive Committee, that: "The Executive Committee be and it hereby is given authority to levy assessments for Institute operating expenses from time to time as needed." Ex. 21-26, pp. 658, 659. It is entirely clear, however, that this relates solely to levies for operating expenses and not to fines.

There is evidence that in the fall of 1930, some steps were taken to devise a plan for penalizing members at the rate of 10 cents per undelivered bag, for failure to compel buyers to take delivery within the contract period. But no such a plan appears to have been formulated.

█ (b) A further charge of illegal conduct is that the Institute from time to time examined the several refiners' records, files, etc., in investigating suspected code violations and that more or less formal trials of refiners were held in order to determine whether there had been code violations. These activities, in so far as they were in aid of defendants' other illegal activities, must be held likewise illegal.

*2. Allocation of Production and Territory.*

█ While plaintiff seeks to show that defendants attempted to allocate production and territory, it does not charge an understanding to adopt a comprehensive scheme for such allocation. The evidence shows at most only that (a) defendants considered allocation of production and collected and exchanged statistics serviceable as a basis therefor; (b) other activities resulted incidentally in limiting sales territories of some defendants in certain isolated instances; there may, too, have been some concerted effort in one case, to induce Western to withdraw from Indiana, Ohio, Kentucky, and Tennessee. These matters will be dealt with briefly.

(a) At the Institute organization meetings, the question of allocating production was discussed. Defendants were advised by counsel at that time that this was an improper subject for concerted action. A representative group of officials of various refiners testified that the matter was thereupon dropped and never again discussed or considered.

Soon after the Institute was formed, statistics of production of the several refiners for 1925, 1926, and 1927 were collected, as "background statistics for comparative purposes," according to defendants. R. 8643. Members also made current weekly reports of production and each in return received from the Institute a report showing the percentage of his production for the week and for the year to date. Ex. I-2. Fisher, Institute's office manager, admitted on cross-examination that the members had all the necessary figures if they had wanted to allocate production. R. 8683.

Defendants offered data indicating that no allocation had in fact been effected, and there is no substantial evidence that it was even attempted. The government relies on a letter from Arbuckle to the Institute, in which reference is made to "results of the years 1925, 1926 and 1927, reported to the Institute to serve as a basis for allotment." Ex. 460. The letter was written in January, 1931, long after the figures were reported. At best, it is but slight evidence that such was the purpose of the report. Defendants urge that the writer evidently confused statistics discussed at pre-Institute meetings before advice of counsel that allocation was improper, with those subsequently reported for "background" purposes. I am inclined to accept this explanation especially in view of the testimony of defendants' witnesses that the matter was never dealt with subsequent to that advice. The context of the Arbuckle letter lends some support thereto, for immediately following the above-quoted excerpt, it proceeds: "Then came the feeling that allotments were not in order and no good came of making our reports for the three years indicated."

Defendants' analyses of production figures show so clearly that no allocation was effected that I deem it unnecessary to discuss them in detail, especially since plaintiff has offered neither evidence nor argument to the contrary. Exhibits upon which defendants rely in this respect are W-14 to Z-14, A-15, B-15. They reveal wide variations from year to year in the production of the several refiners. One of them, Y-14, showing each refiner's percentage of the total melt for the years 1925 to 1931, was referred to in the testimony of one of the defendants' economic experts; he stated: "I see no evidence of freezing or conditions of relative shares of the various refiners measured by these

figures for the melt. The percentages vary normally, it seems ·to me, and as between the period 1925 ·and 1927, compared with 1928 as against 1931, there seems to be rather more variation in the latter period than in the former period." R. 10484, 10485.

(b) There is no evidence that defendants gave any consideration to a general territorial allocation. Plaintiff points out, however, that incidental to the application of Code 3 (c) and agreements with respect to "arrival" terms, McCahan may have lost ground in the Chicago and adjacent territories, that application of Code 3 (c) may have similarly affected Savannah with respect to some territories, and that during the months when Code 3 (c) was a live issue, some refiners made suggestions with respect to the territories in which others ought to operate. Plaintiff complains, too, that Lamborn may have had to withdraw from North Carolina because of agreeing to charges on 1. c. 1. shipments out of Norfolk. Hershey may have suffered territorially because of the elimination of Wilmington as a storage point. But all of these alleged "restraints" were merely incidental to defendants' other wrongful activities heretofore considered and will doubtless end with their cessation.

Plaintiff also seeks to show that Western was persuaded to withdraw from competition in Indiana, Ohio, Kentucky, and Tennessee through efforts of other refiners. Some of the defendants' telegrams and letters support this charge. But there is, too, evidence that Western withdrew because its venture in this section was unsuccessful. In any event, the matter does not appear to have been important. It occurred during the first year of the Institute and there is no evidence showing similar incidents thereafter. Moreover, statistical analyses offered by defendants, as well as testimony of an economic expert in reference to one of them strongly support defendants' contention that there has been no allocation of territory. See Exs. J–15, F–15; R. 10490, 10491.

In such circumstances, plaintiff has shown no substantial basis for a fear that defendants are likely to concern themselves with such matters. I shall therefore deny relief with respect thereto.

### 3. Blacklisting of Customers.

Plaintiff charges an agreement among defendants, (1) to report to the Institute names of those who were stricken from refiners' list of customers because they cancelled or repudiated any part of their contracts; (2) to refuse credit to a customer who for that reason had been stricken from the list of another refiner.

The Institute recommended, in a code interpretation, "that the failure of the buyer to complete his contract according to its legal effect, be deemed sufficient reason for the suspension of credit terms." Section I, p. D5. Plaintiff apparently does not contend that it would be improper for the Institute to recommend withdrawal of credit in such circumstances. There is evidence indicating that refiners did not deem themselves bound by this recommendation but exercised their own individual discretion in determining whether or not credit should be withdrawn. It does contend, however, that it would be improper concertedly to "blacklist" customers stricken from the list of any one refiner because of cancellation or repudiation of contracts. Defendants, admitting that such customers were supposed to be reported to the Institute and that their names, but not that of the refiner reporting them, were circulated, insist, however, that there was no understanding for a concerted black list and that the circulation of the names was intended merely as credit information and was in fact only so used.

Plaintiff urges that: "If the refiners had actually been interested in credit information, their plan would have provided for the reporting of cancellations and repudiations by the customer, whether or not the refiner reporting the information had stricken the customer's name from his list. If, on the other hand, the object was to blacklist any customer who had been stricken from one refiner's list then we would expect the defendants to have acted precisely as they did." Government Brief, p. 449.

The strongest cited evidence of a blacklisting arrangement is a Revere letter to the Institute, dated February 18, 1931 (Ex. I–6), and a series of documents from McCahan's files (Exs. 414–414 P). Material parts of the former follow:

"Last summer one of our competitors placed a customer in breach due to his failure to take delivery of sugars at the expiration of the allotted time.

"We have continued business relations with this customer, and have been subject to some criticism by competitors because we have not severed business relations.

"I submit to you this customer's contract performance for the last seven contracts, and will be interested to learn if you, and the Executive Committee consider that the record as a whole shows evidence of bad faith, either on our part, or on the part of the customer. In other words, do you feel that we, in this particular instance, are properly the subject of just criticism."

While this letter shows that refiners may have hoped that reported customers would be cut off the lists of their competitors and may have criticized the failure to do so, it not only falls far short of establishing, but on the contrary, it tends to negate an agreement in this respect.

The McCahan documents, principally interoffice communications, tend to show: (1) That it was the understanding of Place, its vice president, that a customer reported as stricken from the list of one refiner should not "be sold by other refiners—at least not without discussing the subject openly." (2) That Abbott (general counsel and later president of American), Hoodless (vice president of Pennsylvania), and others had a similar understanding. Ex. 414-E. Place's explanation of these documents, that he was misrepresenting the true facts in order to induce his subordinates to feel bound to cease selling a particular customer whom Place personally wished to cut off, cannot be accepted.

However, responsible officials of a number of refiners testified that the lists of reported customers did not affect their sales policy. Moreover, defendants have introduced the sales records of a number of the refiners; in all, nearly 150 customers were reported during the period covered. Defendants' unchallenged compilation thereof, with respect to the refiners whose records were produced, shows that despite the Institute reports, American continued to sell 62 per cent. of its customers reported by other refiners, National 81½ per cent., Arbuckle 89 per cent., Revere 80 per cent., and Pennsylvania 74 per cent.

I therefore deem the McCahan documents insufficient to establish an understanding on the part of defendants generally to blacklist reported customers. That may have been Place's understanding and his belief as to the others. But this evidence is too inconclusive, especially in view of the countervailing evidence, to establish an agreement in this respect.

Plaintiff's argument that defendants' report of such customers only as had been stricken from refiners' lists indicates a blacklisting scheme is unconvincing. Defendants explain that such names alone were reported in order to simplify the refiners' reports to the Institute and to provide information as to those customers whom refiners deemed the most serious offenders against contract terms. In my judgment, such information would be legitimately of greater interest in determining credit policy than a report of all customers who had repudiated or cancelled contracts.

XII. Raw Sugar Polarization Allowances.

■ Petitioner charges that defendants acted illegally in that they "agreed upon * * * uniform and arbitrary differentials for raw cane sugars purchased for their respective refineries, said price differentials to be based upon the quality of the raw cane sugar indicated by polarization tests, and agreed to restrict their allowances on high quality raw cane sugar."

The evidence establishes the following facts (I paraphrase to a large extent the statements in defendants' brief): The sucrose content of raw sugar expressed in terms of sugar degrees is determined by a polariscopic test. Raw sugar is bought and sold on a 96° basis; that is, the specified contract price is for 96° raw sugar. If the polariscopic test, made after delivery of sugar to the refiner, discloses that the sugar tests higher than 96°, the refiner pays the producer an allowance over the basis price, because of the additional sucrose content; if the sugar tests below 96°, the refiner is entitled to an allowance.

Because the sucrose content of any given lot is not determined until the test, there must be some scale of allowances accepted by both parties, upon the basis of which adjustments in the contract price may be made. This cannot practicably be negotiated for each contract; there must be therefore some generally accepted scale of allowances. This was customarily fixed from time to time by negotiations at meetings of producers and refiners. Thus the scale so adopted in 1916 provided for 1/32 of a cent per pound additional for each degree above 96° to and including 98°, and 1/16 of a cent deduction for each degree below 96°. The deduction per degree was greater than the addition because as refinery equipment is geared to handle 96° sugar, the refiners' benefit if sugar tests

above 96° is proportionately less than the detriment if it tests below 96°. No additional allowance was provided for raw sugar testing above 98° because there is practically no such sugar.

This scale of allowances was defective, in that it did not provide adjustment for variations in the basis price of raw sugar. When this rose materially, the allowance of 1/32 of a cent was inadequate from the producers' standpoint and the deduction of 1/16 of a cent inadequate from the refiners' standpoint. Conversely, when it fell materially, the refiners were paying an excessive premium while the producers suffered unduly, for sugar testing respectively above or below 96°.

Marked variation in the basis price of raws necessitated working out a new scale based on the then prevailing price. In 1919, an attempt was made to eliminate the necessity for repeated revisions, by providing for fluctuations in the price of raw sugar. Different scales were prepared expressing the allowances applicable when the basis price was 6 cents, 7 cents, 8 cents, etc. But this schedule failed to take into account anything less than full cent fluctuations; the same scale applied whether the price was 6 cents, or 6.99 cents while a different scale was used when the price advanced only 1/100 of a cent to 7 cents. The scale was also defective in other respects. As a result the refiners, in 1927, were paying an excessive premium on sugar testing above 96°, while the producers were suffering unduly on sugars testing below 96°.

In January, 1928, the president of National invited the several refiners and a group of raw sugar producers and brokers, representing, as defendants emphasize, 95 per cent. of the raw sugar producing interests operating in the New York market, to a readjustment conference. There, National's technical expert suggested a scale expressed in terms of a percentage of the basis price rather than in fractions of a cent, as more scientific and accurate and operating equally fairly to both sides. The suggestion was approved; committees were selected representing each side to work out an acceptable scale. After negotiations between them, conducted so far as the record shows in entire fairness, had begun, the informal committee of refiners was formally reappointed by the then newly formed Sugar Institute. A compromise agreement, accepted by the two committees in February, 1928, was reported to the Institute; it issued a circular recommending March 12, 1928, as the effective date for the new scale. Because of protests from raw interests, the Institute acquiesced in a suggested postponement to May and issued a second circular to the trade announcing the later effective date.

No suggestion was ever made that the new scale was unfair to the raw producers. Their complaint that large interests were without representation in the "deliberations," evidently referred, not to deliberations resulting in the new scale as such, but to those at which the effective date thereof was determined. The new date appears to have been entirely satisfactory to both interests.

The government complaint is that (1) allowances to sellers of raws for sugar testing above 96° were scaled down, (2) they were not adequately represented in the negotiations, and (3) the differentials finally determined upon were reached by agreement. The evidence affirmatively shows that the scale of allowances prevailing prior to the 1928 agreement, for sugar above 96° was unfairly high; that the new arrangement was scientific and entirely fair; that any lack of representation was due to inadvertence and in any event was unimportant; that scales of allowances similarly negotiated and agreed to were customary and practically necessary.

In my judgment, undue restraint of trade in these respects is not proven. The special circumstances justify the action taken. Cf. Chicago Board of Trade v. U. S., 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed 683 (1918); National Ass'n of Window Glass Mfrs. v. U. S., 263 U.S. 403, 44 S.Ct 148, 68 L.Ed. 358 (1923).

## Legal Consequences of Defendants' Actions.

1. That the anti-trust laws allow competitors a broad field for concerted action in eliminating frauds [Cement Mfrs Protective Ass'n v. U. S., 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925)] and "destructive" practices [Appalachian Coals, Inc., v. U. S., 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933)], that widespread dissemination of trade statistics is to be encouraged in aid of sound competition, [Maple Flooring Mfrs' Ass'n v. U. S., 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925)], and that in any event a restraint of trade is not illegal unless undue or unreasonable are too well settled to require discussion [Appalachian Case, 288 U.S.

---

344, at pages 360, 361, 53 S.Ct. 471, 77 L. Ed. 825; U. S. v. Trenton Potteries Co., 273 U.S. 392, 396, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989 (1927)]. But whether or not a restraint is undue or unreasonable depends, of course, upon all of the facts in the particular case and the effect of that restraint in the specific industry. Appalachian Case, supra; Maple Flooring Mfrs' Ass'n Case, 268 U.S. 563, at page 579, 45 S.Ct. 578, 69 L.Ed. 1093.

In this case, it must be determined whether any or all of the restraints of trade went only so far as was necessary to avert unsound and illegal practices or whether the measures adopted went in whole or in part, beyond what was essential or proper for this purpose and in their application, seriously affected sound competition. In this connection, the variance between defendants' expressed aims and their real objectives as heretofore pointed out, is of importance. While proper and wholesome restraint does not become illegal merely by reason of concealed or pretended motives (Board of Trade of City of Chicago v. U. S., 246 U.S. 231, at page 238, 38 S.Ct. 242, 62 L.Ed. 683, Ann. Cas.1918D, 1207), this may well turn the scale against legality as to those practices the validity of which might otherwise be doubtful.

I take up at the outset one of defendants' principal arguments in justification of the legality of their acts. They contend that the pre-Institute secret concession practices resulted in a discrimination which violated both the letter [George Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060 (1929), American Can Co. v. Ladoga Canning Co., 44 F.(2d) 763 (C.C.A. 7th, 1930)], and the spirit of section 2 of the Clayton Act (15 U.S.C.A. § 13);[27] that for this reason they properly and legally sought concertedly to eliminate these practices. As illustrative of the practices involved, the prohibition of quantity discounts may be cited. As to that, defendants say that though the proviso in section 2 expressly sanctions the granting of discounts based on quantity sales, nevertheless in the sugar industry, such a practice would contravene at least the spirit of the Clayton Act. They assign as the reason therefor, that large sugar sales to a single customer produce no greater economies to the refiner than the equivalent quantity sold to a number of customers. The discussion of the facts, however, has demonstrated what defendants must have known, that economies in many, if not in most cases, had resulted and would result from quantity sales and that therefore a discount based thereon is, at least, not necessarily unfairly discriminatory in its operation. Furthermore, even if in some instances, as at times at least in sales to chain stores, a restraint on the grant of a discount based solely on the quantity bought would be justifiable, a general prohibition of such discounts goes so clearly beyond the proper or necessary remedy for any possible evils as to demonstrate the falsity of defendants' alleged motives and to make their action clearly an unreasonable restraint of trade.

Further illustrative is the prohibition against brokers, warehousemen, and sugar buyers uniting their several functions, also the restraint on tolling contracts. It is entirely clear that whatever discrimination might arise, because some could and others could not take advantage of these opportunities, would be due not to any grant of an arbitrary concession or to any unfair discrimination practiced by the refiner but to the relative economic condition of the two classes. Examples might readily be multiplied.

A discrimination in and of itself is, of course, not necessarily unfair or illegal, as is implicit in the Act itself. Cf. Baran v. Goodyear Tire & Rubber Co., 256 F.

[27] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities * * * where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: Provided, That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade." U.S.C., title 15, § 13 (15 U.S.C.A. § 13).

570 (D.C.S.D.N.Y.,1918). The important fact is that defendants were not primarily interested in conforming or having others conform either to the letter or to the spirit of section 2 of the Clayton Act. Indeed, they have themselves created arbitrary "discrimination" as, e. g. in the case of delivered prices, see p. 856 of this opinion. What interested defendants was the preservation of the price structure, the maintenance of relatively high prices and the elimination of burdensome competitive practices and of every possibility of a secret concession grant.

◼ 2. The refiners' basic agreement to offer all prices, terms, and changes therein only on an open announcement, effected, contrary to defendants' insistent statement, a change [28] from the purported pre-Institute practice. While representatives of the ethical refiners testified that they had made no such change, even they had deviated to some extent from their former practice. Thus, Revere's pre-Institute long term contract, while offered fairly to all customers in a position to use it, had admittedly not been "open" in the sense of having been publicly announced. Tr. of Arg. p. 272. Henderson, too, one of the ethical refiners, gave at least two long-term contracts, apparently without open announcement.[29] Special terms like the pre-Institute tolling, while apparently granted on a fair basis at least by some refiners, never appear to have been the subject of open public announcement. The used bag allowance granted by Pennsylvania to National Biscuit Company and the Godchaux-Edgar long-term contracts were privately negotiated; indeed, they may each have been so unique as to require special arrangements for them alone. The unethical refiners' selling bases, the prices at which they purported to sell, do not appear always to have been openly and publicly announced in advance of sales; some of them varied these from time to time without formal public announcement.

Though defendants contend that the open announcement rule is essential to true economic competition, it has not produced this result. True it is that regardless of the effect of open announcement, special terms were specifically abolished or limited by special agreement; the requirement, however, in all cases, of open announcement in advance of sales, necessarily in and of itself ended any possibility of special terms when private negotiations were essential. The rule in this way afforded a convenient and frequently adopted reason for not offering them; Revere's representative testified that its post-Institute change of policy as to long-term contracts was "because we considered that that was not selling on our openly announced prices and terms." R. 5548. As the discussion of the facts has shown, the assurance to each refiner, implicit in the agreement, that no competitor would vary his prices or terms without advance notice, was even more serious, because it tended in fact, as it naturally would tend, toward maintenance of price levels relatively high as compared with raws.

Defendants contend, too, that open announcement is also essential to prevent wide spread discrimination, fraud, and misrepresentation. Obviously unless both buyers and sellers are well informed with respect to market conditions, fraud and misrepresentation are likely to be wide spread. Thus, a buyer, by misrepresenting the price obtainable from one refiner, may induce a competing refiner, ignorant of the actual situation, to sell at an unreasonably low price; conversely, a seller by similar misrepresentation as to his competitor's prices may be able to exact an unreasonably high price from customers ignorant of the true condition. Naturally, too, the fraud and misrepresentation made possible by ignorance of actual market conditions, may lead to arbitrary discriminations between customers. But such unfair competition could have been remedied without an agreement to sell only on the basis of prices and terms openly and publicly announced in advance of sales. The testimony of defendants' own witnesses indicates that competition among sugar buyers was so keen that when an arbitrary discrimination in favor of one became known, others similarly situated would ordinarily bring pressure to secure like favorable treatment. Either they would have succeeded or the discriminatory favor would have had to be withdrawn. Immediate publicity given to the prices and terms of all *closed* transactions, which so far as the record shows, would not have

---

[28] This was in addition to the use of the Institute for relaying the information by all except C. & H.

[29] Shortly after the Institute he wrote to Ballou "we will, of course, in the future make no more such contracts." Ex. 398–A.

been impracticable, would thus have resulted in preventing the discrimination, fraud, and misrepresentations that defendants professed the desire to avert.

It may be that in some circumstances an ideal system would be, as defendants contend that it is, one in which all sales are made on the basis of open public announcement definitely stating all prices and terms. But the facts of this industry demonstrate that the operation of this agreement for open announcements has been to aid both in maintaining price levels without regard to the normal effect of supply and demand and in eliminating ofttimes, entirely fair competition. Defendants' professed aims in adopting and enforcing the plan could moreover have been achieved by less drastic and less harmful means. Whatever may be its theoretical merits, it has been clearly proven in this case that defendants' concerted plan has here brought about an undue restraint of trade and for that reason is to be condemned.

Exchange and publication of the details of *closed* transactions, through a trade association (Maple Flooring Case, supra), and of prices at which specific job contracts had been entered into (Cement Case, supra), have been upheld. But in neither case was legal sanction given to concerted action for announcing or maintaining open prices and terms for current or future transactions.

In U. S. v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 611, 67 L.Ed. 1035 (1923), an agreement to furnish the Bureau with a "schedule of prices and terms and adhere thereto—unless more onerous ones were obtained—until prepared to give immediate notice of departure therefrom for relay by the Bureau" to members was held illegal. This practice was expressly referred to in the Maple Flooring Case, 268 U.S. 563, at page 581, 45 S.Ct. 578, 69 L.Ed. 1093, in distinguishing the Linseed Oil Case. While, as defendants point out, the agreement·in the instant case differs in its terms from that in the Linseed Oil Case in that here it was to adhere to prices and terms until a public announcement of a departure therefrom should have been given, nevertheless, the principle of that case, in my judgment, is presently applicable.

As defendants state in their law brief (pages 204, 205), the use of the Institute for relaying announcements "is de-

signed to put added support behind the policy of selling only at open public prices." As an integral step in what I have found to be an unreasonable restraint of trade, in concertedly enforcing open public price announcements, the use of the Institute for relaying becomes in itself illegal. I find it unnecessary to pass upon the legality of the use of the Institute for relaying open public price announcements in advance of sales, if each refiner entirely independently of the others voluntarily made his own announcements without obligation to adhere thereto.

As to the Three O'clock Notice Rule, were it not tied up with the concerted open public announcement rule, a different question would be presented, on the legality of which I need not pass. Cf. Board of Trade Case, supra.

The attempt to prevent all repricing was abandoned after the first few months of the Institute. At that time, a code interpretation was adopted, allowing repricing but only as to sugar sold or "delivered" on the day of the decline. Thereby an undue restraint was placed on repricing of the sugar sold or delivered before that day.

### 3. Statistical Activities.

(a) By the failure to circulate to customers the material which the Institute collected and circulated to the refiners and which was not otherwise obtainable, sellers, now better informed than purchasers, have clearly acquired an advantage inconsistent with that "perfect" competition which defendants profess to foster and which their economic expert described.

The legal question is therefore presented whether or not the anti-trust laws condemn defendants' concerted restriction in the dissemination of such information to their own ranks; in my judgment, they do. In American Column & Lumber Co. v. U. S., 257 U.S. 377, at page 411, 42 S. Ct. 114, 121, 66 L.Ed. 284, 21 A.L.R. 1093 (1921), the court significantly said: "In the presence of this record it is futile to argue that the purpose of the Plan was simply to furnish those engaged in this industry, with widely scattered units, the equivalent of such information as is contained in the newspaper and government publications with respect to the market for commodities sold on Boards of Trade or Stock Exchanges. One distinguishing and sufficient difference is that the published reports go to both seller and buyer, *but*

*these reports go to the seller only."* (Italics mine.)

In U. S. v. American Linseed Oil Co., 262 U.S. 371, 380, 43 S.Ct. 607, 608, 67 L. Ed. 1035 (1923), the second comprehensive trade association case before the Supreme Court, which likewise resulted in a decree for the government, all information collected was "for the exclusive and confidential·use of the subscriber" to the plan. In discussing the illegality of defendants' activities, the court ·said:

"The Sherman Act was intended to secure· equality of opportunity." * * *

"With intimate knowledge of the affairs of other producers * * * the subscribers went forth to deal with widely separated and unorganized customers necessarily ignorant of the true conditions. * * *

"The ordinary practice of reporting statistics to collectors stops far short of the practice which defendants adopted." 262 U.S. 371, at pages 388, 389, 390, 43 S. Ct. 607, 67 L.Ed. 1035.

In the Maple Flooring Case, supra, 268 U.S. 563, at page 581, 45· S.Ct. 578, 69 L. Ed. 1093, the court, in distinguishing the Linseed Oil Case, mentioned, among other things, the confidential nature of the statistics collected. And in sustaining the legality of the Maple Flooring trade association, the opinion emphasizes the wide publicity given to all pertinent statistics, in these words: "The statistics gathered by the defendant association are given wide publicity. They are published in trade journals which are read by from 90 to 95 per cent. of the persons who purchase the products of association members. They are sent to the Department of Commerce, which publishes a monthly survey of current business. They are forwarded to the Federal Reserve and other banks and are available to any one at any time desiring to use them." 268 U.S. 563, at pages 573, 574, 45 S.Ct. 578, 581, 69 L.Ed. 1093.

In considering the economic and legal justification for the Association's practices, the court said: "It is the consensus of opinion of ̦economists and of many of the most important agencies of government that the public interest is served by the gathering and dissemination, *in the widest possible manner,* of information with respect to the production and distribution, cost and prices in actual sales, of market commodities because the making available of such information tends to stabilize trade

and industry, to produce fairer price levels and to avoid the waste which inevitably attends the unintelligent conduct of economic enterprise. *'Free competition' means a free and open market among both buyers and sellers* for the sale and distribution of commodities." 268 U.S. 563, at pages 582, 583, 45 S.Ct. 578, 585, 69 L.Ed. 1093. (Italics mine.)

The court concluded (268 U.S. 563, at page 585, 45 S.Ct. 578, 585, 69 L.Ed. 1093) . that the defendants had done no more than "if like statistics were published in a trade journal or were published by the Department of Commerce, *to which all the gathered statistics are made available."* (Italics mine.) And finally, in stating the exact limits of the decision, the opinion says: "We decide only that trade associations or combinations of. persons or corporations ·which *openly and fairly* gather and disseminate information [as to certain specified matters] * * * do not thereby engage in unlawful restraint of commerce." 268 U.S. 563, at page 586, 45 S. Ct. 578, 586, 69 L.Ed: 1093. (Italics mine.)

. It is thus abundantly clear that just as the secrecy in respect to statistics was an element of illegality in the Column & Lumber Co. and Linseed Oil Cases, so the publicity given thereto tended to negative illegality in the Maple Flooring Case.

Defendants urge the Cement Manufacturers' Ass'n Case, supra, decided at the same time and with the same result as the Maple Flooring Case, in support of their failure to disseminate the statistics to the trade. They point to no specific language in the Supreme Court opinion; they cite, however, that of the lower court as indicating that the statistics there collected were in fact kept confidential. 294 F. 390, 398, 399 (D.C.S.D.N.Y.,1923). The District Court did discuss evidence of an effort to conceal from the trade information of production and shipments; but, there was likewise evidence that the trade was not interested therein, and that if it had been, the manufacturers would have revealed it. (Supreme Court Record in that case, vol. 1, p. 338). In any event, the government, if it· had ever pressed the point, evidently abandoned it on appeal; its brief in the Supreme Court contains no reference to such secrecy. Its discussion of statistics other than those as to prices, related to the contention that data as to production and shipment were collected for use in regulating production and prices. See Government brief in that case, pp. 80–

93, 213. The Supreme Court, in determining the legality of the statistical activities, addressed itself solely to this contention. In the closing paragraphs of the opinion, it is said:

" * * * this record wholly fails to establish, either directly or by inference, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred, and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action.

"For reasons stated in Maple Flooring Association v. United States, supra, such activities are not in themselves unlawful restraints upon commerce and are not prohibited by the Sherman Act." (Italics mine.) 268 U.S. 588, at page 606, 45 S.Ct. 586, 592, 69 L.Ed. 1104.

The court, in deciding the Cement Case on the basis of "reasons stated" in the Maple Flooring Case, could not have meant to hold as legal the omission of those acts, the doing of which were deemed a justification for the Maple Flooring activities; it evidently intended only to reaffirm the principles there developed. Of defendants' discussion of the Cement Case, I may say with Judge Learned Hand that "the practice of searching records and extracting as a part of the decision what the court did not mean to hold, may be useful as an academic exercise, but it is otherwise idle." The San Simeon, 63 F.(2d) 798, 802 (C.C. A. 2d, 1933).

I conclude that pursuant to the Supreme Court decisions respecting the duty of trade associations under the anti-trust laws, defendants' failure to make more complete disclosures to the trade of statistics collected and circulated within their own ranks, is in itself an unreasonable restraint of trade.

 (b) Plaintiff complains of the failure of the defendants to collect and circulate statistics as to raw sugar prices, raw stocks, and demand for refined sugar. Statistics as to the last of these matters would clearly be helpful to customers. Statistics as to the first two would be of little if any value. The perfect competition contemplated by economists might have been more nearly realized if defend-

ants had gathered and published all of this material, but in the circumstances of this case, their failure to go so far can not be deemed an unreasonable restraint of trade. The position of refiners and their customers before and after the Institute has been unchanged. In failing to collect and disseminate to the trade information thereon through the Institute or otherwise, the refiners neither sought nor obtained any unfair advantage over their customers.

4. Concerted Dealing with Brokers and Warehousemen.

Defendants' argument with respect to concerted activities affecting brokers and warehousemen may be summarized thus: (a) Because reasonably necessary both to make the principles of the code effective and to prevent frauds upon the refiners, concerted action through what is commonly described as a boycott is legal; (b) the special relations between refiners and brokers or warehousemen are an additional justification of their conduct.

 (a) It is unnecessary to discuss at length primary as distinguished from secondary boycott [cf. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 466, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196 (1921)], because a concerted refusal to deal with an individual (and the allegedly illegal conduct here amounts to little more) may be legal if proper justification therefor be proven by the boycotter. U. S. v. American Livestock Comm., 279 U.S. 435, 437, 49 S.Ct. 425, 73 L.Ed. 787 (1929). Refusal to deal has been upheld as legal when cooperation with the boycotted party would involve commission of an ultra vires act. U. S. v. American Livestock Comm., supra, 279 U.S. 435, at pages 437, 438, 49 S.Ct. 425, 73 L.Ed. 787. The Supreme Court has sustained the limitation in an injunction decree against a combination of meat packers, etc., that the defendants were not restrained "from establishing and maintaining rules for the giving of credit to dealers where such rules in good faith are calculated solely to protect the defendants against dishonest or irresponsible dealers." Swift & Co. v. U. S., 196 U.S. 375, 394 footnote, 25 S.Ct. 276, 278, 49 L. Ed. 518 (1905) ; see, too, the Cement Mfrs' Protective Ass'n Case, supra, 268 U.S. 588, at page 604, 45 S.Ct. 586, 69 L.Ed. 1104. But these cases go no further than to establish a general principle that there may be legal justification for concerted refusal to deal, dependent on the facts in any case.

900

■ The drastic character of the means here adopted to eliminate actual and supposed evils and possibilities of evils in a business requiring the use of brokers and warehousemen has been sufficiently developed in the discussion of the facts. The resulting hardship to a substantial number of persons and the prevention of the possibilities of a lower price to the ultimate consumers through vertical organization of distribution agencies, have likewise been described.

Defendants seek to justify their dealings by showing that they were necessary and reasonable to prevent (1) secret concessions, (2) discrimination, and (3) fraud.

(1) As the foregoing discussion of the facts indicates, secret concessions might have been prevented without compelling a choice of but one of the several distribution activities. This may well have been the surest and easiest method of preventing refiners from practicing the type of secret concessions made possible by combination of functions. But as other methods not involving material damage to innocent third persons were readily available, defendants' purpose to end secret concessions is no justification for the action taken.

■ (2) Another avowed and important aim in prohibiting the combination of functions was to prevent what defendants call the improper discrimination that would result therefrom. But they fail to demonstrate that combination of the several functions in one concern, due to better financial condition or greater business acumen and/or efficiency is unfair, uneconomic, or inconsistent with sound competition because it may give a greater opportunity to reduce charges or prices below those of a competitor. While this might perhaps ultimately lead to the elimination of those who cannot or will not effectuate a like combination, the development of a system in which combination of functions is the rule, may, on the other hand, well bring about a more economical and efficient distribution of sugar and therefore be desirable.

Defendants' real reason, as already indicated, for opposing the combination of functions is that it tends to prevent uniformity of price structure.

Defendants' argument is fully answered in a series of decisions involving analogous situations. Thus a concerted refusal by jobbers to deal with manufacturers who also sell directly to retailers has been held illegal under the anti-trust laws. Eastern States Retail Lumber Dealers' Association v. U. S., 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788 (1914); Wholesale Grocers' Ass'n v. Fed. Trade Comm., 277 F. 657 (C.C.A. 5th, 1922); U. S. v. Southern Cal. Wholesale Grocers' Ass'n, 7 F.(2d) 944 (D.C.S.D.Cal.,1925). So, too, a combination of manufacturers, jobbers and retailers to boycott agencies in their industry that unite a wholesale and retail business. National Harness Mfrs' Ass'n v. Fed. Trade Comm., 268 F. 705 (C.C.A. 6th, 1920). In the leading case of Eastern States Retail Lumber Dealers' Association v. U. S., supra, 234 U.S. 600, at page 613, 34 S.Ct. 951, 954, 58 L.Ed. 1490, L.R.A.1915A, 788, the court said: "The argument that the course pursued is necessary to the protection of the retail trade and promotive of the public welfare in providing retail facilities is answered by the fact that Congress, with the right to control the field of interstate commerce, has so legislated as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted."

Defendants seek to distinguish these cases on the ground that they involve condemnation of concerted refusal to deal where its justification is merely "to increase the business advantage of the group or association engaged in the boycott." But the preservation of uniformity in price structure is precisely that; defendants' practice lessens the possibility of developing more economical distribution.

If defendants had demonstrated, as they have not, that in the long run it would be economically wise and conducive to fairer competition, to create or maintain a distribution set-up composed of brokers, warehousemen, and merchandisers, each independent of the other, a different situation would be presented; then the "freezing" of a particular set-up might be legally justifiable. Cf. Chamber of Commerce v. Fed. Trade Comm., 13 F.(2d) 673 (C.C.A. 8, 1926). But in the present situation, I deem the cited cases controlling in rejecting defendants'. argument that their concerted refusal to permit the unifying of the activities is justified by the desire to eliminate "discrimination."

■ (3) While it clearly appears that some brokers and warehousemen had been guilty of frauds and unfair dealings and

that the combination of distribution functions did and would facilitate such wrongful practices, it is likewise clear that other brokers and warehousemen in substantial numbers, combining the several functions, were entirely honest and zealously guarded the refiners' interest. Only clearly proven necessity could justify action which bore so heavily as did defendants' on entirely innocent parties.

Defendants have failed to show that less drastic methods, not so injurious to innocent third persons, would not have afforded them full protection against frauds. No real effort in that direction was ever made. As the discussion of the evidence shows, there is good reason to believe that the fraudulent and unfair practices would have been effectively checked, had the same energy been devoted to discovering and dealing with them as was given to ending the union of functions. The Cement Case presents just such a situation. There, fraud seems to have been effectively dealt with by a trade association without adopting such prohibitive measures.

Defendants' interest in matters other than the legitimate one of eradicating fraudulent and unfair practices largely explains their procedure. In such circumstances, fraudulent conduct of some customers will not justify a concerted refusal to deal. U. S. v. First Nat. Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 (1930). This case cannot be distinguished on the ground urged by defendants that the concerted action there was designed to go much further than merely to eliminate fraud. There, as here, the fact that one of the purposes was legitimate, effectively to protect against fraud, see opinion of court below, 34 F.(2d) 815, 818 (D.C.S.D. N.Y.,1929), could not save the scheme. See, too, Paramount Famous Lasky Corp. v. U. S., 282 U.S. 30, 51 S.Ct. 42, 75 L. Ed. 145 (1930).

(b) I come then to defendants' second major contention on this subject: that "the course of dealing with brokers and warehousemen is legally justified by the special relations in which the refiners stand" to such parties.

The character of these relations has been sufficiently developed in the discussion of the facts. Defendants argue: "In view of these relations it is obvious that both the broker and the warehouseman are integral links in each refiner's conduct of his business. He can not direct his conduct along the lines which he has elected to follow except through control of the conduct of the brokers and warehousemen in his employ. It is submitted that under these circumstances, if the refiner is permitted as a matter of law to follow the conduct outlined in the Code, there can be no lawful objection to his taking such steps as are reasonable to provide that this conduct shall not be interfered with by the acts of his brokers and warehousemen. It is submitted that where there is a legitimate concert to accomplish a particular end there may lawfully be a concerted control of persons standing in the relation which brokers and warehousemen occupy towards the refiners in order to insure their cooperation towards the end in question." Defendants' Law Brief, p. 251.

It is apparent that the argument is not essentially different from the one already advanced. However, defendants cite two District Court cases from which they seek to draw an applicable inference that the legal consequences of concerted regulation of agents differ from those which follow concerted action directed toward other ends. In one of them, United States v. Hamburgh-American S. S. Line, 216 F. 971, at page 974 (D.C.S. D.N.Y.,1914, before Lacombe, Coxe, Ward, and Rogers, Circuit Judges), Judge Lacombe writing the opinion stated: "Much is made in argument of the circumstance that members of the combination employ only agents who will agree to confine their business to selling passage tickets for such members. When the deplorable conditions which existed before this method of business was adopted are considered it would seem that such an arrangement has greatly benefited the traveling public, especially the more ignorant class of many different nationalities which travels in the third class or steerage."

It is therefore clear that on the facts of that case the court was satisfied that the action of the members of the combination was reasonable. Judge Lacombe did add: "Moreover, dealing as it does merely with the control of defendants' agents, who are free to accept or decline such agency, it is analogous to the case which was presented in United States v. Periodical Clearing House, supra, where, upon the question whether or not such control of agents was or was not within the act, this court was divided in opinion and dismissed the bill. No attempt was made to review

that decision on appeal. It is thought, therefore, that complainant has not shown itself entitled to relief on this branch of the case." 216 F. 971, at page 974.

On appeal to the Supreme Court it was held that the intervention of the World War made the case moot. U. S. v. Hamburg-Amerikanische, etc., 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387 (1916).

In the second case U. S. v. Moore, 275 F. 992 (D.C.S.D.N.Y.1920), Judge Mayer considered the sufficiency of an indictment charging that a combination of steamship companies and others had agreed with brokers, who were agents of shippers, that they as such agents would maintain the steamship companies' quoted rates without discrimination among shippers. Judge Mayer expressed approval of this agreement. At the same time he found that the indictment in charging an agreement to pay brokerage only to members of a certain brokerage association failed to show that interstate commerce was thereby affected.

There is no suggestion whatsoever in the present case that defendants in respect to the dealings with their brokers and warehousemen did not substantially affect interstate commerce. Cf. Anderson v. Shipowners' Ass'n, 272 U.S. 359, 364, 47 S.Ct. 125, 71 L.Ed. 298 (1926). The Hamburg-American and Moore Cases, in so far as here applicable, hold merely that concerted regulation of the dealings with brokers, if in fact found reasonable, does not violate the anti-trust laws. If the intimations in the Hamburg-American Case that regulation of agents deserves special treatment under the anti-trust laws were deemed a decision, it would not be controlling in the light of Anderson v. Shipowners' Ass'n, supra. In that case, suit had been brought by a seaman to enjoin under the anti-trust laws associations of shipowners, etc., from concertedly controlling employment on their ships. The bill charged that the associations required every seaman seeking employment to "register, receive a number, and await his turn according to the number, before he can obtain employment, the result of which is that seamen, well qualified and well known, are frequently prevented from obtaining employment at once, when, but for these conditions, they would be able to do so. A certificate is issued to each seaman, which he is obliged to carry and present in order to obtain employment. The certificate, in part, recites that no person will

be employed unless registered; that the certificate must be delivered to the master of the vessel upon articles being signed; that the certificate is the personal record of the seaman and the basis of his future employment. At the same time, two cards are issued—one to the seaman, assigning him to a specified employment, and another to the ship, reciting the capacity in which the seaman is to be employed, with the statement that 'he must not be employed on your ship in any capacity unless he presents an assignment card, grey in color, issued by us and addressed to your vessel, designating the position to which we have assigned him.' The associations fix the wages which shall be paid the seaman. Under the regulations, when a seaman's turn comes, he must take the employment then offered or none, whether it is suited to his qualifications or whether he wishes to engage on the particular vessel or for the particular voyage, and the officers of the vessels are deprived of the right to select their own men or those deemed most suitable. Without a compliance with the foregoing requirements, no seaman can be employed on any of the vessels owned or operated by members of the associations." 272 U.S. 359, at pages 361, 362, 47 S.Ct. 125, 126, 71 L.Ed. 298. The bill further alleged that complainant had lost employment on one occasion because of the associations' rules.

In reversing the lower courts [(C.C.A.) 10 F.(2d) 96], the Supreme Court said: "From these averments, the conclusion results that each of the shipowners and operators, by entering into this combination, has, in respect of the employment of seamen, surrendered himself completely to the control of the associations." 272 U.S. 359, at page 362, 47 S.Ct. 125, 126, 71 L.Ed. 298.

After determining that the conduct of the associations restrained interstate commerce, the court concluded: "Taking the allegations of the bill at their face value, as we must do, in the absence of countervailing facts or explanations, it appears that each shipowner and operator in this widespread combination has surrendered his freedom of action in the matter of employing seamen and agreed to abide by the will of the associations. Such is the fair interpretation of the combination and of the various requirements under it, and this is borne out by the actual experience of the petitioner in his efforts to secure employment. These shipowners and opera-

tors having thus put themselves into a situation of restraint upon their freedom to carry on interstate and foreign commerce according to their own choice and discretion, it follows, as the case now stands, that the combination is in violation of the Anti-Trust Act." 272 U.S. 359, at pages 364, 365, 47 S.Ct. 125, 71 L.Ed. 298.

What is there said in relation to seamen as employees is, in my judgment, equally applicable to agents. The test of the legality of such concerted action is its reasonableness. Therefore defendants' second argument adds nothing to its first.

(c) Two other matters relating to defendants' dealings with brokers and warehousemen remain to be considered.

### (1) Fixing of brokerage fees.

 The agreement in this respect concertedly fixed the brokers' commission for negotiating contracts pertaining to and thereby substantially restrained interstate commerce. The commission is an important element in the cost of sugar. The evidence indicated that there was active competition for brokerage service prior to Institute action regulating brokers' commissions. Fairness in the commission rate does not validate an agreement, otherwise illegal. Trenton Potteries Co. Case, supra; cf. too, Anderson v. Shipowners' Ass'n, supra, 272 U.S. 359, at page 362, 47 S.Ct. 125, 71 L.Ed. 298. In Appalachian Coals Case, the court found (288 U.S. 344, at page 375, 53 S.Ct. 471, 77 L.Ed. 825), that there was no "intent or power to fix prices." Such intent and power with respect to brokerage fees is present here. The legality of the "uniform commission rule" in Chamber of Commerce v. Federal Trade Commission, supra (C.C.A.) 13 F.(2d) 673, at page 691, does not appear to have been in issue.

### (2) Brokers and Warehouse Agreement.

 To the extent that the brokers pledge imposed an obligation to support defendants' actions generally, it is plainly an unreasonable restraint inasmuch as those actions are themselves in large part so. The requirement that brokers refrain from giving rebates is subject to like condemnation, although refiners, independently, might well impose such a restraint on their agents. I reach a similar conclusion with respect to the agreement requiring warehouses to refrain from rebates and concessions to any customers with a penal-ty for its violations. Defendants' professed aim of preventing secret arbitrary discrimination could have been realized by less drastic means.

### 5. Transportation Matters.

(a) Defendants contest plaintiff's claim of illegality as to Code 3 (c) because, as they contend, it was a reasonable means of preventing discrimination.

 The issue, however, is not, as defendants suggest, moot. In their brief, they recognize the desirability of the principle as a solution for refiners' transportation problems. Fact Brief, p. 193. There is substantial danger that they may again attempt to make Code 3(c) or a similar principle effective. In these circumstances, plaintiff is entitled to assurance that Code 3(c) and defendants' activities under it, if found illegal, will not be revived. U. S. v. U. S. Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121 (1920); Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co., 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248 (1916).

 Extensive discussion is unnecessary to demonstrate that Code 3 (c), the code ruling adopted thereunder, and defendants' actions pursuant thereto, constituted an unreasonable restraint of trade. Transportation cost is a very substantial element in the cost of sugar to the consumer. Because the routes available to the several refiners are not the same, the cost of getting their sugars to the trade frequently differs. They sought concertedly, as the discussion of facts has shown, to put into effect an arbitrary uniform freight rate for all deliveries ex-consignment, regardless of actual cost. This was the vital feature of the plan. In thus concertedly fixing a substantial element in the price of sugar without any demonstration or even real consideration of the reasonableness of the charge, I find that defendants acted unreasonably and therefore illegally.

 (b) Defendants, relying entirely upon their contention that they have not been shown to have concertedly instituted and/or maintained the delivered price system, offer no argument to sustain the legality of concerted action in that respect. The charge for transportation service thus fixed and maintained, is even more patently unreasonable than in the case of Code 3 (c); it bears no reasonable relation whatsoever to the actual cost of the service performed for the purchaser.

In U. S. v. American Linseed Oil Co., supra, a combination of manufacturers acting somewhat analagously to the refiners was held illegal even though purchasers were given the option of buying f. o. b. factory. See opinion below, 275 F. 939, 945 (D.C.N.D.Ill., 1921). The defendants in that case maintained a zoning system for determining freight charges, 262 U.S. 371, at page 386, 43 S.Ct. 607, 67 L.Ed. 1035. In the Maple Flooring Ass'n Case, supra, the evidence was undisputed that the defendants quoted and sold f. o. b. mill whenever a purchaser so requested. In that case the court said, 268 U.S. 563, at page 571, 45 S.Ct. 578, 580, 69 L.Ed. 1093: "the mills of most of the members of the association are located in small towns in Michigan and Wisconsin and * * * the average freight rates from these principal producing points in Michigan and Wisconsin, to the principal centers of consumption in the United States, are approximately the same as the freight rate from Cadillac, Michigan, to the same centers of consumption. There is abundant evidence that there were delays in securing quotations of freight rates from the local agents of carriers in towns in which the factories of defendants are located, which seriously interfered with prompt quotations of delivered prices to customers; that the actual aggregate difference between local freight rates for most of the defendants' mills and the rate appearing in defendants' freight-rate book based on rates at Cadillac, Michigan, were so small as to be only nominal, and that the freight-rate book served a useful and legitimate purpose in enabling members to quote promptly a delivered price on their product by adding to their mill price a previously calculated freight rate which approximated closely to the actual date from their own mill towns."

In the Cement Case: "The custom in the cement trade of selling cement at a delivered price, which includes the mill price, the price of bags, and freight charges, was an established trade practice before the organization of the defendant association. As required by the by-laws of the defendant association, it has distributed to its members freight rate books, listing freight rates from established basing points to practically every city and town in the northeast section of the United States. The freight rates contained in the freight rate book are compiled from the official tariffs and translated from the rate per ton of the official tariffs into the rate per barrel of 380 pounds, the unit for the sale of cement. Similar lists of freight rates embracing substantially the same subject-matter were prepared and used by individual manufacturers before the organization of the defendant association. The association freight rate book took the place of previous separate publications by individual manufacturers, with a consequent saving of money and increase of accuracy and a more thorough and continuous checking of rates. The basing points from which freight rates were calculated were not selected by the association, but were the same as those appearing in prior books published by individuals before the publication of the association freight rate book. The basing points are points of actual shipment from which the larger proportion of the cement in a given locality in which cement is manufactured is actually shipped. The rates published are the actual rates omitting fractions of cents between the basing points and actual points of delivery." 268 U.S. 588, at page 597, 45 S. Ct. 586, 589, 69 L.Ed. 1104.

So far as appears from this opinion, there was no evidence that defendants there sought to maintain delivered prices in the face of a threatened breakdown. The facts of these two cases differ manifestly from those of the sugar industry in respect to transportation matters.

The concerted maintenance of artificial freight applications substantially higher than those which customers would otherwise have to pay, is clearly an unreasonable restraint of trade. I express no opinion on the legality of a delivered price basis, if instituted and maintained by each refiner independently. Cf. In the Matter of U. S. Steel Corp., 8 Fed.Trade Comm. 1 (1924).

■ (c) For reasons more fully outlined in discussing the legal consequences of the Institute's open announcement plan and reporting activities, the practice in announcing freight changes must in the circumstances of this case be held illegal. They were used, moreover, in aid of other illegal activities relating to delivered prices and Code 3 (c).

■ The so-called "freight book" was really a digest of selling terms. Unlike the "freight-rate books" in the Cement and Maple Flooring Cases, it filled no real need of the industry. Individual refiners had accurate books of their own upon which they depended. At best, the Institute serv-

ice can be justified, if at all, as a slight "convenience." Against such justification must be weighed the proven danger of the freight book as revealed in the practice of using it to further other illegal activities. As the four-payment plan incident shows (see pp. 872, 873 of this opinion), it offered an opportunity subtly and in ostensibly innocuous fashion to achieve ends which the Institute's own counsel had frowned upon. In my judgment, it is so closely related to the other illegal activities that it must fall with them.

 (d) As already indicated, defendants' concerted activities in obtaining changes in railroad transit tariffs were not improper. But in so far as defendants' other activities relative to transiting and diversion were designed to preserve the artificial freight structure, they are illegal.

 The legal consequences of the regulation of trucking has been sufficiently indicated in the discussion of the boycott of brokers and warehouses. Defendants' actions with respect to pool cars and cargoes and switching are analagous to those described in sections VIII and IX, the legality of which are presently considered.

 The "rumors" of rebating upon which defendants predicated their action with respect to water carriers, do not justify the coercive concerted tactics which defendants employed. The water carriers were under no duty publicly to announce their rates in advance and defendants have not shown that the pre-Institute practices of the water carriers were subversive of sound competition.

 6. The absence of justification for defendants' activities described in sections VIII and IX has been indicated therein. The practices there considered, which defendants sought concertedly to prohibit and limit, are not in themselves unfair or subversive of sound competition.[30] If defendants had shown, as they have not, that

the various practices were in themselves "destructive" (Appalachian Coals Case, supra, 288 U.S. 344, at pages 362, 363, 53 S.Ct. 471, 77 L.Ed. 825), a different question would be presented (Id., 288 U.S. 344, at pages 373, 374, 53 S.Ct. 471, 77 L. Ed. 825).

Prior to the Institute, some of them were used as a means of granting secret, unfair, and perhaps illegal concessions. For the alleged purpose of averting these wrongdoings or preventing discrimination, defendants have gone much further than necessary, in prohibiting numerous trade practices clearly beneficial not only to the customers but to the refiners, such as long-term, tolling, and used bag contracts, and quantity and other special discounts on sales of the kind that effect economies for the refiner. Similarly, under the guise of preventing waste, they have drastically cut out consignment points clearly beneficial to substantial elements in the trade, and with the asserted object of developing better business practices, they have imposed substantial but unnecessary restraint upon the credit terms. In nearly all of the matters considered in sections VIII and IX of this opinion, not only were their actions far more drastic than they were willing to admit, but their professed and their real aims were widely different. Code 3 (g) condemns "special services to customers without appropriate charges therefor." Although, as the discussion of the facts shows, the additional cost of consignment service could be and at times was recouped by the refiner in his charge for transportation, defendants agreed that a specific service charge should be made on all l. c. l. deliveries ex-consignment. This code provision was the basis for the requirement of a separate charge for each element in the cost of the sugar, even though that element might have been included in some other charge; it furnished an excuse for an additional charge, regardless of whether it was reasonably justified.

---

[30] Able commentators in discussing a list of strikingly parallel trade practices have described them as:

"Acts which not only are not unfair but under ordinary conditions are not even objectionable except as all competition is objectionable to a competitor. In other words, making due allowance for special business conditions that might convert a normally fair practice into an unfair one if all the circumstances could be known * * * [these] practices * * * mere-

ly mean direct or indirect price competition. * * *

"The only way in which these aggressive and uncomfortable methods of competition can be shown to be unfair is by establishing that their perpetrators, either in ignorance of their costs or with reckless disregard of consequences, are headed for bankruptcy and are contributing to unhealthy conditions in the industry." See Isaacs and Taeusch, The NIRA in The Book And In Business, 47 Harv.L.Rev. 458, 473, 475 (1934).

In so far as defendants, without offering any substantial factual basis for their contentions, seek to justify their activities by attempting to show that the practices which they have restrained are in the long run economically unwise, they but argue against the wisdom of the competitive system.

Further discussion seems unnecessary in view of the full consideration of the evidence relating to these matters in the earlier part of this opinion. As to consignment points, service charge on l. c. l. deliveries, long-term contracts and contract enforcement, tolling, quantity and other special discounts, credit terms, the guaranty, containers, used bag allowances, private brands, secondhand and damaged sugar, and frozen stocks, I find that defendants have concertedly imposed substantial restraints upon competition, unreasonably because without sufficient justification therefor. I reach a similar conclusion with respect to the activities concerning pool cars and cargoes and switching described in section VII.

## Findings and Decree.

The government seeks the dissolution of the Institute as well as a decree enjoining all defendants from further engaging in all the alleged illegal activities of the conspiracy. Defendants, on the other hand, have presented their case with a view to obtaining complete vindication for all their activities. As the foregoing discussion indicates, each side must fail in part.

The problems confronting the refiners have been found to be in many instances neither fancied nor slight; but the record has revealed a striking absence of effort on defendants' part to approach their solution in a truly disinterested and constructive spirit; too often, they have disregarded the true facts and the interests of the distributors and consumers. They have contended that their guiding motive has been the elimination of secret discrimination, fraud, and waste; in most of their activities, however, they have been found to have gone much further than was necessary to accomplish these ends. It is clear that their dominant aim was to preserve uniformity in price structure and to maintain relatively high prices, to relieve themselves of burdensome competitive devices, and to make absolutely certain that, regardless of the injury to the public, no secret conces-sions should be given. It is, however, clear that conditions in the industry prior to the Institute were in a number of respects subversive of sound and fair competition; further, that divorced from its illegalities, the Institute offers certain opportunities for effecting desirable results entirely consistent, in my judgment, with the kind of competition required under the anti-trust laws.

All points presented by counsel have been considered, and I have endeavored to state my conclusions as to each subject matter. While, as hereinabove indicated, most of the relief demanded by the government must be granted, dissolution of the Institute, however, need not be decreed. Certain provisions of the Code of Ethics have not been specifically complained of in the petition and have been mentioned only incidentally in the course of the trial; as to these, I have refrained from expressing any opinion.

Some months ago, a conference was had with counsel respecting the effect on this case of the recent A. A. A. (48 Stat. 31) and N. R. A. (48 Stat. 195) legislation and of any code that may be approved pursuant thereto. It was agreed, except by counsel for the Spreckels interests, that at any rate until such a code shall have been formulated and approved, this case had not become moot. In the circumstances, it has seemed best fully to consider and to decide the case as submitted; if and when a code shall have been approved for this industry, the injunction decree may be modified or suspended to the extent, if any, thereby made necessary.

The motions heretofore made and several times renewed on behalf of defendant Spreckels Sugar Corporation and certain of its present and former officers, to dismiss as to them on the ground that they had ceased all active connection with the Institute before this suit was filed and that by reason of the Spreckels Company's insolvency, receivership, and cessation of all business, no danger of the resumption of their wrongful activities was threatened, must be denied as to Spreckels Sugar Corporation and Rudolph Spreckels. The former has not yet been dissolved and may in some way be reorganized; the latter, ever a dominant figure in the Institute, an important one in the industry and still the principal figure in the company, was conceded by his counsel

as late as last October as "most interested in obtaining a reorganization of this Company if he could, and is still talking about it and still hoping that something will come of it."

In these circumstances, I cannot say that the danger of renewal of their former illegal activities has passed.

As to defendants Harper and Stone, a different situation is presented. They have long since, though after suit was filed, joined a newly established sugar brokerage firm and since then have apparently had no other active connection with the industry. Brokers had not been made defendants in this proceeding. Assuming that the petition would have been sustained as against brokers jointly with the members of the Institute, I cannot deem this alone a sufficient reason now to retain them in the case and thus to make them alone of the many brokers defendants therein. Regardless of the situation when suit was filed, there seems now to be no impending threat by Harper or, with some little doubt, by Stone, of a renewal of the wrongs with which, in a capacity other than that of brokers, they were originally charged. As to these two defendants, the petition will be dismissed without prejudice.

A decree together with findings of fact, pursuant to the views hereinabove expressed, may be submitted.

### Final Decree.

### Oct. 9, 1934.

This cause having come on for final hearing upon the petition, filed March 30, 1931, as amended, and upon the several answers thereto, and the issues thereby presented having been duly tried before the undersigned, Julian W. MACK, United States Circuit Judge, and having been argued, and the court having duly rendered and filed its opinion herein, and having this day duly made and entered special findings of fact and conclusions of law in accordance with Equity Rule 70 1/2 [28 U.S.C.A. following section 723], now, upon consideration thereof, and upon motion of plaintiff, by the United States Attorney. for the Southern District of New York, and by Harold M. Stephens, Assistant Attorney General, and James Lawrence Fly and Walter L. Rice, Special Assistants to the Attorney General, for relief in accordance with the prayer of the petition, and defendants Spreckels Sugar Corporation, Rudolph Spreckels, W. W. Harper, and Edgar H. Stone, having appeared by their attorneys, Messrs. Cadwalader, Wickersham & Taft, and all the other defendants having appeared by their attorneys, Messrs. Sullivan & Cromwell, it is hereby ordered, adjudged, and decreed:

I. That the court has jurisdiction of the subject-matter hereof, and of all parties hereto; that the petition states a cause against defendants under the Act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" (26 Stat. 209), commonly known as the Sherman Anti-Trust Act [15 U.S.C.A. §§ 1–7, 15 note].

II. That all of the defendant corporations, firms, and individuals have engaged in a combination and conspiracy to restrain trade and commerce in sugar among the several states and in the District of Columbia in violation of the said Sherman Anti-Trust Act.

III. That the petition is dismissed as to defendants George M. Rolph and William Henderson (both deceased) in so far as they are individual parties to this action and as to W. W. Harper and Edgar H. Stone.

IV. That as hereinafter used:

1. "Said defendants" shall mean all the defendant corporations, firms, and individuals, except George M. Rolph, William Henderson, W. W. Harper, and Edgar H. Stone.

2. "Representatives" shall mean all the officers, agents, attorneys, servants, and employees of each or any of said defendants and all persons acting under, through, by, or in behalf of each or any of said defendants or claiming so to act.

3. "Program" shall mean any agreement, understanding, or concerted action, including, but without limiting the generality of the foregoing, any rule, policy, or code provision or interpretation, concertedly adopted or maintained.

V. That the said defendants and their representatives are hereby perpetually enjoined, restrained, and prohibited, individually and collectively, in connection with the sale, marketing, shipment, transportation, storage, distribution, or delivery of refined sugar from engaging or attempting to engage directly or indirectly with

one another or with any competitor, through any program, in—

1. Effectuating any general plan to give the same terms, conditions, or freight applications to customers, regardless of the varying circumstances of particular transactions or classes of transactions or regardless of the varying situation of particular refiners, distributors, or customers or classes thereof;

2. Selling only upon or adhering to prices, terms, conditions, or freight applications announced, reported, or relayed in advance of sale or refraining from deviating therefrom;

3. Effectuating any system for or systematically reporting to or among one another or competitors, or to a common agency, information as to current or future prices, terms, conditions, or freight applications, or lists or schedules of the same;

4. Relaying by or through the Sugar Institute, Inc., or any other common agency, information as to current or future prices, terms, conditions, or freight applications, or any list or schedule of the same;

5. Giving any prior notice of any change or contemplated change in prices, terms, conditions, or freight applications, or relaying, reporting, or announcing any such change in advance thereof;

6. Restraining or preventing repricing, or limiting the period during which or the extent to which a sales contract may be repriced or new prices arranged therefor;

7. Effectuating any system of gathering and/or disseminating statistical information regarding melt, sales, deliveries, stocks on hand, stocks on consignment, stocks in transit, volume of sugar moved by differential or other particular routes or types of routes, new business or any other statistical information of a similar character, wherever and to the extent that said information is not made, or is not readily, fully, and fairly available to the purchasing and distributing trade;

8. Requiring, persuading, or requesting third parties to abide by or conform to any program enjoined by this decree;

9. Meeting, suppressing, or restraining prices, terms, conditions, or freight applications of particular refiners or distributors;

10. Requiring or requesting any broker, warehouse, customer, carrier, trucking concern, or any combination thereof, to elect to perform one or more such distribution functions to the exclusion of others or to discontinue or refrain from any distribution function or to dispose of any business or property interest;

11. Obtaining, requesting, exacting, or attempting to exact, pledges or uniform contracts or obligations from any broker as part or in aid of any program enjoined by this decree;

12. Obtaining, requesting, exacting, or attempting to exact, nonrebating agreements from any broker, warehouseman, or trucking concern;

13. Making or circulating lists of warehouses, brokers, carriers, or trucking concerns employed or to be employed by any refiner or competitor, as a part or in aid of any program enjoined by this decree;

14. Refusing, or threatening to refuse, to deal with, any broker, warehouse, customer, trucking concern, carrier, or any combination thereof, as part or in aid of any program enjoined by this decree;

15. Dealing or threatening or purporting to deal exclusively or primarily with any defined group or class of brokers, warehouses, customers, carriers, or trucking concerns, as a part or in aid of any program enjoined by this decree;

16. Subjecting, or threatening to subject, any broker, warehouseman, customer, carrier, trucking concern, or any combination thereof, or any agent of any refiner, to any loss of business or employment, damage, injury, forfeiture, fine, or penalty, as a part or in aid of any program enjoined by this decree;

17. Determining or restricting brokerage commissions or fees;

18. Determining transportation charges or freight applications to be collected from customers, or limiting freight absorptions;

19. Selling only on delivered prices or on any system of delivered prices, including zone prices or refusing to sell f. o. b. refinery;

20. Restricting routes of shipments;

21. Making or disseminating at or through the Sugar Institute, Inc., or any other common agency, any freight book or digest of freight applications or selling

terms, or conditions, or supplying information relating thereto, but the foregoing shall not be construed to prevent said defendants from agreeing to report and relay announcements of prices, terms, conditions, or freight applications in past and closed transactions through the Sugar Institute, Inc., · or a common agency;

22. Preventing, restraining, or refusing to grant the privilege of transiting or diverting shipments, but the foregoing shall not be construed to prevent said defendants from freely discussing and advising one another as to the most effective means for taking steps individually to prevent fraudulent use of transiting and diversion privileges;

23. Requiring, inducing, or requesting water carriers to announce rates or terms openly in advance or to agree not to deviate from such announced rates or terms or to agree not to carry or to refuse to carry sugar except upon such openly announced rates or terms;

24. Preventing, restraining, or refusing to enter into private charters;

25. Preventing, restraining, or refusing to participate with customers in pool-car or pool-cargo shipments;

26. Determining switching charges or restricting the absorption thereof;

27. Imposing service or extra charges;

28. Eliminating, reducing, limiting, or restricting consignment points, reconsignment points, or storage at ports of entry or other points;

29. Imposing a service charge on less than carload deliveries, or on any deliveries from consignment;

30. Preventing, restraining, or refusing to enter into long-term contracts, or refusing to arrange for deliveries over periods in excess of thirty days;

31. Submitting contracts or information to the Sugar Institute or any other agency before entering into any contract or sale;

32. Determining whether or to what extent to relax or change contract terms, or using statistics of unspecified or undelivered contract balances as a part or in aid of such conduct;

33. Preventing, restraining, or refusing to grant quantity or other discounts where such discounts reflect, effect, or result in economies to refiners either in direct or indirect costs;

34. Preventing, restraining, or refusing to enter into tolling arrangements for customers;

35. Preventing, restraining, or refusing to enter into tolling arrangements for others than customers as a part or in aid of any program enjoined by this decree;

36. Preventing, restraining, or refusing to grant the four-payment plan or split billing;

37. Fixing, restraining, or refusing to grant cash discounts, or restricting the periods for which cash discounts are granted;

38. Preventing, restraining, or refusing to grant price guaranties;

39. Preventing, restraining, or refusing to make allowances on containers, used bags, or customers' bags or containers, or discouraging experiments with or preventing or restraining the use of new types of containers;

40. Preventing, restraining, or refusing to arrange the packing or selling of private brands;

41. Preventing, restraining, or refusing to make resales of sugar or sales of secondhand sugar, but the foregoing shall not be construed to prevent said defendants from agreeing to invoice resales to the original buyers;

42. Preventing, restraining, or refusing to make sales of damaged sugar or frozen stocks;

43. Requesting, obtaining, exacting, or attempting to exact any promise or agreement from any merchant or distributor to maintain any price;

44. Requiring buyers to elect between the guaranty and nonguaranty form of contract at the time of entering the contract or at any other time before delivery or refusing to grant buyers the privilege of changing from one destination to another by resale or otherwise;

45. Engaging in any policing activities or investigating or maintaining any system of investigation, or examining files, records, or stocks, or holding any trials, to ascertain or prevent violations of or departure from any program enjoined by this decree;

VI. That said defendants and their representatives, individually and collectively, are hereby directed forthwith to cancel such part of all outstanding pledges and agreements with brokers, warehousemen,

carriers, and trucking concerns and agreements with parties for whom sugar has been or is being tolled, as obligates such brokers, warehousemen, carriers, trucking concerns, or parties to support or adhere to any program enjoined by this decree;

VII. That jurisdiction of this cause is hereby retained for the purpose of enforcing, enlarging, or modifying the terms of this decree and to enable any party hereto to apply to the court for such other orders, directions, and decrees as may be necessary and proper for the aforesaid purpose;

VIII. Any program enjoined by this decree is enjoined without prejudice to applications by any party hereto for such modification of this decree as may be necessary and proper to permit adopting, maintaining, and effectuating such program in so far as such program may be permissible under and pursuant to the act of Congress of June 16, 1933, 48 Stat. 195, known as the National Industrial Recovery Act and/or the act of Congress of May 12, 1933, 48 Stat. 31, known as the Emergency Farm Relief Act [Agricultural Adjustment Act], and/or any other present or future statutes of the United States;

IX. That the plaintiff have and recover from the defendants all costs of this suit, except the amounts allowed to the special master pursuant to agreement of the parties to share therein in equal parts.

### APPENDIX TO OPINION.

### Code of Ethics of the Sugar Institute, Inc.

Among the purposes for which this Institute was formed were the following: To promote a high standard of business ethics in the industry; to eliminate trade abuses; to promote uniformity and certainty in business customs and practices; and to promote the service of the industry to the Public.

Accordingly, the organization of this Institute was a frank recognition, in and of itself, that customs and practices had grown up in the industry which were unsound and unbusinesslike, and which were harmful to producers and consumers alike. These customs and practices had resulted in confusion in the trade and discrimination as between purchasers, with a consequent uneven and uneconomic distribution of sugar to the public. The more important result to the industry was a demoralization and restriction of the re-

tail trade in sugar and a retardation of the normal increase of consumption.

Believing that the trade will welcome a rectification of those business methods of the industry which have served to promote discrimination between purchasers; and believing that the public will be better served if the present channels of distribution are preserved and enlarged by maintaining equality of business opportunity among merchants of sugar; and believing that the members of the industry will recognize that it is in the interest of the industry to encourage and promote the wider distribution of its product to the end of increasing its consumption;

The Institute declares its policy to be founded upon, and recommends to its members the adoption of business methods in accordance with, the following principles, to wit:

1. All discriminations between customers should be abolished. To that end, sugar should be sold only upon open prices and terms publicly announced.

2. The business of the sugar refining industry is that of refining a raw product, the price of which to the industry is the controlling factor in the price which the industry receives for its own refined product; and the industry as a purchaser of raw sugar receives no concessions for quantity purchased. Concessions made by the industry for the quantity of refined sugar purchased have resulted in discrimination between customers, which discrimination the Institute believes it to be in the interest of the industry, of the trade and of the public to avoid. The Institute accordingly condemns as discriminatory, and in so far as this industry is concerned, as unbusinesslike, uneconomic and unsound, concessions made to purchasers on the basis of quantity purchased.

3. The following trade practices if not uniformly employed with all customers of a refiner are discriminatory. Furthermore, if not secretly employed they will of necessity be generally demanded, with the result that they must then be uniformly employed or abandoned. If uniformly employed they amount to a general price concession which should frankly take the form of a price reduction. The Institute condemns them as unethical except when practiced openly; as discriminatory unless uniformly employed; and in any event as wasteful and unbusinesslike.

(a) Variations from the open and publicly announced prices and terms, including (but without limiting the generality of this clause) the following:

Special allowances by way of discounts, brokerage, storage or advertising; variations from openly announced grade or package differentials; reduction or substitution of grades or packings; delayed billings; full discounts in cases of delayed payment; and rebates or other allowances by any name or of any nature.

(b) Split billings, except on cars moving on an 80,000 lb. minimum and rate.

(c) The use of differential rates on consignments, or otherwise than on direct shipments over differential routes at customers' request.

(d) Payment of brokerage where any part thereof inures to the benefit of the purchaser.

(e) *Storage of sugar in warehouses in which customers or brokers are interested, or with which they are in any way affiliated.

(f) Allotments to brokers running beyond the close of business of the day on which an advance in price is announced by the refiner.

(g) Special services to customers without appropriate charges therefor.

(h) The sale of secondhand sugar by refiners.

(i) Sales for export under contracts which do not provide for shipment out of the country.

4. The factors which enter into and determine the cost of his product for the refiner are so largely outside his control, and the probable margin of his profit so small, as to render highly speculative and unsound the giving by him of options to purchase his sugar. Furthermore, unless equally available to all customers alike, the giving of options is discriminatory. The Institute condemns the giving of options by refiners.

5. In the interest of a more even distribution to the trade, the Institute recommends that sugar shall be consigned only to recognized detention points for reshipment, or to recognized markets and then in care of railroad or steamship lines or to public † warehouses, and that the control of the sugar shall remain with the refiner.

6. The Institute recommends the use by members of uniform contracts to be adopted by the Institute for Eastern, Southern and Western markets.

NOTE: The Supreme Court modified this decree (pages 908, 910) only by eliminating paragraphs numbered 3, 4, and 5, and changing paragraphs numbered 7 and VIII. See 297 U.S. 553, 56 S.Ct. 624, 615, 80 L.Ed. 859.

---

* Subpar. (e) originally read, "Storage of sugar in customers' warehouses" and was amended to read as printed above by resolution adopted May 2, 1929.

† The words "or brokers," appearing before the word "warehouses," were stricken out by resolution adopted May 2, 1929.